**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Shari Ferreira, et al., | No. CV-15-01845-PHX-JAT |
| Plaintiffs, | **ORDER** |
| v. | |
| Joseph M Arpaio, et al., | |
| Defendants. | |

Pending before the Court is Defendants' Motion for Summary Judgment (Doc. 209). The Court now rules on the motion.

**I.    BACKGROUND**

On July 31, 2017, Defendants filed the pending Motion for Summary Judgment (Doc. 209). Plaintiffs filed a timely Response on September 20, 2017 (Doc. 230). Defendants then filed a Reply on November 2, 2017 (Doc. 236).

Following this Court's Order on Defendants' Motion to Dismiss (Doc. 76), Plaintiffs maintain the following two causes of action: (1) a gross negligence claim against Defendants Penzone[1] and Maricopa County for failure to train, supervise, and

---

[1] On February 10, 2017, Defendants filed a Notice of Substitution (Doc. 148) to substitute Sheriff Paul Penzone for former Sheriff Joseph Arpaio. Plaintiffs did not object to Defendants' Notice of Substitution. Accordingly, further proceedings are in Sheriff Penzone's name instead of former Sheriff Arpaio's name. Furthermore, Plaintiffs never specify in their Response (Doc. 230) whether they maintain claims against Arpaio and Medical Director for Maricopa Correctional Health Services Jeffrey Alvarez in their personal or official capacities. Because Plaintiffs fail to make a distinction and do not allege any specific acts by either individual, the Court construes all claims brought against Arpaio (now Penzone) and Alvarez to be brought against them in their official

hire; and (2) Fourteenth Amendment failure-to-protect and familial-association claims under 42 U.S.C. § 1983 against Defendants Penzone, Alvarez, Maricopa County, Hovanec, Huber, and Hansen.

**A.  Facts**

Plaintiff Shari Ferreira brought this action on behalf of decedent Zachary Daughtry in her capacity as personal representative of the estate (hereafter "Plaintiffs") against Maricopa County and several public employees (collectively "Defendants"). (Doc. 12 at 2). The Court went through the background facts regarding the decedent's injuries in its Order on Defendants' Motion to Dismiss, so the Court will not repeat them all here (*See* Doc. 76 at 2). Facts most relevant to this Order are discussed below and the Court will discuss other relevant facts as necessary:

> Daughtry was initially arrested on December 12, 2013, and booked into the 4th Avenue Jail complex. ([Doc. 12] at 8). Over the following months, Daughtry "had several assignments and transfers" to different facilities, but was ultimately transferred back to the 4th Avenue Jail on July 6, 2014. (*Id*.). Between his initial booking and July 6, Daughtry had been referred to "Psychiatric Services" on several occasions in light of "medical and mental health issues that required ongoing medical and psychological treatment." (*Id*.).
>
> On July 9, 2014, fellow inmate [] Ryan Bates was placed in a cell with Daughtry after Bates was discovered in a restricted area of the 4th Avenue Jail. (Doc. 12 at 9 ¶[¶] 42-43). At approximately 2200 hours, officers were "escorting medical personnel and conducting a general headcount," and passed by Daughtry's cell. (*Id*. at 12 ¶ 67). When the officers passed by, they observed Bates standing over Daughtry, who was unresponsive and visibly bleeding from the head and face. (*Id*.). Daughtry received medical treatment on-site, and was subsequently transported to Banner Good Samaritan Hospital "with life threatening injuries." (*Id*. at 12-13). Daughtry suffered "multiple facial fractures, major head injuries including orbital fractures, nose fractures, a broken jaw, internal injuries, a subdural hematoma to the brain with brain bleed, and severe lacerations to his head and left ear." (*Id*. at 13). On July 20, 2014, Daughtry passed away from his

---

capacities only. (*See, e.g.,* Doc. 12 at 19 (in describing the allegations against Arpaio in the operative complaint, Plaintiffs note that "Arpaio's actions and inactions are actions and inactions on behalf of the County," which seems to indicate that Plaintiffs are referring to Arpaio only in his official capacity)). Finally, no party has moved to update the case caption following the Notice of Substitution, so it will remain unchanged at this time.

injuries. (*Id*. at 15 ¶ 76).

(Doc. 76 at 2).

Having set forth the pertinent factual and procedural background, the Court turns to Defendants' Motion for Summary Judgment.

## II. SUMMARY JUDGEMENT STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations . . . admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id*. 56(c)(1)(A), (B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and the elements of the cause of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id*. at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id*. A material fact is any factual issue that may affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477

U.S. at 248 (1986). The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id*. at 247–48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

At the summary judgment stage, the Court's role is to determine whether there is a genuine issue available for trial. There is no issue for trial unless there is sufficient evidence in favor of the non-moving party for a jury to return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 249-50. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id*. (citations omitted).

