1  Joel B. Robbins, Esq. (011065)
2  Anne E. Findling, Esq. (010871)
   Jesse M. Showalter, Esq. (026628)
3  ROBBINS & CURTIN, p.l.l.c.
   301 East Bethany Home Road, Suite B-100
4  Phoenix, Arizona 85012
   Tel: 602-285-0100
5  Fax: 602-265-0267
6  joel@robbinsandcurtin.com
   anne@robbinsandcurtin.com
7  jesse@robbinsandcurtin.com
8
   *Attorneys for Plaintiff*
9

10              **UNITED STATES DISTRICT COURT**

11                   **DISTRICT OF ARIZONA**

12  Shari Ferreira, *et al.*,                    No. 2:15-cv-01845-JAT

13                  Plaintiff,

14      vs.                                       **NOTICE OF FILING
                                                  DECLARATION
15                                                OF JEFFREY EISER**
   Joseph M. Arpaio, *et al.*,
16
17                  Defendants.

18         Pursuant to this Court's Order (Doc. 244), Plaintiff hereby submits the attached

19  Declaration of Jeffrey Eiser.

20         RESPECTFULLY SUBMITTED: January 25, 2018

21                                    **ROBBINS & CURTIN, p.l.l.c.**

22                       By:   /s/ Jesse M. Showalter
                               Joel B. Robbins
23                             Anne E. Findling
24                             Jesse M. Showalter
                               *Attorneys for Plaintiff*
25
26
27
28

*Sidebar (rotated):* **ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

1

**CERTIFICATE OF SERVICE**

2

    I hereby certify that on January 25, 2018, I electronically transmitted the attached

3

document to the Clerk's Office using the CM/ECF system for filing and transmittal of a

4

Notice of Electronic Filing to the following CM/ECF registrants:

5

Daniel P. Struck, Esq.

6

Ashlee B. Hesman, Esq.
Struck Love Bojanowski & Acedo, PLC

7

3100 W. Ray Road, Suite 300

8

Chandler, Arizona 85226
*Attorneys for Defendants*

9

10

Eric W. Schmidt, Esq.
The Schmidt Law Group, PC

11

8902 E. Via Linda, Suite 110-112

12

Scottsdale, Arizona  85258
*Co-Counsel for Plaintiffs*

13

David L. Abney, Esq.

14

Ahwatukee Legal Office, P.C.
Post Office Box 50351

15

Phoenix, Arizona 85076

16

*Co-Counsel for Plaintiffs*

17

Dorothy Clay Sims, Esq.
Law Office of Dorothy Clay Sims

18

1301 NE 14th Street

19

Ocala, Florida 34470
*Co-Counsel for Plaintiffs*

20

21

22

By: /s/ Julie Molera

23

24

25

26

27

28

**ROBBINS & CURTIN, P.L.L.C.**
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ◆ Fax:   (602) 265-0267

1  Joel B. Robbins, Esq. (011065)
2  Anne E. Findling, Esq. (010871)
   Jesse M. Showalter, Esq. (026628)
3  ROBBINS & CURTIN, p.l.l.c.
   301 East Bethany Home Road, Suite B-100
4  Phoenix, Arizona 85012
5  Tel: 602-285-0100
   Fax: 602-265-0267
6  joel@robbinsandcurtin.com
   anne@robbinsandcurtin.com
7  jesse@robbinsandcurtin.com
8
   *Attorneys for Plaintiff*
9

10              **UNITED STATES DISTRICT COURT**

11                  **DISTRICT OF ARIZONA**

12  Shari Ferreira, *et al.*,                    No. 2:15-cv-01845-JAT

13                  Plaintiff,

14      vs.
                                            **DECLARATION OF**
15  Joseph M. Arpaio, *et al.*,            **JEFFREY EISER**

16                  Defendants.

17

18      I, Jeffrey Eiser, declare under penalty of perjury that the following statements are

19  true and correct:

20      1.      I authored reports in this matter dated November 21, 2016 and March 21,

21  2017, attached hereto as Exhibits A and B, respectively.

22      2.      My findings in these reports outline my opinions to a reasonable degree of

23  professional certainty based on my education, training, experience, and review of the

24  materials provided to me as of the date of these reports.

25      3.      If called to testify in this matter, I will testify consistent with my reports.

26      DATED this _23rd_ day of January, 2018.

27                                          _____
                                            Jeffrey Eiser
28

                        Page 1 of 1

*(left margin)* ROBBINS & CURTIN, P.L.L.C.
301 East Bethany Home Road, Suite B-100
Phoenix, Arizona 85012
Telephone: (602) 285-0707 ♦ Fax: (602) 265-0267

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

|  |  |  |
|---|---|---|
| SHARI FERREIRA, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | Case No. 2:15-cv-01845-JAT |
| | ) | |
| JOSEPH M. ARPAIO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## REPORT OF JAIL OPERATIONS EXPERT JEFF EISER

1.    I was retained to provide expert testimony and opinions concerning the incarceration of Zachary Daughtry in the 4th Avenue Jail from December 2, 2013 through July 9, 2014, a detention facility operated by the Maricopa County Sheriff's Office and located in Maricopa County, Arizona. Specifically, I have been asked to provide my professional opinions pertaining to contemporary jail industry standards and practices as they relate to the operational procedures and practices of the 4th Avenue Jail and the duties and responsibilities of the Maricopa County Sheriff's Office, the 4th Avenue Jail and its staff, to take reasonable steps to protect Mr. Daughtry from harm while he was in their custody.

2.    My professional opinions are a function of the unique facts and circumstances in this case and are based on my training, education and 29 years of practical experience and the contemporary corrections industry standards and practices that existed at the time of the incident, specifically: the Performance Based Standards for Adult Local Detention Facilities (4th Edition: June 2004) and Core Jail Standards (1st Edition, 2010) promulgated by the American Correctional Association (ACA). Although not

mandatory, ACA standards are recognized throughout the corrections industry as the principal authority for accepted local jail facility operations.

3.      I have over 29 years of practical work experience in the operation and administration of one of the largest local corrections systems in the United States. I also have extensive experience and expertise in the operation and staffing of small, medium and large jail facilities. I have written extensively on the subject of jail administration as co-author of the Ohio Jail Administrator's Handbook, in conjunction with the Ohio Bureau of Adult Detention and I have personally researched and authored a large part of the curriculum used by the Ohio Peace Officer Training Council to certify corrections officers, supervisors and jail administrators.

4.      Since 2002, I have been an adjunct instructor of criminal justice in the College of Evening and Continuing Education at the University of Cincinnati. I have been retained as a consultant and trainer for small, medium and large jails and have participated as an instructor at national training seminars for the American Jail Association and the National Institute of Corrections – U.S. Department of Justice. I hold a Bachelor of Science Degree in Criminal Justice from the University of Dayton and a Master's Degree in Education from Xavier University (Cincinnati, Ohio). My experience in jail operations, jail administration and jail staff training has made me familiar with the basic standard of care which applies to jails such as the one in Maricopa County, Arizona in 2013-14. My resume/curriculum vitae, fee schedule, list of publications and a list of cases in which I have testified in a deposition and/or trial as a jail operations expert in the last 4 years, are attached hereto.

2

5.      I have testified as a jail operations expert in civil rights and tort litigation since
1994 for defendants and plaintiffs. My expertise is in all areas of jail facility
operations including: staffing, inmate assault (failure to protect), staff use-of-force,
prisoner access to medical and mental health care, in-custody deaths, inmate suicide,
sexual assault by staff/other prisoner, conditions of confinement, inmate supervision,
inmate booking, classification and housing, administrative segregation, strip/body
cavity searches, jail records procedures, jail policies and procedures, and the training
of correctional staff, supervisors and administrators.