### A. Admissibility of Evidence at the Summary Judgment Stage

The Ninth Circuit applies a double standard to the admissibility requirement for evidence at the summary judgment stage. *See* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure § 2738* (3d ed. 1998). With respect to the *movant's* evidence offered in support of a motion for summary judgment, the Ninth Circuit requires that it be admissible both in form and in content. *See Canada v. Blains Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987); *Hamilton v. Keystone Tankship Corp.*, 539 F.2d 684, 686 (9th Cir. 1976). With respect to *non-movant's* evidence offered in opposition to a motion for summary judgment, the Ninth Circuit has stated that the proper inquiry is not the admissibility of the evidence's form, but rather whether the *contents* of the evidence are admissible. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *Celotex Corp.*, 477 U.S. at 324 ("We do not mean that the *nonmoving party* must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." (emphasis added)).

Accordingly, the Ninth Circuit has held that a non-movant's hearsay evidence may

establish a genuine issue of material fact precluding a grant of summary judgment. *See Fraser*, 342 F.3d at 1036-37; *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028-29 (9th Cir. 2001); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). Thus, "[m]aterial in a form not admissible in evidence may be used to *avoid*, but not to *obtain* summary judgment, except where an opponent bearing a burden of proof has failed to satisfy it when challenged after completion of relevant discovery." *Tetra Techs., Inc. v. Harter*, 823 F. Supp. 1116, 1120 (S.D.N.Y. 1993) (emphasis in original). Similarly, evidence containing hearsay statements is admissible only if offered in opposition to the motion. "Because [v]erdicts cannot rest on inadmissible evidence and a grant of summary judgment is a determination on the merits of the case, it follows that the *moving* party's affidavits must be free from hearsay." *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1121 (E.D. Cal. 2006) (internal quotation marks omitted) (emphasis in original).

### 1. Admissibility of Plaintiffs' Exhibits

Here, Defendants argue that they are entitled to summary judgment because Plaintiffs' Response (Doc. 230) "is supported by inadmissible evidence," namely the report of jail operations expert Jeffrey Eiser. (Doc. 236 at 2). Plaintiffs, in part, rely on Expert Eiser's report, which is signed but unsworn, to oppose Defendants' motion on all remaining claims. (*See* Doc. 229-7 at 33). Plaintiffs point out that courts in the Ninth Circuit have routinely held that "to be competent summary judgment evidence, an expert report must be sworn to or otherwise verified, usually by a deposition or affidavit," regardless of whether an expert report is being offered to support or oppose summary judgment. *Reed v. NBTY, Inc.*, No. EDCV 13-0142 JGB (OPx), 2014 WL 12284044, at *4 (C.D. Cal. Nov. 18, 2014). However, "courts have generally held that this problem may be remedied after it is identified." *King Tuna, Inc. v. Anova Food, Inc.*, CV 07-7451 ODW (JWJx), 2009 WL 650732, at *1 (C.D. Cal. Mar. 10, 2009) (citing *Maytag Corp. v. Electrolux Home Prods., Inc.*, 448 F.Supp.2d 1034, 1043 (N.D. Iowa 2006) ("while an unsworn expert report, standing alone, does not constitute admissible evidence that can

be considered at the summary judgment stage of the proceedings, . . . an unsworn expert report may be considered at summary judgment where the opinions therein are otherwise adopted or reaffirmed")).[2]

"Although [Defendants] are correct that [Plaintiffs'] report should have been signed under penalty of perjury, as the party opposing summary judgment, [Plaintiffs'] papers are held to a less exacting standard than those of [the moving party]." *Finmeccanica S.p.A. v. Gen. Motors Corp.*, No. CV 07-07537 SJO (PJWx), 2008 WL 11336141, at *9 (C.D. Cal. Dec. 17, 2008) (citing *Competitive Techs., Inc. v. Fujitsu Ltd.*, 333 F. Supp. 2d 858, 863 (N. D. Cal. 2004) (admitting signed but unsworn expert reports that otherwise met the requirements of Federal Rule of Civil Procedure ("Rule") 56(e), as prescribed by Rule 56(c)(4))). "Further, 'the existence of [the report], although not presently in evidentiary form, should alert the summary judgment court to the availability at the trial of the facts contained in [them].' " *Id.* (quoting *Competitive Techs., Inc.*, 333 F. Supp. 2d. at 864). Defendants raise no questions as to the authenticity of Expert Eiser's report or predicted testimony in this matter.