6.      The preliminary opinions that I set forth in this report are based on my education,
training, experience and review of the documents listed below:

        a.      Third Amended Complaint filed 12/2/15;

        b.      Plaintiff's 10th Supplemental Disclosure Statement;

        c.      Plaintiff's 12th Supplemental Disclosure Statement;

        d.      Inmate Classification System Assessment and Review by Randy
                Demory dated May 5, 2015;

        e.      Plaintiff's Motion to Enforce Fourth Amended Judgment and for
                Additional Relief;

        f.      Plaintiff's Reply in Support of Their Motion to Enforce Fourth
                Amended Judgment;

        g.      Defendant's Joseph Arpaio, Denny Barney, Steve Chueri, Andrew
                Kunasek, Clent Hickman and Mary Rose Wilcox's Response to
                Plaintiff's Motion to Enforce Fourth Amended Judgment;

        h.      Affidavit of William Edmond dated April 26, 2016;

3

i.  First Quarterly Report of Kathryn A. Burns, M.D. dated June 1,2009 in Graves, et al. v. Arpaio,et al.; United States District Court Case No. CV 77-479-PHX-NVW;

j.  Second Quarterly Report of Kathryn A. Burns, M.D. dated September 4, 2009 in Graves, et al. v. Arpaio, et al., United States District Court Case No. CV 77-479-PHX-NVW;

k.  Third Quarterly Report of Kathryn A. Burns, M.D. dated February 24, 2010 in Graves, et al. v. Arpaio, et al., United States District Court Case No. CV 77-479-PHX-NVW;

l.  Fourth Quarterly Report of Kathryn A. Burns, M.D. dated June 9, 2010 in Graves, et al. v. Arpaio, et al., United States District Court Case No. CV 77-479-PHX-NVW;

m.  Report of Kathryn A. Burns, M.D. dated August 24, 2010 in Graves, et al. v. Arpaio, et al., United States District Court Case No. CV 77-479-PHX-NVW;

n.  Report of Kathryn A. Burns, M.D. dated January 3, 2011in Graves. et al. v. Arpaio, et al., United States District Court Case No. CV 77-479-PHX-NVW;

o.  Addendum to Fifth Report of Kathryn A. Burns, M.D. filed January 3, 2011, dated February 25, 2011 in Graves, et al. v. Arpaio, et al, United States District Court Case No. CV 77-479-PHX-NVW;

4

p.      Sixth Report of Kathryn A. Burns, M.D. dated April 5, 2011 in Graves, et al. v. Arpaio, et al., United States District Court Case No. CV 77-479-PHX-NVW;

q.      Seventh Report of Kathryn A. Burns, M.D. dated August 8, 2011 in Graves, et al. v. Arpaio, et al., United States District Court Case No. CV 77-479-PHX-NVW;

r.      Ninth Report of Kathryn A. Burns, M.D. dated April 30, 2012 in Graves, et al. v. Arpaio, et al., United States District Court Case No. CV 77-479-PHX-NVW;

s.      Tenth Report of Kathryn A. Burns, M.D. dated January 15, 2013 in Graves, et al. v. Arpaio, et al., United States District Court Case No. CV 77-479-PHX-NVW;

t.      Declaration of Eldon Vail dated November 15, 2013 in Graves, et al. v. Arpaio, et al., United States District Court Case No. CV 77-479-PHX-NVW;

u.      Eleventh Report of Kathryn A. Burns, M.D. dated February 12, 2014 in Graves, et al. v. Arpaio, et United States District Court Case No. CV 77-479-PHX-NVW;

v.      Trial Testimony of Kathryn A. Burns, M.D. dated March 5, 2014 in Graves, et al. v. Arpaio, et al., United States District Court Case No. CV 77-479-PHX-NVW;

DAUGHTRY 006784

w.    Trial Testimony of Pablo Stewart, M.D. dated March 6, 2014 in Graves. et al. v. Arpaio. et al.. United States District Court Case No. CV 77-479-PHX-NVW;

x.    Trial Testimony of Eldon Vail dated March 5, 2014 in Graves. et al. v. Arpaio, et al., United States District Court Case No. CV 77-479-PHX-NVW;

y.    Report of Madeleine LaMarre, MN and Robert Cohen, M.D. dated December 2-4, 2015 in Graves. et al. v. Arpaio. et al.. United States District Court Case No. CV 77-479-PHX-NVW;

z.    Declaration of Eldon Vail dated April 1, 2016 in Graves. et al. v. Arpaio, et al., United States District Court Case No. CV 77-479-PHX-NVW;

aa.    Ryan Bates CHS Medical files (MCSO 001522-002623);

bb.    Mesa House Application Form for Zachary Daughtry dated 11/8/12 (004178-004182);

cc.    Rule 11 Competency Evaluation report for Zachary Daughtry by Craig Rypma, Ph.D. dated 2/4/14;

dd.    Maricopa County Sheriff's Office Policy and Procedures:

      1.    DF-1 Inmate Classification (12/16/11)

      2.    DI-2 Admin and Security Segregation (8/24/05)

      3.    DI- 4 Special Management Review Committee (12/29/05)

      4.    DO-1 Intake Process (12/21/12)

      5.    DI-1 Inmate Housing Categories (10/24/11)

6

      6.   DH-6 Inmate Supervision, Security, Walks, Headcounts.

      7.   DQ-2 Medical Isolation and Psychiatric Housing

ee.   CHS Policy and Procedures:

      1.   CHS J-A -08 Communication on Patients' Health Needs

      2.   CHS J-E-05 Mental Health Screening and Evaluation

      3.   CHS J-G-02 Patients with Special Needs

      4.   CHS j-G-02-02 Treatment Planning for Patients with Mental Health Needs

      5.   CHS J-G-04-01 Admission to Acute Mental Health Housing Units

ff.   Banner Health Center records for Zachary Daughtry (000100 – 002259);

gg.   UPC Medical records for Zachary Daughtry (002260 – 002409);

hh.   CHS Medical files on Zachary Daughtry (000862 – 001521);

ii.   MCSO Jail file for Zachary Daughtry (000451- 000545);

jj.   Headcount Roster for 2B for July 6-9, 2014 (MCSO 002730 – 002734);

kk.   Headcount Roster for 2E for July 4-9, 2014 (MCSO 002694 – 002714);

ll.   Photographs taken of cell, Ryan Bates and Zachary Daughtry (00546-00809);

7

mm.  Maricopa County Incident Reports, Supplements, Investigator notes and documents concerning the July 9, 2014 assault on Zachary Daughtry by cellmate Ryan Bates (MCSO 000001 – 0000114) and (MCSO 000153 – MCSO 000234) and (MCSO 000305 – MCSO 000325) and (MCSO 000349 – MCSO 000389;

nn.  OJ Queries on Ryan Bates (MCSO 000115- 116);

oo.  OJ Queries – Log Check 4AVE2B for 7/6-9/14 (MCSO 000117 – 111152);

pp.  MCSO Jail file on Zachary Daughtry (MCSO 000235 – MCSO 000304);

qq.  Disciplinary Action Reports for Ryan Bates (MCSO 000326 – 000343);

rr.  Audio Interview files of :

  1.  Firefighter Smith

  2.  Firefighter Ramsey

  3.  Officer Hansen

  4.  Officer Huber

  5.  Officer Hewitt

  6.  Officer Johnson

  7.  Firefighter Capt. Llona

  8.  Fire Fighter Sanchez

  9.  Firefighter Cramer

  10. Dr. Casano

8

11. Inmates Cooper and Roberts

12. Inmate Farley

13. Inmate Gause

14. Inmate Goodman

15. Inmate Hockaday

16. Inmate Holden

17. Inmate Hunter

18. Inmate Jones

19. Inmate Lauderdale

20. Inmates Mente and Clayborn

21. Inmate Morris

22. Inmate Oakley

23. Inmate Reed

24. Inmate Slaughter

25. Interview of inmates in Pod 2B (Part I)

26. Interview of inmates in Pod 2B (Part II)

27. Interview of PA Cramer

28. Interview of RN Quaid and CHT Daugherty

29. Interview with "Various Inmates in Pod 2B"

30. Interview of Ryan Bates:

ss.   Audio recording of phone call to Britton McGrath and Shari

Ferreira:

9

tt.  MCSO Jail file for Ryan Bates (MCSO 000390 – 000450)(MCSO 002624 – MCSO 002689);

uu.  Ryan Bates Inmate File P934985 (1/7/13) (MCSO 0002768 – 2792);

vv.  Ryan Bates Inmate File T075299 (4/29/14) (MCSO 0002793 – 0002811);

ww.  Ryan Bates Inmate File P075617 (5/26/05) (MCSO 003384 - 003389);

xx.  Ryan Bates Inmate File P08654 (7/4/05) (MCSO 003378 – 003383);

yy.  Ryan Bates Inmate File P096686 (8/10/05) (MCSO 003373 – 003377);

zz.  Ryan Bates Inmate File P130655 (12/9/05) (MCSO 003367 – 003372);

aaa.  Ryan Bates Inmate File P249881 (1/9/07) (MCSO 003360 – 003366);

bbb.  Ryan Bates Inmate File P330004 (8/26/07) (MCSO 003348 – 003353);

ccc.  Ryan Bates Inmate File P330818 (6/13/07) (MCSO 003354 – 003359);

ddd.  Classification File of Ryan Bates (6/1/14 – 3/3/16) (MCSO –2816 – 002842);

eee.  CHS file on Ryan Bates (MCSO 001522 – MCSO 002623);