The Court has carefully reviewed Expert Eiser's report and finds that it meets the requirements of Rule 56(e), namely that it is "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated" therein. Fed. R. Civ. P. 56(c)(4). Expert Eiser's report does state that his opinions therein are based on his "training, education and personal knowledge," and makes clear his intention to testify to his opinions at trial. Under these circumstances, the Court declines to exclude the Eiser report for the purposes of considering Defendants' summary judgment motion. *See Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1261 (9th Cir. 1993) ("when a party opposing summary judgment fails to comply with the formalities of Rule 56, a court may choose to

---

[2] Plaintiffs could remedy the procedural deficiency of the original filing by way of a subsequently filed sworn statement of Expert Eiser affirming the contents of his report. *See Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 2d 1025, 1038-39 (N.D. Cal. 2011).

be somewhat lenient in the exercise of its discretion to deal with the deficiency" (citations omitted)).

## III. GROSS NEGLIGENCE CLAIM

Plaintiffs maintain a state law tort claim against Defendants Penzone and Maricopa County alleging that these Defendants were grossly negligent in hiring, training, and supervising jail personnel. (*See* Doc. 209 at 5 (citing Doc. 12 at 17)).

### A. Legal Standard

"Gross negligence differs from ordinary negligence in quality and not degree." *Walls v. Arizona Dep't of Pub. Safety*, 826 P.2d 1217, 1221 (Ariz. Ct. App. 1991) (citation omitted).[3] It is "action or inaction with reckless indifference to the result or the rights or safety of others." *Williams v. Thude*, 885 P.2d 1096, 1104 (Ariz. Ct. App. 1994). A person acts with reckless indifference if "he or she knows, or a reasonable person in his or her position ought to know: (1) that his action or inaction creates an unreasonable risk of harm; and (2) the risk is so great that it is highly probably that harm will result." *Id*. at 1102.

To bring a gross negligence claim to the jury, "gross negligence need not be established conclusively, although the evidence must be more than slight and may not border on conjecture." *Luchanski v. Congrove*, 971 P.2d 636, 639-40 (Ariz. Ct. App. 1998) (citation omitted). In this case, Plaintiffs' gross negligence claim is premised on Defendants' alleged failure to train their employees. In order to prevail on a negligent training claim, a plaintiff must demonstrate "that a defendant's training or lack thereof was negligent and that such negligent training was the proximate cause of the plaintiff's injuries." *Rodrigues v. Ryan*, CV-16-08272-PCT-DGC (ESW), 2017 WL 2539236, at *5 (D. Ariz. May 16, 2017) (citation omitted).

---

[3] In Arizona, to establish a claim for gross negligence, "a plaintiff must prove four elements: (1) a duty requiring the defendant to conform to a certain standard of care; (2) a breach of the duty of that standard; (3) a causal connection between the defendant's conduct and the resulting injury; and (4) actual damages." *Alegria v. United* States, CV 11-809-TUC-HCE, 2012 WL 12842258, at *4 (D. Ariz. Nov. 20, 2012) (citing *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007)). Here, Defendants' Motion (Doc. 209) only includes argument on the element of causation, so the Court will focus its inquiry there.

## B. Analysis

### 1. Plaintiffs' Claim is Direct, not Derivative

First, Defendants argue that this is a derivative claim against Defendants Penzone and Maricopa County, which fails because "no gross negligence claim remains against the individual officer Defendants." (Doc. 209 at 5). Plaintiffs' gross negligence claim, however, is "direct and not derivative" because the claim stems from allegedly negligent employment practices. *See Quinonez for & on Behalf of Quinonez v. Andersen*, 696 P.2d 1342, 1346 (Ariz. Ct. App. 1984). Further, a principal may be "liable, apart from his derivative liability," for independent negligence. *Torres v. Kennecott Copper Corp.*, 488 P.2d 477, 479 (Ariz. Ct. App. 1971) (citations omitted). "In such a case, a judgment in favor of the [agent] will not ordinarily bar a recovery against the [principal]," so long as the principal is culpable. *Id*. (citing *DeGraff v. Smith*, 157 P.2d 342, 344 (Ariz. 1945) (when a principal has "been guilty of acts on which, independent[] of the acts of the [agent], liability may be predicated," the principal may remain liable even if the agent is dismissed from the lawsuit)). Here, Plaintiffs' are not seeking to recover on their state law gross negligence claim under a theory of *respondeat superior*, but allege that Defendants Penzone and Maricopa County were directly responsible for gross negligence in enacting a policy, practice, or custom that caused Plaintiffs' harm.