DAUGHTRY 006789

fff.　MCSO Classification Manual (Revised 8/9/13) (DAUGHTRY 000001 – 000076);

ggg.　Autopsy Report and photographs for Zachary Daughtry dated 3/19/15;

hhh.　Intermountain Heart Center records for Sari Ferreira;

iii.　Mesa Police Department reports on Zachary Daughtry (DAUGHTRY 003057 – 003082);

jjj.　Pinal County Sheriff's Office Jail and medical records for Zachary Daughtry (DAUGHTRY 003083 -003193);

kkk.　Items entitled "Journal Entries" (DAUGHTRY 003194 – 003646);

lll.　Call records of Daughtry (MCSO 0002843);

mmm.　Call records of Ryan Bates (MCSO 0002844 – 0002859);

nnn.　Deposition of Steven Hanson;

ooo.　Deposition of Jeffrey Alvarez, M.D.;

ppp.　Deposition of Christine Ajir;

qqq.　Deposition of Christian Huber;

rrr.　Deposition of Robert Hewitt;

sss.　Deposition of William Hovanec;

ttt.　Deposition of John McMullen;

uuu.　Revised Fourth Amended Judgment (Graves v Sheriff Arpaio, et al. Case No. CV-77-00479) (DAUGHTRY 006773 – 006779);

vvv.　Findings of Fact & Conclusions of Law (Graves v Sheriff Arpaio, et al. Case No. CV-77-00479) (DAUGHTRY 006707 – 006772);

11

      www.  Declaration of Pablo Stewart (<u>Graves v Sheriff Arpaio, et al.</u> Case

            No. CV-77-00479) (DAUGHTRY 006532 – 006706);

      xxx.    Letter from Ryan Bates to "Mom" (DAUGHTRY 005821 -

            005825).

7.    The methodology I have used during my 22 years as a jail operations expert is to review a case by reading and analyzing case materials, determine the facts upon which I will rely and comparing the action(s) of jail and administrative staff to the applicable state and/or contemporary jail industry standards. I then base my professional opinions on this comparison study plus my training, education and experience.

8.    **Overview of facts:**  On 12/2/13, Zachary Daughtry was admitted to the 4th Avenue Jail to begin serving a 30 day sentence for Criminal Trespassing. Mr. Daugherty's <u>Initial Classification Assessment</u> was performed on 12/3/13 at 0756 hours. Mr. Daughtry answered "yes" to the question "Are there any medical or mental health issues that may affect your placement in general population?" and the Counselor performing the screening wrote a comment "spoke to medical already". His final custody evaluation placed him in the classification of "Minimum – General Population" housing with the comment "No Tents". Mr. Daughtry's <u>Initial Classification Assessment</u> form also indicated he was "High risk" of recidivism and referred to a previous incarceration from 10/20/13. Mr. Daughtry's <u>Initial Classification Assessment</u> form dated 10/20/13 indicated that during the previous incarceration he was assigned a "Minimum – Psych" classification and also indicated

DAUGHTRY 006791

he was "High risk" of recidivism.  Mr. Daughtry was then assigned and housed at the Durango Facility in Unit 8-C cell 4.

On 12/5/13, while escorting inmates back from the Power Medical Clinic, Officer Tackett observed Mr. Daughtry attempting to climb up the facility fence "toward the razor wire". Officer Tackett drew his Taser and ordered him "to stop climbing, get down off the fence". Mr. Daughtry stopped climbing and stated very softly "Okay, I'll get down, I'm done." Officer Norris arrived on the scene and pulled Mr. Daughtry from the fence and placed on the ground, where he was handcuffed and then transported to medical by Sgt. Means and Officer Norris. Mr. Daughtry was written up by jail staff and pleading guilty to in-house charges and received 30 days in Disciplinary Segregation with "Full Restrictions". He was then transferred to the 4th Avenue Jail to a holding cell and eventually housed in Unit B-1 cell 29 and his classification was changed to Max – Med (Security-Custody Level).

Mr. Daughtry was transferred "per Dr. Jaffe" on 1/1/14 to the Lower Buckeye Jail Facility Unit P3-B. He was assigned to the Tower Facility when on 1/6/14 he was placed in "Security Segregation" and pending "Psychiatric Isolation" after being observed by other inmates and the housing officer "masturbating out in the open". Mr. Daughtry was then transferred back to Unit P3-A per "Dr. Balaji".

Jail records indicate Mr. Daughtry was again assigned to the Tower Facility on 1/12/14 and a Jail Commander's Notification Form on 1/14/14 he was being held in Security Segregation and Psychiatric Isolation "pending Psychiatric evaluation". On 1/21/14, Mr. Daughtry was written up by jail staff for "refusing to obey direct orders" after he remained in a "meditation style pose on the cell floor" and "look at the floor

13

DAUGHTRY 006792

and/or wall and giggle" as staff was trying to move him to Tower 5 "after he was never moved to Psych by medical staff". He received 10 days of disciplinary segregation for his behavior. A <u>Referral for Psychiatric Services</u> form was completed on Mr. Daughtry on 1/21/14 by "Detention" staff stating "Inmate Daughtry's behavior is of a concern for his safety as when you try to talk to him he stares at the wall or floor and giggles, and acts if you are not there" and "His odd behavior may endanger himself as other inmates will perceive him as odd." The "Observed Behaviors" checked by the officer included "Unusual physical and/or verbal isolation", "Appears confused", "unusually slow response time to questions" and "unusual and repetitive mannerisms".

On 2/4/14, Mr. Daughtry was again charged with refusing to obey an order because he would not respond to the officer who was trying to move him from Disciplinary Segregation after his disciplinary time had expired. Mr. Daughtry refused to sign the write-up or attend his disciplinary hearing and he was given an additional 15 days in Disciplinary Segregation. On 2/12/14, Mr. Daughtry was again charged with refusing to obey an order because he would not respond to the officer who was calling him out to go to court. The jail record indicated he "just laid there and did not respond" when directed to exit the cell for court. Mr. Daughtry again refused to sign the write-up or attend his disciplinary hearing and he was given an additional 20 days in Disciplinary Segregation.

A <u>Referral for Psychiatric Services</u> form was completed on Mr. Daughtry on 2/15/14 by "Detention" staff stating "Inmate was punching the wall and when questioned about it he would stare at the wall and grunt," and he was "not speaking.

14

sitting on the floor, staring into space playing with his beard." The "Observed Behaviors" checked by the officer included "Unusual physical and/or verbal isolation", "Appears confused", "unusually slow response time to questions" and "unusual and repetitive mannerisms".

On 2/21/14, Mr. Daughtry was again charged with refusing to obey an order because he would not respond to the officer who was calling him out to go to court. The jail record indicated he "laid in bed and did not want to wake up or respond to any of our direct orders." Mr. Daughtry again refused to sign the write-up or attend his disciplinary hearing and he was given an additional 20 days in Disciplinary Segregation.

A Referral for Psychiatric Services form was completed on Mr. Daughtry on 3/2/14 by "Detention" staff stating "Per Sgt. Padilla, due to statement on Ad-Seg form and hygiene appearance inmate should be evaluated." The "Observed Behaviors" checked by the officer included "Unusual physical and/or verbal isolation".

On 3/4/14, Classification Supervisor Rosie Carrillo notified Sgt. McGowan of the Detention staff through an email that, "I spoke to my supervisor, John McMullan, about inmate Zachary Daughtry, Bk #T033307. John also agrees that this inmate is probably not suitable for Maximum security. This inmate has not had any violent DAR's, does not have a current or past violent arrest and does not have any felony arrests only misdemeanor arrests. It appears this inmate has more psychological issues as he has been placed into Psych housing several times and is currently

15

awaiting a Rule 11 his next court. Based on the above information, we will not be reclassifying this inmate at this time."

On 3/11/14, Mr. Daughtry was written up because the "American flag in the cell was missing". Mr. Daughtry pled "not guilty" to the charge but failed to attend his disciplinary hearing where he was found guilty and given an additional 20 days in Disciplinary Segregation.

On 4/7/14, Mr. Daughtry was ordered to be transferred to the Lower Buckeye Jail Facility Unit P3-B Psych Unit because he was "actively suicidal per Dr. Sorokin".

On 5/4/14, Mr. Daughtry was told by jail staff to "roll up" because his time in Disciplinary Segregation had expired and he needed to be transferred to a new cell location. Mr. Daughtry did not respond to the commands and remained on his bunk. He was again charged with refusing to obey an order because he would not respond to the officer's directions and orders. Mr. Daughtry pled "not guilty" to the charge but refused to attend his disciplinary hearing where he was found guilty and given an additional 20 days in Disciplinary Segregation.