Defendants point out that the Arizona Court of Appeals has stated that "[f]or an employer to be held liable for the negligent hiring, retention, or supervision of an employee, a court must first find that the employee committed a tort." *Kuehn v. Stanley*, 91 P.3d 346, 352 (Ariz. Ct. App. 2004) (quoting *Mulhern v. City of Scottsdale*, 799 P.2d 15, 18 (Ariz. Ct. App. 1990)). The court further reasoned where the plaintiffs' negligent supervision theory was based on the negligent act of a single employee, "[i]f the theory of the employee's underlying tort fails, an employer cannot be negligent as a matter of law for hiring or retaining the employee." *See id*. (finding that purchasers of real estate were owed no duty by a mortgagee and the mortgagee's hired appraiser who performed a negligent appraisal; therefore, the purchasers' claim against the mortgagee failed because

it was based solely on the failed, underlying claim against the appraiser).[4] The case before this Court, however, is readily distinguishable from the context of an individual tortfeasor considered in *Kuehn*. The "underlying tort" requirement in *Kuehn* fails to contemplate a scenario in which the coordination of multiple actors, none of whom commits an independently negligent act, can amount to gross negligence.[5]

Furthermore, applying the "underlying tort" theory in this context would contradict widely held principles of agency law. When the coordination of an entire group of employees is the alleged cause of harm to a third party, the principal may logically be held directly liable for negligent supervision of employees who dutifully carry out a bad policy devised by the principal. *See* Restatement (Third) of Agency § 7.05

---

[4] For other examples, *see Hall v. City of Tempe*, No. CIV. 12-2094-PHX-PGR, 2013 WL 4079199, at *3 (D. Ariz. Aug. 13, 2013) (citing *Kuehn*, 91 P.3d at 352 (holding that a negligent training claim against municipal defendants must be dismissed because the claim was based on the alleged use of excessive force of an officer, who the court found did not use excessive force)); *Timeless Glob., LLC v. Olson*, 1 CA-CV 15-0005, 2016 WL 3660238, at *6 (Ariz. Ct. App. July 5, 2016) (holding that a court's decision to dismiss all claims against a defendant-employee barred the plaintiff's claims "against employer where employer's liability was based *solely* on the negligent acts of employee" (emphasis added) (internal quotation marks and brackets omitted)); *Slone v. State*, No. 1 CA-CV 07-0161, 2007 WL 5473086, at *3 (Ariz. Ct. App. Nov. 6, 2007) ("judgment for employee relieves employer of *derivative* liability when derivative claim is *not* based on independent grounds" (emphasis added)).

[5] *See Weatherford v. State*, 316, 54 P.3d 342, 345 (Ariz. Ct. App. 2002), *aff'd in part, rev'd in part on other grounds sub nom Weatherford ex rel. Michael L. v. State*, 81 P.3d 320 (2003) (reasoning that the government-defendant "mistakenly relie[d] upon *Mulhern*" in arguing that a plaintiff's claim against the government was barred for lack of an underlying tort by a government employee because *Mulhern* "fail[s] to shed light on the independent liability" of the government for negligent supervision). Although the court concluded that the individual defendants in that case "failed to follow the policies and procedures in place," the court contemplated a situation in which "the state's independent liability derives from 'the combined acts and omissions of its employees' " who were not negligent in their administration of an otherwise proper policy, but rather dutifully followed a defective policy. *Id.* In other prison contexts, a district court may consider "whether combined acts and omissions [of staff members] created unconstitutional [deprivations]" to hold policymakers liable, even if no one staff member is responsible for the violation of a prisoner's rights. *See Ortega v. Flavetta*, C 12-3426 SBA PR, 2013 WL 2557781, at *5 (N.D. Cal. June 10, 2013); *see also Garcia v. Lamarque*, No. C 09-00235 CW (PR), 2010 WL 1875750, at *1 (N.D. Cal. May 7, 2010) (denying summary judgment on a prisoner's Eighth Amendment claim based on allegations that the "combined acts and omissions" of multiple jail personnel, who were not held independently liable, gave rise to a constitutional violation by California Department of Corrections and Rehabilitation officials for devising and implementing a harmful policy).

(Am. Law. Inst. 2006).[6] The Arizona Supreme Court previously recognized that direct liability of an entity is available when the entity is "alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's officers.' " *City of Phoenix v. Yarnell*, 909 P.2d 377, 384 (Ariz. 1995) (quoting *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)). Additionally, state courts have more recently recognized that when an employer's liability "is based solely on the negligence of his [employee], a judgment in favor of the [employee] is a judgment in favor of the [employer], but '[w]hen the negligence of the [employer] is independent of the negligence of the [employee], the result may be different.' " *Angulo v. City of Phoenix*, No. 1 CA-CV 12-0603, 2013 WL 3828778, at *1 (Ariz. Ct. App. July 16, 2013) (quoting *Torres*, 488 P.2d at 479). Accordingly, this Court will not apply the "underlying tort" theory promulgated in *Kuehn* to bar Plaintiffs' direct gross negligence claim herein.