On 6/6/14, Mr. Daughtry was told by jail staff to "roll up" because his time in Disciplinary Segregation had expired and he needed to be transferred to a new cell location. Mr. Daughtry did not respond to the commands. He was again charged with refusing to obey an order because he would not respond to the officer's directions and orders. Mr. Daughtry refused to sign and refused to attend his disciplinary hearing where he was found guilty and given an additional 21 days in Disciplinary Segregation.

DAUGHTRY 006795

On 6/22/14, Mr. Daughtry was ordered to be transported to the 4th Avenue Jail and placed in a "safe cell" and then transferred to the Lower Buckeye Jail Unit P3 Psych Unit per "Bankson, NP". He was transferred back to the 4th Avenue Jail on 6/30/14 and eventually assigned to Unit 3C-1 cell 25. On 7/6/14 at approximately 1225 hours Officer Thompson noticed "multiple bruises" on Mr. Daughtry's face and questioned him about how he got them. Mr. Daughtry stated "I peed on my cellies blanket and then he told me I need to roll up and that is when we faught." Upon review of the video surveillance of the Unit it was confirmed that Mr. Daughtry had engaged in a fight with another inmate. Mr. Daughtry was transferred from Unit 3C-1 to Unit 2B and placed on security segregation for being involved in "inmate mutual fighting".

On 6/1/14, Ryan Bates was arrested and booked into the 4th Avenue Jail on charges of Assault, Burglary, Possession of Dangerous Drugs and Possession of Drug Paraphernalia. Mr. Bates Initial Classification Assessment was performed on 6/1/14 at 1316 hours. His final custody evaluation placed him in the classification of "Maximum – General Population" housing. Jail records indicated that Mr. Bates had numerous prior incarcerations on his record.

On 7/9/14, Officer Hewitt was assigned to Unit 2E which housed inmate Ryan Bates in a single cell. Hewitt stated that during Bates' time out of the cell in 2E Pod, he went into an unauthorized "Sally Port" area. Officer Johnson and Hewitt told inmate Bates he could not be in there and he needed to return to his cell. Officer Johnson Stated that inmate Bates was eating an orange and saying something like "Junior. Where is Junior?" and he appeared to be in a daze. Officers Hewitt and

17

Johnson directed Bates to return to his cell but he did not respond. Officer Hewitt stated that Bates continued to say something like "Junior....Junior is here." Hewitt stated that because Bates did not follow instructions, he was placed into a holding tank until he was transferred out of the Unit. Officer Huber was assigned as the control officer meaning he was responsible for moving and/or transferring the inmates on that level. Officer Hewitt handcuffed Bates and placed him in a holding cell until he could be moved to a cell in 2B awaiting disciplinary action. Officer Huber contacted Unit 2B Tower and asked if they had an open cell. At 2130 hours Officer Huber secured Bates and moved him to 2B, 100, cell 3. Hanson stated that he put Bates in the cell that Daughtry was also housed in. Officer Hanson was assigned as the level two control officer on the night of July 9, 2014 and made the decision to house Bates in the same cell as Mr. Daughtry. At the time inmate Bates was placed in Mr. Daughtry's cell, Officers Cormier and Wade were assigned to the housing unit and were passing out canteen. At approximately 2143 hours, Officers Hewitt and Johnson went into the housing unit in 2B Pod and gave inmates Bates a mattress and his personal property and then exited the housing unit. At approximately 2159 hours, (according to IR: 14-015778, Form 4, Probable Cause Statement) "MCSO Detention Officer Cormier B2481 and Wade B2679 were conducting headcounts in the 2B Pod of the 4th Avenue Jail located at 2D1 S. 4th Avenue Phoenix, Arizona. The facility is within Maricopa County and under the jurisdiction of the Maricopa County Sheriff's Office. Detention Officer Cormier and Wade were accompanied by two 4th Avenue Jail medical personnel, Lois Quaid RT580, and Traci Daugherty CHT who were conducting welfare checks. As Officer Cormier walked by cell #3, located in 2B Pod of the Fourth Avenue Jail, he saw inmate Zachary Daughtry T033307 lying on the

18

floor, face down, with his head towards the toilet/sink combination. His head was surrounded by a pool of blood. At the time of the occurrence the cell was secured (locked) and the only occupants within the cell were Inmates Daughtry and Ryan Bates T084946. Officer Cormier called via radio for a "man down", and assisting Officers arrived shortly on scene to assist.

Inmate Bates was safely removed from the cell and placed into a medical holding cell. Medical personnel, Lois Quaid RT580, and Traci Daugherty entered the cell with Officers Cormier, Hinrichs, Sergeant Garcia, Sergeant Maynes, and Lieutenant Smith to provide emergent medical treatment to Inmate Daugherty.

Inmate Daugherty had sustained a deep laceration on the right side, of his forehead and what appeared to be a deep indentation to his skull in the area of the laceration which was approximately 1.5 inches to 2 inches in circumference. It was observed at the time by medical personnel that inmate Daugherty also had a large laceration to the center of his forehead approximately 2.5 to 3 inches in length. Inmate Daugherty was unresponsive but was breathing. Physician Assistant Ian CS100 arrived at the incident scene and assisted in the emergent medical treatment of Inmate Daugherty. Phoenix Fire Department was called and responded within 12 minutes. Inmate Daugherty was stabilized and transported to Good Samaritan Hospital for life threatening injuries by Phoenix Fire Department.

Inmate Bates had been assigned and placed into cell #03 approximately 25-30 minutes prior to Officer Cormier finding innate Daugherty unresponsive. Inmate Daugherty had not left cell #03 since the Pod had been in lockdown. Further, Inmate

DAUGHTRY 006798

Daugherty had no other cell mates assigned to his cell #03 that day until Inmate Bates arrived that night.

Gentec video review showed Inmate Bates arrive and enter cell #03 about 25-30 minutes prior to the incident accompanied by MCSO Officers. The last time officers made contact with Inmates Bates and Daughtry prior to the "Man down" call was at about 21:44:24 hours when officers' closed the cell door after having brought a pillow and mattress to cell #03. At about 22:00:57 hours, Officers' during head count called out for a "Man Down" in 2B Pod cell #03 after noticing an inmate lying on the floor of the cell in a pool of blood. The time difference between the last observable contact with inmates Bates and Daughtry, prior to the "Man down" call and the officers' emergency call for a "Man Down" was approximately 16 to 17 minutes.

Inmate Daughtry was OK and was the single occupant in cell #03 when Inmate Bates was placed in cell #03 at about 21:32:20 hours. Inmate Daughtry and Bates were OK at 21:43:20 hours when officers' opened the door to cell #03 to give a pillow and mattress.

No person(s) were observed, during the review of the video file, to enter or exit cell #03 from about 21:44:24 hours when officers' closed the cell door after having brought a pillow and mattress to cell #03, and the officers' emergency call for a "Man Down" at about 22:00:57 hours.

On July 10th, 2014 at approximately 0330 hours, Ryan Bates was transported to the Sheriff's Office Major Crimes Division and was interviewed. Bates was advised of his Miranda Rights to which he stated he understood. During the interview, Bates appeared lethargic and lost to his own thoughts during Miranda and subsequent

DAUGHTRY 006799

interview. While questioning Bates brought no details of the incident, Bates recalled a dream in which he thought he had been to "court" earlier in the day. While recalling the dream Bates said he thought he had been to court but had been told by his cell-mate he had slept through his scheduled court appearance. While telling of the dream, Bates appeared lost in his gaze or catatonic. He spoke in a very low voice and at points was almost inaudible. His eyes were wide and vacant and his movements were slow. Bates was asked if he remembered what he had done that day. Bates said he had a dream in which he thought he had gone to court earlier in the day. The next thing he remembered was waking up naked in a cell. Bates did not recall any events between the dream and his waking up naked in a cell. No events of the incident were told by Inmate Bates during the interview.

Inmate Daughtry remained at Good Samaritan Hospital in Intensive Care from July 9th, 2014, until the day he died, July 20th, 2014."

Maricopa County Medical Examiner C. Poulos MD determined that Zachary Daughtry had died due to "Blunt Force Trauma." Ryan David Bates was charged with one count of Second Degree Murder per ARS 13-1104.

9.    **Discussion of issues:** The detainees in the 4th Street Jail rely upon facility staff for their personal needs and safety. Contemporary jail industry standards and practices recognize that all facilities are required to provide prisoners with the basic necessities of life. The fact of being in jail does not mean that human essentials can be taken away. Taking reasonable steps to protect inmates from harm is one of the most basic and primary responsibilities of a jail and its staff. The denial of protection from known risks would in essence "punish" the prisoner and the ignoring or failing

21

to take corrective action to abate all known risks would amount to "deliberate indifference" to the safety and well-being of the inmate. The key for facility staff is that once the potential for a risk to the safety of an inmate is known, or the risk is so "obvious", the jail staff has a duty to take reasonable steps to protect the inmate from harm.