### 2. Factual Analysis

On the merits, Plaintiffs allege that "jail officers lacked the supervision, training, skill, ability, and control to protect Daughtry from a foreseeable and preventable attack" by housing Daughtry with Bates. (Doc. 230 at 7). In support of this argument, Plaintiffs offer the opinions of Expert Jeffrey Eiser, a jail operations expert. Expert Eiser opines that the "policies, practices, and customs" employed by Defendants demonstrate deliberate indifference to Daughtry's well-being by housing "seriously mentally ill" prisoners together in the Disciplinary Segregation Unit. (Doc. 230 at 8 (citing Doc. 229 at ¶ 192)). If, as Expert Eiser opines, inadequate training allowed Defendants to house Daughtry and Bates together when a reasonable jailer would have kept them separate, a reasonable jury could find that the failure to train is both a grossly negligent act and the

---

[6] "A principal who conducts an activity through an agent is subject to liability for harm to a third party caused by the agent's conduct if the harm was caused by the principal's negligence in selecting, training, retaining, supervising, or otherwise controlling the agent." Restatement (Third) of Agency § 7.05(1). While it is not binding authority, Arizona frequently looks to the Restatement (Third) of Agency for guidance. *See, e.g.*, *Hayes v. US Airways Group, Inc.*, No. 1 CA-CV 13-0036, 2013 WL 6507189, at *2 (Ariz. Ct. App. Dec. 10, 2013) ("adopting Restatement (Third) of Agency § 7.07").

proximate cause of Plaintiffs' injuries.

Plaintiffs' Expert Eiser further opines that a "systemic lack of training and direction" regarding cell assignments failed to protect inmates from being placed in unnecessarily dangerous situations. (*Id*. (citing Doc. 229 at ¶ 195)). That is precisely the situation, Plaintiffs argue, that resulted in Daughtry's death when Bates was assigned to his cell without proper regard for the mental health status of each inmate. (*Id*.). Conversely, Defendants contend that jail personnel "received an abundance of training; that the training was proper and adequate; and that they followed their training in assigning and escorting Bates" to Daughtry's cell (Doc. 209 at 7 (citing Doc. 210 at ¶¶ 34, 35, 51-53, 92-107)). While both parties agree that Defendants' Jail Management System ("JMS") notes factors that jail personnel must consider in making cell assignments, including whether an inmate is "seriously mentally ill," the parties disagree as to whether Bates and Daughtry were properly classified and whether officers were trained to recognize symptoms of mental illness that result in violent interactions. (*Compare* Doc. 210 at ¶ 13 *with* Doc. 229 at ¶ 13).

On July 9, 2014, Plaintiffs provide that Bates was sent to the Disciplinary Segregation Unit after he violated facility rules and exhibited abnormal behavior, which Plaintiffs' experts contend should have required a psychiatric evaluation. (*See* Doc. 230 at 4; Doc. 229 at ¶¶ 34, 51 (Bates was "saying something about Junior, where is Junior, and appeared to be in a daze")). Bates was assigned to Daughtry's cell even though Bates had a known history of violence and Daughtry was in the Disciplinary Segregation Unit due to a fight with his previous cellmate. (*See* Doc. 230 at 4 (citing Doc. 229 at ¶ 11); Doc. 229 at ¶ 150). Defendants provide that Defendant Officers' review of JMS showed that neither inmate had to be housed alone, there was no note in JMS requiring that they be separated from each other, and Defendant Officers believed Bates to be malingering rather than demonstrating symptoms of mental instability. (*See* Doc. 209 at 4). Defendant Officers left the inmates alone in a shared cell, consistent with cell assignment policy, and returned approximately 16 to 30 minute later to find Daughtry injured. (*Compare*

Doc. 209 at 5 *with* Doc. 230 at 6).

Plaintiffs provide sufficient evidence that Bates' and Daughtry's respective mental health histories and behavior exhibited on the day of the incident could indicate to a properly trained and fully-informed officer that the pair could not be safely housed together. This creates a genuine dispute of fact as to whether Defendants acted with reckless indifference towards Daughtry's safety and whether the cell assignment caused Plaintiffs' injuries. (*See* Doc. 230 at 4-5). Accordingly, the Court finds that Defendants Penzone and Maricopa County have not shown they are entitled to summary judgment as to the state law claim of gross negligence.

## IV. THE § 1983 CLAIMS

Plaintiffs maintain Fourteenth Amendment failure-to-protect and familial-association claims under 42 U.S.C. § 1983 against Defendants Penzone, Alvarez, Maricopa County, Hovanec, Huber, and Hansen. (*See* Doc. 209 at 2; Doc. 12 at 18-20).[7]

### A. Qualified Immunity

Defendants argue that Defendant Officers Hovanec, Huber, and Hansen (the "Individual Defendants") are entitled to qualified immunity on Plaintiffs' § 1983 claims. (*See* Doc. 209 at 8).