10.     Based upon my training, education and experience, an effective classification and cell assignment process is a critical component of every jail and is fundamental to fulfilling a jail's duty to take reasonable steps to protect inmates from harm. An effective classification and cell assignment process improves the safety, security and control of inmates by identifying and providing appropriate surveillance for each group and by assisting the corrections staff in knowing what "kind" of inmates are where; it also assists in the deployment of personnel.  The initial classification process should be a valid risk assessment screening so inmates can be housed in the least-restrictive custody possible.  The process should use verifiable and documented data about inmates.  A jail classification and cell assignment system is used to separate inmates into groups that reduce the probability of assault and disruptive behavior.

11.     There are two major flaws in the system.   First, the Classification Specialist did not consider an inmate's mental health issues at all.  John McMullan, the operations manager for the Classification Division at the time, testified in his deposition:

>      Q.     Were there any special rules for classifying inmates that were mentally ill?

DAUGHTRY 006801

MS. NGUYEN:          Same objections.

THE WITNESS:          Any special rules for classifying?  I'm not -- um,
          special rules for classifying mentally ill inmates. Uh, no.

*McMullan Deposition*, at 6.

Q.     And what -- as I understand it, there are no classifications which
        permit you to consider mental illness when making the
        assignment?

MS. NGUYEN:          Object to form.

THE WITNESS:          That is left up to the psychiatric staff.  Classification
          doesn't get involved in that kind of assessment.

*Id*. at 14-15.

Again, that would be a decision that the psychiatric people would make.
The classification level is separate from that. The classification is based on
your current charges, their past charges, criminal history, uh, institutional
behavior.   Whether they're maximum or minimum is where they're
classified at and where they're housed at. Whether they go to psychiatric
housing, that's up to the psychiatric people within the jail system.

*Id*. at 21.

Q.     Sure, but at least as of the time that you were there, there was no --
        the mental health providers would not perform a placement within
        the jail system. They would just be sent to you guys and put back
        to their old classification?

A.     Correct.

*Id*. at 39.

Secondly, the information about an inmate's "risk" or "mental illness" was not

available or reviewed by the Tower officer who makes the actual cell assignments in

the 4th Avenue Jail.   There were sufficient facts and circumstances available for

review at the time of Mr. Daughtry's assault and he should be considered a

"vulnerable" inmate, not "suitable" for maximum security housing and could be

DAUGHTRY 006802

misunderstood and/or taken advantage of by other detainees. Instead of taking reasonable steps to protect Mr. Daughtry from harm, the security staff of the 4th Avenue Jail ignored the obvious role that his mental illness played in his repeated failure to follow routine staff directions and instead chose to create a serious risk to Mr. Daughtry's safety by moving a maximum security detainee, Ryan Bates, into his cell in the Disciplinary Housing Unit. Mr. Bates was transferred to the Unit as a result of failing to follow staff directions and the record indicated he was also suffering from possible mental health issues (looking for and talking an imaginary person "Junior" and appearing to be in a daze).

12.     Classification did not consider the fact an inmate's behavior might be the result of an inmate's mental illness. *McMullan Deposition*, at 12-13 ("There was no policy regarding somebody with a disciplinary issue if somebody was mentally ill").

> Q.     And certainly there was no effort on behalf of the Classification Department to involve the mental health care mechanisms or the mental health resources within the jails to determine whether or not a person's DARs or write-ups were caused by mental illness; correct?
>
> MS. NGUYEN:     Object to form and foundation.
>
> THE WITNESS:     Right. Classification would not do that at that point.
>
> *Id.* at 30; *see also id.* at 34.

13.     I am not opining that all inmates should have a single cell; I am opining that the jail must take reasonable steps to protect all inmates from harm in determining cell assignments. Based upon my training, education and experience the only reasonable step when you are assigning "seriously mentally ill" detainees to Disciplinary Segregation cells is to ensure the staff person making the cell assignments has all the

DAUGHTRY 006803

available information about each inmate. This is a basic and fundamental step to minimize the risk to an obviously "vulnerable" detainee who had a recent history of fighting with a cellmate. The policy, practice, and custom of having the Tower officer make the actual cell assignments and re-assignments makes no operational sense unless the Tower Officer has the same background and "risk identification" information on each inmate as the Classification Specialists should possess.   In essence, the system of uninformed Tower officers being used to assign and re-assign known "seriously mentally ill" detainees in the Disciplinary Segregation Unit in the 4th Avenue Jail created a substantial and serious risk to detainee Zachary Daughtry and other "vulnerable" and "seriously mentally ill" inmates that may have been housed on the unit.

14.   I base this upon my training, education and personal knowledge of similar cases involving the Maricopa County Jail system. I was retained and offered my professional opinions in 2012 in a very similar case against Sheriff Arpaio and the Lower Buckeye Jail (Cielo ten Boden, et al. v. Maricopa County, et al. – Superior Court of the State of Arizona – County of Maricopa - Case No. CV2011-012488).  In that case an inmate (Wietse ten Boden), who was charged with a sexual crime against his step daughter, was beaten to death by his cellmate (Lamont Rider) who had a known history of mental illness as well as violent and assaultive behavior. The case record indicated the assaultive inmate was assigned to the same cell as Mr. ten Boden and the Core Duty Officer was never required and/or trained to check and analyze the available records to determine if he posed a potential threat to Mr. ten Boden. I offered professional opinions at that time in a sworn deposition (January 2014) and in

DAUGHTRY 006804

prior written disclosure statements that the cell assignment process in the Administrative Segregation unit was flawed and was directly related to injuries suffered by Mr. ten Boden.

15. I have also been retained (and I issued an expert report) in two other cases, <u>Klatt v. Sheriff Arpaio</u> (Case No. 2:14-cv-02711 and <u>Walker v. Sheriff Arpaio</u> (Case No. 2-15-cv-00226-SPL) where the same policy, pattern, and custom of the Tower officer, without reviewing all the available risk assessment information on each inmate, assigns inmates to cells in the Administrative Segregation Units at the Lower Buckeye Jail. This policy, practice and custom created a substantial and serious risk to the safety of the inmates in "protective custody" status. The policy, practice, and custom fails to acknowledge the various levels of risk and different needs of each individual inmate that were assigned to "Admin Seg" status, especially the most vulnerable.

Based upon my training, education and experience any reasonably competent jail administrator should understand the importance of reviewing the risk factors posed by the unique circumstances of each inmate, such as detainees Daughtry and Bates, assigned to "Disciplinary Segregation" and ensure all housing and cell assignments are made by someone who has been trained to assess all the background and risk identification information available to minimize the risk to each inmate. The policy, practice and custom of the 4th Street Jail in this case (and the other three listed in this report that I have been retained to review) does the exact opposite….. they actually maximize the risk faced by each "seriously mentally ill" and "vulnerable" prisoner housed together in a cell in the Disciplinary Segregation Unit. It is very disturbing to

DAUGHTRY 006805

me, as a former jail administrator, that similar failures pointed out in the ten Boden litigation (originally filed in 2011) had not been addressed and are directly related to other inmate deaths in the Maricopa County Jail system in 2014.

16.     The classification and housing of inmates who are "seriously mentally ill" and/or "vulnerable" from the general population has become a common operational and safety issue for today's jails. Based upon my training, education and experience, jails must have adequate policies, procedures and training to direct staff when dealing with inmates who pose a serious risk to safety of other inmates and inmates that often are in need protection from other inmates. The proper supervision, classification and housing of potentially violent and vulnerable inmates is a required basic level of protection and required for all size jail facilities. It is well known in the jail industry that housing "Disciplinary Segregation" inmates together in the same Unit (or Pod) is a common practice, but it also poses a serious challenge for jail staff. Jail Administration, supervision and staff (working the pod/unit) must all be informed of the identified "risks" posed by each inmate assigned to Disciplinary Segregation in order to safely develop cell assignments which will minimize the risk every detainee faces while ensuring the basic needs of all the inmates are met. The need to protect the more vulnerable inmates, like Zachary Daughtry, is so obvious that the pattern and practices of the staff and administration of the 4th Street Jail in this case leaves me with two primary concerns; (a) there is a systematic lack of training and direction for the detention staff of the 4th Street Jail assigned as Tower officers on how to make cell assignments and re-assignments which identify and protect inmates with serious safety and risk factors in Disciplinary Segregation housing; and (b) there is a pattern,

27

practice and custom of 4th Street Jail administration and staff making a choice to ignore a "seriously mentally ill" and "vulnerable" inmate's obvious need to be protected from potential safety risks while re-assigned to the Disciplinary Segregation Unit .