#### 1. Legal Standard

Section 1983 provides a private right of action against individuals acting under color of state law who violate others' constitutional or statutory rights. 42 U.S.C. § 1983. Specifically, a jail officer is liable under § 1983 for Fourteenth Amendment violations if the officer "acted with deliberate indifference to a substantial risk of serious harm." *Byrd v. Maricopa Cnty. Bd. of Supervisors*, 845 F.3d 919, 924 (9th Cir. 2017) (citing *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998)). Qualified immunity, however, shields

---

[7] The failure of a municipality's policymakers may serve as the basis for § 1983 liability. *See Wilson v. Maricopa County*, 463 F. Supp. 2d 987, 990 (D. Ariz. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 388-90 (1989)). There is no dispute that Sheriff Penzone has final policymaking authority under Arizona law with respect to the operation of Maricopa County jails or that Director Alvarez has final policymaking authority under Arizona law with respect to health services of Maricopa County jails. *See id*. at 990-97.

- 12 -

certain government actors from civil liability under § 1983 when applicable. Qualified immunity "is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985) (emphasis in original). Defendants are entitled to qualified immunity if their conduct did not violate a clearly established constitutional right "of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 801 (1982).

The United States Supreme Court has set forth a two-part test—comprised of the "constitutional inquiry" and the "qualified immunity inquiry"—to determine if a defendant is entitled to qualified immunity. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). The "constitutional inquiry" examines whether the alleged facts, as viewed in the light most favorable to the non-moving party, demonstrate that a defendant's conduct violated one of a plaintiff's constitutional rights. *Id*. If the alleged facts show that a right was violated, the Court must then address the "qualified immunity inquiry" to determine whether the right was "clearly established." *Id*. at 201–02. The qualified immunity inquiry includes a further dimension "to grant officers immunity for reasonable mistakes as to the legality of their actions." *Id*. at 206. The qualified immunity inquiry "must be undertaken in [the] light of the specific context of the case, not as a broad general proposition." *Id*. at 201.

### 2. Analysis

Here, Daughtry had a "due process right to be free from violence from other inmates" stemming from the Eighth and Fourteenth Amendments. *Castro v. County of Los Angeles*, 833 F.3d 1060, 1067 (9th Cir. 2016), *cert. denied sub nom. Los Angeles County, Cal. v. Castro*, 137 S. Ct. 831 (2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)) ("the Supreme Court made clear that 'prison officials have a duty to protect prisoners from violence at the hands of other prisoners' "). Defendants argue, however, that the Individual Defendants' conduct was reasonable under the circumstances and thus, they are entitled to qualified immunity for their actions. (Doc. 209 at 9-11).

### i. Defendant Hovanec

The parties agree that Defendant Hovanec made the cell assignment decision to place Bates in a shared cell with Daughtry on the day of the incident, consistent with his role as Tower Officer. (*See* Doc. 209 at 9). Plaintiffs provide no evidence to dispute that Defendant Hovanec followed Defendant Maricopa County's policies and procedures in making the cell assignment decision by reviewing JMS notes to confirm that the inmates were not required to be housed alone and no other JMS notes indicated that housing these particular inmates together would pose a heightened risk of harm. (Doc. 209 at 10; *compare* Doc. 210 at ¶¶ 34-35 *with* Doc. 229 at ¶¶ 34-35). Plaintiffs' Expert Eiser concluded that Defendants' jail-classification and cell assignment system was deficient in that it failed to consider an inmate's mental health status and "information about an inmate's risk was not available to or reviewed by the Tower Officer—the person who made the actual cell [assignment] here." (Doc. 230 at 9-10). This opinion suggests that County practices may have been inadequate to protect Daughtry, but nothing that Defendant Hovanec did in following procedure to make the cell assignment demonstrates that he "acted with deliberate indifference to a substantial risk of serious harm." *Byrd*, 845 F.3d at 924. Accordingly, Defendant Hovanec is entitled to qualified immunity on Plaintiffs' § 1983 claims.