17.     In the <u>Graves v. Sheriff Arpaio, et al.</u> case documents I reviewed, Judge Wake was particularly troubled by the lack of treatment received by seriously mentally ill inmates and, in particular, their shuttling in-and-out between the mental health unit and general population without adequate treatment or supervision once released from the Mental Health Unit.  In his September 30, 2014, Findings of Fact and Conclusions of Law, Judge Wake found:

> 171.   Defendants have not shown that a mental health provider determines the placement of each pretrial detainee needing mental health care after the provider has performed a face-to-face assessment, especially for admission into and discharge from the Mental Health Unit.

> 172.   Defendants have not shown that pretrial detainees placed in acute units of the Mental Health Unit are provided sufficient opportunity to become clinically stable in stepdown treatment units before they are transferred out of the Mental Health Unit.

> 173.   Defendants have not shown that pretrial detainees transferred out of the Mental Health Unit are assessed by a mental health professional or provider within 24–48 hours after the transfer.

28

Zachary Daughtry was in maximum custody segregation for non-violent disciplinary infractions that were consistent with his mental illness. Yet, rather than receiving consistent treatment, he was punished for this behavior, and put into a position where he would be housed with a potentially violent inmate (and more specifically, another mentally ill inmate with violent tendencies), who immediately assaulted and killed Daughtry. Based upon my training, education and experience, this indicated the MCSO has a custom and practice of punishing, rather than treating, the mentally ill.

18.    The same custom and practice is evident with respect to inmate Ryan Bates. The record indicated that his mental illness and past violent behavior was known to jail personnel from the day of his booking, June 1, 2014. As with Daughtry, he received almost no mental health treatment, even when he was "floridly psychotic", such as what he was experiencing on the day that he was assigned to the cell of another mentally ill inmate, Zachary Daughtry, who he proceeded to assault and kill.

19.    The record indicated that at least one inmate reported that Ryan Bates told detention officers that he did not want to go into the cell with Mr. Daughtry (who had some serious hygiene problems, as well as mental illness issues). The inmate statement also said a detention officer told Bates that he (Bates) would have to "fight" to be removed from the cell. If such a statement was made to Bates, with his known mental health history, then that officer would be guilty of consciously creating and ignoring a substantial and serious risk to the safety and health of Mr. Daughtry; and that officer's actions would be directly related to the injuries suffered by Mr. Daughtry at the hands of Ryan Bates.

DAUGHTRY 006808

20.     Based on my training, education, and experience, the policy, practice and custom of Sheriff Arpaio and the administration of the 4th Street Jail to require the Tower Officer to make the actual cell assignments and re-assignments in the Disciplinary Segregation Unit, without any review of the background and "risk identification" information on each inmate created a substantial and serious risk to the safety of detainee Zachary Daughtry, and is in violation of clearly established correction industry standards and practices including the Performance-Based Standards for Adult Local Detention Facilities (4th Edition; June 2004) promulgated by the American Correctional Association (ACA). Specifically, **ACA Performance Standards 1A** and **2A** which require:

**ACA Standard 1A:** "Staff, volunteers, contractors, and inmates are protected from injury and illness in the workplace."

**ACA Standard 2A:** "The community, staff, volunteers, contractors, and inmates are protected from harm. The number and severity of events are minimized."

21.     After my review, I hold the following professional opinions to a reasonable degree of professional certainty, incorporating by reference the opinions expressed in the preceding paragraphs. The opinions that I set forth are based on my education, training, experience and review of the documents and audio files provided to me as of date of this report. I reserve the right to update and modify my opinions if additional information or materials become available:

> a. The policy, practices and customs of Sheriff Joseph Arpaio and the administration of the 4th Street Jail to require the Tower Officer to make the actual cell assignments and re-assignments in the Disciplinary

30

DAUGHTRY 006809

Segregation Unit, without any review of the background and "risk identification" information of each inmate, created a substantial and serious risk to the safety of detainee Zachary Daughtry. Their actions are in violation of clearly established correction industry standards and practices and are directly related to the injuries suffered by Mr. Daughtry.

b. Sheriff Joseph Arpaio and the administration of the 4th Street Jail, after being put on notice through previous and ongoing litigation, continued the policy, practice and custom described in (a) above that created a substantial and serious risk to the safety of inmates who suffer from "serious mental illness and are obviously vulnerable to assault or manipulation by other inmates. Their actions are in violation of clearly established correction industry standards and practices and are directly related to the injuries suffered by Mr. Daughtry.

22. In summary, the duty of Sheriff Joseph Arpaio and the 4th Street Jail administration and staff was to take reasonable steps to protect detainee Zachary Daughtry from harm while he was in their custody. They failed in their duty to protect Mr. Daughtry from harm and the facts in this case indicate a policy, pattern and custom of ignoring a known substantial and serious risk to the safety of detainees, including Mr. Daughtry, during his incarceration. During that time period Sheriff Arpaio, and the 4th Street Jail administration and supervision actually created a substantial and serious risk to Mr. Daughtry's safety and their actions are directly related to the injuries suffered by Mr. Daughtry.

DAUGHTRY 006810

23.     Should you wish further information or clarification on issues discussed in this report, don't hesitate to contact me.  I reserve to right to update and modify my opinions after further review and if additional information or materials become available during discovery.

Signed this 21st of November, 2016 in Cincinnati, Ohio.



Jeff Eiser

Attachments (2):

    Exhibit #1 - Resume/CV
    Exhibit #2 - List of Publications, fee schedule and list of all cases where I testified in
    a deposition and/or trial in the last four years.

32

DAUGHTRY 006811

EXHIBIT #1

# JEFF EISER

*Cincinnati, Ohio 45251 • (513) 851-6838 • jeffeiser@gmail.com*
*http://www.jurispro.com/JeffreyEiser*

## OBJECTIVE

To provide professional instructional, consulting and expert witness services to government agencies, attorneys, colleges and universities that wish to evaluate and improve their corrections knowledge, programs and operations.

## SUMMARY OF QUALIFICATIONS

◊　Offers a unique combination of real-life experience, a researcher and adjunct instructor of criminal justice at the undergraduate university level.

◊　Possesses a distinct advantage over other criminal justice/corrections experts because he has personal work experience in every facet of a corrections/jail facility.

◊　Retired as the Deputy Director of Corrections for the Hamilton County Sheriff's Office in Cincinnati, Ohio.  Responsible for the operation of four facilities with approximately 2,200 inmates, over 600 employees and a  operating budget of over 40 million dollars.

◊　Twenty-nine years (29) of experience working in corrections, the last nineteen (19) as a top administrator.

◊　Nationally recognized speaker and trainer in the areas of interpersonal communication and de-escalation skills for U.S. Department of Justice – National Institute of Corrections and the American Jail Association.

◊　Co-author of the Ohio Jail Administrator's Handbook (March 2008) in conjunction with the Ohio Bureau of Adult Detention.

◊　Qualified as an expert witness in state and federal courts since 1994.

◊　Serving as an Adjunct Instructor  in the Social Sciences Department for the College of Evening and Continuing Education at the University of Cincinnati.

◊　Committed to the highest levels of professional and personal excellence.

## PROFESSIONAL EXPERIENCE

- ***Corrections Administrator***  - served as Operations Commander and Deputy Director of one of the largest local corrections operations in the United States.  Extensive experience and expertise in the operation and staffing of small, medium and large jail facilities. Twenty (20) years of experience in the research, writing and updating of departmental policy, procedures and general orders.

- ***Criminal Justice Author, Trainer and Researcher*** - A co-author of the Ohio Jail Administrator's Handbook , in conjunction with the Ohio Bureau of Adult Detention and serving since 1986 as a member of Ohio Peace Officer Training Council (O.P.O.T.C.) sub-committee on corrections training.  Personally researched and authored a large part of the training curriculum used by O.P.O.T.C. to train and certify corrections officers, supervisors and administrators in the State of Ohio.  Assisting O.P.O.T.C. since 1997 in presenting "Corrections Management" training to all newly elected County Sheriffs in Ohio.

DAUGHTRY 006813

- **Consultant and Trainer -** since 1993 presenting national training seminars for the American Jail Association and the National Institute of Corrections - U.S. Department of Justice.  Nationally recognized in the areas of interpersonal communication and de-escalation skill training for corrections/jail staff.