### ii. Defendants Huber and Hansen

The parties also agree that Defendants Huber and Hansen escorted Bates to the shared cell with Daughtry on the day of the incident at Defendant Hovanec's direction. (*See* Doc. 209 at 9; compare Doc. 210 at ¶ 45 with Doc. 229 at ¶ 45). Plaintiffs argue that the escorting officers observed Bates acting "abnormally" and "one other inmate said Bates told detention officers he did not want to go into the cell with Daughtry" when Bates was left at the cell. (Doc. 230 at 11). Even if the escorting officers observed Bates exhibit abnormal behavior and verbally protest the assignment, which is based on hearsay, that is not a sufficient basis to alert a reasonable officer that leaving Bates in a shared cell with Daughtry poses a significant safety risk to Daughtry without additional

information. Plaintiffs' argument that inadequate training and awareness of mental health status resulted in the Individual Defendants "ignoring a substantial, serious risk to Daughtry's safety and health" by placing Bates in the cell similarly falls short of the standard required to deny qualified immunity. (*See* Doc. 230 at 11); *see also Malley v. Briggs*, 475 U.S. 335, 341 (1986) (qualified immunity shields "all but the plainly incompetent or those who knowingly violate the law").

Plaintiffs must demonstrate "that the prison officials were aware of a 'substantial risk of serious harm' to an inmate's health or safety." *Seawright v. Arizona*, CV 11-1304-PHX-JAT, 2013 WL 452885, at *5 (D. Ariz. Feb. 6, 2013) (quoting *Farmer*, 511 U.S. at 837). Here, the Court finds that Defendants Huber and Hansen did not act "with deliberate indifference to a substantial risk of serious harm" in carrying out Defendant Hovanec's cell assignment directive. *Byrd*, 845 F.3d at 924; *see also Carrasquilla v. County of Tulare*, 1:15-CV-00740-BAM, 2016 WL 7474520, at *12 (E.D. Cal. Dec. 27, 2016) (finding that "placement alone" in a cell where an inmate was later attacked by his cellmate was insufficient to establish deliberate indifference on behalf of the escorting officers). Accordingly, Defendants Huber and Hansen are entitled to qualified immunity on Plaintiffs' § 1983 claims.

### B. *Monell* Claim

#### 1. Legal Standard

"[A] municipality can be found liable under § 1983 only where the municipality itself causes the constitutional violation at issue." *Harris*, 489 U.S. at 385 (citing *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)). To establish § 1983 liability for governmental entities under *Monell*, a plaintiff must prove:

> (1) that [the plaintiff] possessed a constitutional right of which [s]he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and, (4) that the policy is the moving force behind the constitutional violation."

*Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011) (internal quotation marks and citation omitted). The alleged constitutional violation may be pursuant to a written

governmental policy or a "longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity." *Gillette v. Delmore*, 979 F.2d 1342, 1346 (9th Cir. 1992) (internal quotation marks and citation omitted).

### 2. Analysis

Here, according to Expert Eiser, there was a "pattern, practice, and custom" employed by Defendants to ignore inmates' mental health status and the resulting need to be protected from potential safety risks in the Disciplinary Segregation Unit. (Doc. 230 at 10-11 (citing Doc. 229 at ¶ 195)). Plaintiffs contend that this practice of punishing, rather than treating mentally ill inmates and "requiring the Tower Officer to make actual cell assignments and reassignments in the Disciplinary Segregation Unit, without review of the background and risk identification information on each inmate, created a substantial and serious risk to Daughtry's safety." (*Id.* at 12).

Expert Eiser opines that JMS notes, both routinely and in this case, ignored pertinent mental health information, which should have factored into cell assignment decisions if available. (*Id.* at 12-13). This argument is supported by Classification Supervisor Rosie Carrillo's March 4, 2014 e-mail that Daughtry was "probably not suitable for [m]aximum security" and that it "appears this inmate has more psychological issues" than disciplinary issues, yet Daughtry was repeatedly assigned to the Disciplinary Segregation Unit as punishment for psychiatric outbursts. (*Id.* at 13 (citing Doc. 229 at ¶¶ 111, 203)). Daughtry's classification to maximum security came from an attempt to jump onto a razor-wire fence in full view of guards, which was classified as an "escape," leading to the punitive classification, as opposed to a mental health evaluation. (*Id.* at 11 (citing Doc. 229 at ¶ 196).

Expert Eiser's opinions coincide with those of Plaintiffs' Expert Pablo Stewart, M.D. Expert Stewart opines that Daughtry belonged "in psychiatric housing" due to his mental illness, but Defendants' practice of sending inmates to the Disciplinary Segregation Unit without proper psychiatry evaluation gave rise to a significant risk of violence. (*Id.* at 14 (citing Doc. 229 at ¶ 206)). Plaintiffs' experts also agree that the risk

- 16 -

posed by housing two mentally ill inmates together was "obvious," thus establishing deliberate indifference. (*See* Doc. 230 at 8, 13); *Farmer*, 511 U.S. at 842 (deliberate indifference may be established "from the very fact that the risk was obvious"). Finally, Plaintiffs argue that the failure to train jail personnel to recognize, catalogue, and consider mental health information and related risk factors in cell assignments led the Individual Defendants to place Bates and Daughtry together, which was the "moving force" behind Daughtry's injuries. *See Dougherty*, 654 F.3d at 900.