- **Expert Witness in State and Federal Court -** since 1994 assisting attorneys from around the country in civil rights and tort litigation. Qualified and testified in areas of corrections standards and practices, jail facility operations and staffing, inmate assault (failure to protect), staff use-of-force, Corrections Emergency Response Teams (CERT), prisoner access to medical and mental healthcare, in-custody deaths, inmate suicide, sexual assault by staff/other prisoner, conditions of confinement, inmate supervision,  booking, classification, housing, jail records procedures, strip/body cavity searches and the training of correctional staff, supervisors and administrators.

- **Adjunct Instructor of Criminal Justice -** since 2002 instructing undergraduate students in the course "Introduction to Corrections" in the College of Evening and Continuing Education at the University of Cincinnati.

## EDUCATION

**Master of Education Degree    Xavier University - Cincinnati, Ohio**        *Graduation:  May 2011*
Major: Educational Administration  (4.0 GPA)

**Bachelor of Science Degree    University of Dayton – Dayton, Ohio**        *Graduation:   April 1980*
Major:  Criminal Justice

Professional Certifications:
- Ohio Peace Officer Training Council – Basic Peace Officer Training Academy Lifetime Instructor Certification
- *Certified Peace Officer* –certified from 1980 – 2009 as peace officer by Ohio Peace Officer Training Council.
- Certified Master instructor for the <u>AchieveGlobal</u>'s "Frontline Leadership" and "Leadership for Results" training programs for managers and administrators.

## ADDITIONAL SKILLS

- Assisted and led teams that planned, opened and transitioned into two new major corrections facilities (800+ beds)

- Team leader in the design and implementation of "Windows/PC based" jail management system in conjunction with UNISYS Corporation.

- Certified Master instructor for the *Achieve Global's*  "Frontline Leadership" and "Leadership for Results" training programs for managers and administrators.

- Assist the local Prosecutors and attorneys in the understanding of corrections and inmate litigation.

- Research, write and administer promotional exams and assessment board interviews for supervisory and administrative positions.

- 20 years of experience in the research, writing and updating of departmental policy, procedures and general orders.

- Negotiate labor contracts from the side of management. Testify and present arguments in verbal and written form for arbitration hearings.

- Attend budget hearing, analyze budget requests and develop, prepare budget documents.

- Perform in-depth jail staffing studies and analysis to discover inventive ways to save taxpayer money and resources.

## REFERENCES

Available upon request

EXHIBIT #2

| LIST OF CASES WHERE JAIL OPERATIONS EXPERT JEFF EISER TESTIFIED AT A DEPOSITION AND/OR AT TRIAL IN THE LAST FOUR YEARS: |

1.   J.K.J. v. Polk County Sheriff's Department , et al.
     United States District Court for the Western District of Wisconsin
     Case no. 15-cv-428
     FOR PLAINTIFF

2.   M.J.J. v. Polk County Sheriff's Department , et al.
     United States District Court for the Western District of Wisconsin
     Case no. 15-cv-433
     FOR PLAINTIFF

3.   Mary Ellen Klatt, et al.  v.  Joseph Arpaio, et al.
     United States District Court for the District of Arizona
     Case No. 2:14-cv-02711
     FOR PLAINTIFF

4.   Russell Walker, et al.  v.  Joseph Arpaio, et al.
     United States District Court for the District of Arizona
     Case No. 2:15-cv-02226
     FOR PLAINTIFF

5.   Shirley Ann Hafer, et al.  v.  City of Trenton, et al.
     In the Superior Court of New Jersey
     Law Division: Mercer County
     Case No. MER-L-762-10
     FOR PLAINTIFF

6.   Estate of Adam Banks, et al.  v.  Butler County, et al.
     United States District Court for the Eastern District of Missouri – Southwestern Division
     Case No. 1:15-CV-00070
     FOR PLAINTIFF

7.   Layne Scheffer v  Michael  Gayer,  Sheriff Pulaski County, et al.
     State of Indiana – Pulaski County Circuit Court
     Case No. 66CO 1-1003-CT-004
     FOR DEFENDANT

8.   Johnnie Judah, et al. v. The Board of County Commissioners for Comanche County, et al.
     United States District Court for the Eastern District of Oklahoma
     Case No.  14-cv-00070-SPS
     FOR PLAINTIFF

9.   Gregory DuBois v. The Board of County Commissioners of Mayes County, et al.
     United States District Court for the Northern District of Oklahoma
     Case No. 12-cv-677-JED-PLC
     FOR PLAINTIFF

10.  Estate of Lyvita Gomes, et al.  v.  County of Lake, et al.
     United States District Court for the Northern District of Illinois – Eastern Division
     Case No. 12-cv-4439 - FOR DEFENDANT

11.    Natasha Blueberry, et al.   v. Comanche County Facilities Authority, et al.
       United States District Court for the Western District of Oklahoma
       Case No. CIV-2013-278
       FOR PLAINTIFF


12.    Johnnie Judah, et al.  v.  The Board of County Commissioners for Comanche County, et al.
       United States District Court for the Eastern District of Oklahoma
       Case No. 14-cv-00070
       FOR PLAINTIFF


13.    Tanya Stockton, et al.  v.  Wake County, North Carolina, et al.
       United States District Court for the Eastern District of North Carolina – Western Division
       Case No. 5:13-CT-3302-BO
       FOR PLAINTIFF


14.    Frank Hyman  v. City of Philadelphia, et al.
       United States District Court for the Eastern District of Pennsylvania
       Case No. 210-cv-00499
       FOR DEFENDANT


15.    John P. Seiler, et al.   v.  Scott J. Israel, Sheriff of Broward County, Florida, et al.
       Circuit Court of the 17th Judicial Circuit in and for Broward County, Florida
       Case No. 12-018433(14)
       FOR PLAINTIFF


16.    Reginald Pittman, et al.  v.  County of Madison, Illinois, et al.
       United States District Court for the Southern District of Illinois
       Case No.  08-890
       FOR PLAINTIFF


17.    Elizabeth Awalt, et al.  v.  Rick Marketti, et al.
       United States District Court for the Northern District of Illinois – Eastern Division
       Case No. 11-cv-6142
       FOR DEFENDANT


18.    LaDona A. Poore  v. Stanley Glanz, Sheriff of Tulsa County, et al.
       United States District Court for the Northern District of Oklahoma
       Case No.  11-CV-797-CVE-TLW
       FOR PLAINTIFF


19.    Stefan Woodson  v. City of Richmond, Virginia, et al.
       United States District Court for the Eastern District of Virginia – Richmond Division
       Case No.  3-13CV134
       FOR PLAINTIFF


20.    Cindy M. Stiltner v. Cabell County Commission, et al.
       United States District Court for the Southern District of West Virginia at Huntington
       Case No.  3:13-cv-7513
       FOR DEFENDANT

DAUGHTRY 006818

21.  <u>Celesa Gail Simmons, et al.  v.  Mark E. Bolton, et al.</u>
     Commonwealth of Kentucky – Jefferson County Circuit Court
     Case No.  09-CI-00910
     FOR PLAINTIFF


22.  <u>John Middleton v. South Carolina Department of Corrections</u>
     United States District Court for the District of South Carolina – Columbia Division
     Case No.  9:13-cv-1317
     FOR PLAINTIFF


23.  <u>Michael Degraw, et al.  v. Bob Gualteri, et al.</u>
     United States District Court for the Middle District of Florida – Tampa Division
     Case No. 8:11-cv-720
     FOR DEFENDANT


24.  <u>William Muncy, et al.  v.  PCSD, et al.</u>
     United States District Court for the District of South Carolina
     Case No.  5:12-cv-03177
     FOR DEFENDANT


25.  <u>Nancy Morris, et al.  v.  Hope Clinic, LLC, et al.</u>
     United States District Court for the District of South Carolina
     Case No.  5:12-cv-03177
     FOR DEFENDANT


26.  <u>Katie Kindl, et al.  v.  City of Berkley Department of Public Safety, et al.</u>
     United States District Court for the Eastern District of Michigan – Southern Division
     Case No.   2:12-cv-13410
     FOR PLAINTIFF


27.  <u>Leah Allyn Norton  v. Heather Stille, in her individual capacity.</u>
     United States District Court for the Western District of Michigan – Southern Division
     Case No.  1:11-cv-01083
     FOR DEFENDANT


28.  <u>Aleshia Henderson  v.  Stanley Glanz, Sheriff of Tulsa County, et al.</u>
     United States District Court for the Northern District of Oklahoma
     Case No.  12-cv-68
     FOR PLAINTIFF


29.  <u>Raymond Scott  v. City of Cleveland, Ohio, et al.</u>
     United States District Court for the Northern District of Ohio
     Case No.  1:11-CV-02411
     FOR DEFENDANT