Defendants dispute that they failed to properly catalogue and consider mental health information, but the cell assignment process and lack of consideration given to the mental states of Bates and Daughtry on the day of the incident creates a genuine dispute as to this issue. *See supra* part III(B). Further, if such a policy existed, Defendants failed to carry their burden of demonstrating that such a policy did not pose an obvious risk to Daughtry and that policy was not the proximate cause of Plaintiffs' injuries. Accordingly, the Court finds that Defendants are not entitled to summary judgment on Plaintiffs' *Monell* claim. Thus, summary judgment is denied as to Defendants Maricopa County, Penzone in his official capacity, and Alvarez in his official capacity as to this claim.

### C. Familial Association Claim

#### 1. Legal Standard

In the Ninth Circuit, it is well established that "parents have a fundamental liberty interest in maintaining a relationship with their children which is protected by the Fourteenth Amendment." *Doe v. Dickenson*, 615 F. Supp. 2d 1002, 1012 (D. Ariz. 2009) (quoting *Kelson v. City of Springfield*, 767 F.2d 651, 654 (9th Cir. 1985)). Specifically, "a parent has a constitutionally protected liberty interest in the companionship and society of his or her child," and "[t]he state's interference with that liberty interest without due process of law is remediable under section 1983." *Kelson*, 767 F.2d at 655.

#### 2. Analysis

Here, Plaintiffs set out a familial association claim under § 1983 in their Complaint through arguing that "Plaintiffs have been deprived of their constitutional

1 interest in the continued familial companionship and society of their son Daughtry, caused by his untimely death." (Doc. 12 at 21). Defendants argue that Plaintiffs' Fourteenth Amendment familial association claim should fail "[b]ecause there is no underlying constitutional violation[.]" (Doc. 209 at 15). Defendants further correctly identify that Plaintiffs' Response (Doc. 230) fails to ever mention the familial association claim by name. (Doc. 236 at 11).

While it is true that Plaintiffs have not specifically addressed the survival of their familial association claim, Defendants' sole argument on this issue is that the familial association claim fails because there is no underlying constitutional violation by Defendants. (*Id.*; *see also* Doc. 209 at 15). Plaintiffs' familial association claim is premised on Plaintiffs' *Monell* claim and alleged underlying Fourteenth Amendment failure-to-protect violation, which Plaintiffs did address at length. (*See* Doc. 230 at 9-15). The Court found that Plaintiffs' *Monell* claim presents a triable issue for the jury. *See supra* part IV(B)(2). Therefore, it logically stands that Plaintiffs' familial association claim should also survive summary judgment because the premise of Defendants' argument on this issue—that there is no underlying constitutional violation—remains a genuine issue for trial. Accordingly, summary judgment is denied as to Plaintiffs' familial association claim.

## V. PUNITIVE DAMAGE CLAIMS

"Although a municipality may be liable for compensatory damages in § 1983 actions, it is immune from punitive damages under the statute." *Mitchell v. Dupnik*, 75 F.3d 517, 527 (9th Cir. 1996) (citing *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 271 (1981)). Further, "[a] suit against a governmental officer in his official capacity is equivalent to a suit against the governmental entity itself." *Larez v. City of Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991); *see also Mitchell*, 75 F.3d at 527 (holding that a district court's award of punitive damages against government employees in their official capacities "is in reality an assessment against the county, which is immune from such damages"). Defendants are entitled to summary judgment on the § 1983 claim

against the Individual Defendants, which forecloses the possibility of punitive damages in this case.[8]

### VI. CONCLUSION

For the reasons set forth above,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 209) is **GRANTED** in part and **DENIED** in part. Summary Judgment is granted to Defendants Hovanec, Huber, and Hansen, but denied as to all other Defendants. Summary Judgement is granted to Defendants on Plaintiffs' punitive damages claim, but denied as to all remaining claims. The Clerk of the Court shall not enter judgment at this time.

Dated this 22nd day of December, 2017.

*James A. Teilborg*
Senior United States District Judge

---

[8] While the Court construes all claims against Defendants Penzone and Alvarez to be in their official capacities, even if any claims persisted against any defendant in an individual capacity, Plaintiffs failed to put forward any evidence of "evil motive or intent" or "reckless or callous indifference to [Plaintiffs'] federally protected rights" by either individual. *See Smith v. Wade*, 461 U.S. 30, 30 (1983). Further, Plaintiffs only referenced punitive damages in relation to the § 1983 claims; to the extent that there was a claim for punitive damages with respect to Plaintiffs' state law claim, Plaintiffs failed to offer any evidence on that issue and Defendants are entitled to summary judgment on that issue.