30.  <u>Cielo Ten Boden, et al.  v.  Maricopa County, et al.</u>
     Superior Court of the State of Arizona – County of Maricopa
     Case No. CV2100-012488 - FOR PLAINTIFF


31.  <u>Linda Bickerstaff, et al.  v.  Ohio Department of Rehabilitation and Correction</u>
     In the Court of Claims – State of Ohio
     Case No.  2012-03409
     FOR PLAINTIFF

32.  Estate of Jahqui Graham, et al.  v.  State of New Jersey, County of Essex, et al.
     Superior Court of New Jersey – Essex County
     Docket No. ESX-L-5595-10
     FOR PLAINTIFF

33.  John Doe  v. Kershaw County, et al.
     United States District Court for the District of South Carolina – Aiken Division
     Case No. 1:11-cv-02419
     FOR DEFENDANT

34.  Edward Shaver, et al.  v.  Brimfield Township, et al.
     United States District Court for the Western District of Ohio – Eastern Division
     Case No.  5:11-cv-01034
     FOR DEFENDANT

35.  Charles Edwin Shelley  v. County of Kershaw, et al.
     United States District Court for the District of South Carolina – Columbia Division
     Case No. 3:11-3477-CMC
     FOR DEFENDANT

36.  Kenneth L. Mantell, et al.   v.   Health Professionals, LTD., et al.
     United States District Court for the Northern District of Ohio – Eastern Division
     Case No.  5:11-cv-01034
     FOR DEFENDANT

37.  Cody Hearn, et al.  v.  Lancaster County, et al.
     United States District Court for the District of South Carolina – Beaufort Division
     Case No.  9:11-1074-MBS-BM
     FOR DEFENDANT

38.  Debbie Veith  v.  Portage County, Ohio, et al.
     United States District Court for the Northern District of Ohio - Eastern Division
     Case No:  5:11-CV-02542-JRA
     FOR DEFENDANT

39.  Marletha Rankins  v.  Milwaukee County, et al.
     United States District Court for the Eastern District of Wisconsin
     Case No. 11-CV-1153
     FOR DEFENDANT

40.  Curtis Dressman  v.  Metropolitan Government of Nashville and Davidson County, et al.
     United States District Court for the Middle District of Tennessee at Nashville
     Case No.  3:11-0336
     FOR PLAINTIFF

41.  Deborah D. Tanner, et al.  v.  City of Sullivan, et al.
     United States District Court for the Eastern District of Missouri – Eastern Division
     Case No. 4:11-CV-01361-NAB
     FOR PLAINTIFF

42.  Scott Krodel, et al.  v.  Jerry Harbstreit, Sheriff of Daviess County, et al.
     In the Daviess Circuit Court – State of Indiana
     Case No. 14 C 01-0607-PL-286 - FOR DEFENDANT

43. <u>Estate of Charles Holdstock, Deceased, et al.  v. The Brd. of Cty. Commissioners of Oklahoma County, et al.</u>
United States District Court for the Western District of Oklahoma
Case No.  09-cv-1208
FOR PLAINTIFF

---

| LIST OF BOOKS OR PUBLICATIONS (as of August 2016): |
|---|

1. Co-Author of <u>Ohio Jail Administrator's Handbook</u> in conjunction with the Bureau of Adult Detention – Ohio Department of Rehabilitation and Correction (2008).

---

| FEE SCHEDULE FOR JEFF EISER  (Effective since October 2015): |
|---|

- RETAINER: $1000  (Payable by client at the start of case, the first six hours of work are deducted from this retainer)

- HOURLY RATE FOR READING AND REVIEWING DOCUMENTS:  $175 per hour

- HOURLY RATE FOR DESIGNING, RESEARCHING, EDITING AND WRITING A REPORT/POSITION PAPER:  $175 per hour

- RATE FOR TESTIFYING IN A DEPOSITION:  $1200 per day

- RATE FOR TESTIFYING IN COURT PROCEEDING/HEARING:  $1200 per day ($800 per day waiting on-site without testifying).

- RATE FOR SITE VISIT AND ANALYSIS: $800 per day/visit (travel time to/from site and analysis)

- TRAVEL EXPENSES: REIMBURSEMENT FOR MILEAGE (@ current IRS rate per mile), ACTUAL COST OF LODGING, AIRLINE TICKET (if applicable), LOCAL TRANSPORTATION COSTS (rental car, shuttle, etc.) AND MEALS PER DIEM OF $50.

**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| SHARI FERREIRA, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. 2:15-cv-01845-JAT |
| | ) |
| JOSEPH M. ARPAIO, *et al.*, | ) |
| | ) |
| Defendants. | ) |

Most of Defendants' expert opinions were rebutted in my first report. Defendants' correctional expert has not discussed the following standards pertaining to Zachary Daughtry**:

**American Correctional Association**
**Performance Based Standards for Adult Local Detention Facilities** (4th edition 2004)

**Classification and Separation**
**4-ALDF-2A-34:**

Single occupancy cells/rooms are available when indicated for the following:

- maximum security and close security
- inmates with severe medical disabilities
- *inmates suffering from serious mental illness***
- sexual predators
- *inmates likely to be exploited or victimized by others***
- inmates who have other special needs for single-occupancy housing

**American Correctional Association**
**Core Jail Standards** (1st edition 2010)

**Separation in Classification**
**1-CORE-2A-17:**

Inmate management and housing assignments considers age, gender, legal status, custody needs, *special problems and needs***, and behavior.

DAUGHTRY 007638

**Single Occupancy Cells**
**1-CORE-2A-18:**

*Inmates not suitable for housing in multiple occupancy cells are housed in single occupancy cells.* **

Given Mr. Daughtry's inability to house with other inmates because of his bizarre behaviors (known to the Jail staff) of masturbating in public, urinating on his roommate's bedding, smearing feces on the walls, and other odd behaviors, he should have been housed alone for his own protection. Assigning him with another inmate, let alone a mentally unstable inmate, was in violation of clearly established correction industry standards and practices and is directly related to the injuries suffered by Mr. Daughtry.

As previously stated in my original report (dated November 21, 2016), the major flaw in the MCSO cell assignment system was that potentially critical "high risk" and "serious mental illness" information that was known to the Classification Specialist and the Mental Health staff was not available or reviewed by the Tower officers who make the actual cell assignments in the 4th Avenue Jail. There were sufficient facts and circumstances available for review at the time of Mr. Daughtry's assault and he should be considered a "vulnerable" inmate, not "suitable" for maximum security housing and could be misunderstood and/or taken advantage of by other detainees. Instead of taking reasonable steps to protect Mr. Daughtry from harm, the security staff of the 4th Avenue Jail ignored the obvious role that his mental illness played in his repeated failure to follow routine staff directions and instead chose to create a serious risk to Mr. Daughtry's safety by moving a maximum security detainee, Ryan Bates, into his cell in the Disciplinary Housing Unit. Mr. Bates was transferred to the Unit as a result of again failing to follow staff directions and the record indicated he was also suffering from possible mental health issues (looking for and talking an imaginary person "Junior" and appearing to be in a daze). My opinion is supported by Classification Supervisor Rosie Carrillo's email of 3/4/14 when she notified Sgt. McGowan of the Detention staff that, "I spoke to my supervisor, John McMullan, about inmate Zachary Daughtry, Bk #T033307.

2

John also agrees that this inmate is probably not suitable for Maximum security. This inmate has not had any violent DAR's, does not have a current or past violent arrest and does not have any felony arrests only misdemeanor arrests. It appears this inmate has more psychological issues as he has been placed into Psych housing several times and is currently awaiting a Rule 11 his next court."

In summary, and as stated in my original report, the duty of Sheriff Joseph Arpaio and the 4th Street Jail administration and staff was to take reasonable steps to protect detainee Zachary Daughtry from harm while he was in their custody. They failed in their duty to protect Mr. Daughtry from harm and the facts in this case indicate a policy, pattern and custom of ignoring a known substantial and serious risk to the safety of mental health detainees, including Mr. Daughtry. During the time period of Mr. Daughtry's incarceration, Sheriff Arpaio, and the 4th Street Jail administration and supervision actually created a substantial and serious risk to Mr. Daughtry's safety and their actions are directly related to the injuries suffered by Mr. Daughtry.

Should you wish further information or clarification on issues discussed in this report, don't hesitate to contact me. I reserve to right to update and modify my opinions after further review and if additional information or materials become available during discovery.

Signed this 21st of March, 2017 in Cincinnati, Ohio.

Jeff Eiser

DAUGHTRY 007640