**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Shari Ferreira, et al., | ) |
| | ) |
| Plaintiff, | ) |
| | ) **CV15-01845-PHX-JAT** |
| | ) Phoenix, Arizona |
| vs. | ) May 15, 2018 |
| | ) 8:58 a.m. |
| Paul Penzone, et al., | ) |
| | ) |
| Defendants. | ) |
| _____ | ) |

**BEFORE:  THE HONORABLE JAMES A. TEILBORG, JUDGE**
**REPORTER'S TRANSCRIPT OF PROCEEDINGS**
**JURY TRIAL - DAY #3**

**APPEARANCES:**

**For the Plaintiff:**
          ROBBINS & CURTIN PLLC
          By:  **Joel B. Robbins, Esq.**
               Jesse M. Showalter, Esq.
          301 E. Bethany Home Road, Suite B100
          Phoenix, AZ  85012-3312

          RAFI & SCHMIDT LAW PLLC
          By:  **Eric W. Schmidt, Esq.**
          520 W. Union Hills Drive, Suite 101
          Phoenix, AZ  85027

**For the Defendants:**
          STRUCK LOVE BOJANOWSKI & ACEDO PLC
          By:  **Daniel P. Struck, Esq.**
               **Ashlee B. Hesman, Esq**.
          3100 W. Ray Road, Suite 300
          Chandler, AZ  85226

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC. 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1            **INDEX**

2    <u>**SUMMARY OF COURT PROCEEDINGS**</u>                                    <u>**PAGE**</u>:

3    Court addresses Juror No. 5                          Page  6

4

5                    **INDEX OF WITNESSES**

6    <u>**ROBERT HEWITT:**</u>

7    Direct examination by Mr. Robbins              Page  8
     Cross examination  by Ms. Hesman               Page 81
8    Cross examination (cont'd) by Ms. Hesman       Page 133
     Redirect examination by Mr. Robbins            Page 135
9
     <u>**RICHARD GAUSE:**</u>
10   (appearing via video teleconferencing)

11   Direct examination by Mr. Robbins              Page 106
     Cross examination by Mr. Struck                Page 122
12   Redirect examination by Mr. Robbins            Page 132

13   <u>**WILLIAM HOVANEC:**</u>

14   Direct examination by Mr. Showalter            Page 139
     Cross examination by Mr. Shuck                 Page 181
15   Redirect examination by Mr. Showalter          Page 205

16   <u>**STEVEN HANSEN:**</u>

17   Direct examination by Mr. Robbins              Page 215

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

1

2                              **INDEX OF EXHIBITS**

3
         **EXHIBIT NO.:**            **DESCRIPTION:**              **RECEIVED:**
4

5        Exhibit No. 25                                          Page  67
         Exhibit No. 76                                          Page  66
6        Exhibit No. 135                                         Page 185
         Exhibit No. 282                                         Page 200
7        Exhibit No. 283                                         Page 200
         Exhibit No. 284                                         Page 200
8        Exhibit No. 285                                         Page 157
         Exhibit No. 324                                         Page  91
9        Exhibit No. 326                                         Page  98

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2          (Called to the order of court at 8:58 a.m. )

3          (Open court, no jury present.)

4              THE COURT:   Thank you.   Please be seated.

5              The record will reflect the presence of the parties

6      and counsel outside the presence of the jury.

7              This is really just a followup from last night.   I

8      rethought my decision to charge the plaintiffs with the unused

9      time last night because there are extenuating circumstances

10     probably on both sides.   Maybe I should have charged both

11     sides and split it.

12             But the main point is, what I said last night, I have

13     vacated it.   But here's the point and I don't think it needs

14     me to repeat it.

15             It's going to -- it is going to require the

16     plaintiffs, while we're in the plaintiff's case, and the

17     defendants on the defendant's case, to make sure they have

18     witnesses lined up for those eventualities where we run short

19     of time.

20             And I realize in this case, presumably because of the

21     cooperation of the defendants, that they were making their

22     witnesses available.   But it's going to require the defendants

23     to also, if that is the case, make sure that -- we don't want

24     to run into what we ran into last night where suddenly the

25     witness on short notice can't be available.

UNITED STATES DISTRICT COURT

1          Because if we're dealing with your witnesses, then

2    they need to be ready to come on short notice so that the

3    plaintiffs can have one or two witnesses ready to go.

4          Enough said.

5          How do we stand with our jury, Ms. Williams?

6          THE CLERK:  We're missing one.

7          THE COURT:  We're missing one.  So we should just

8    wait.

9          Anything else to come up from either counsel?

10         MR. STRUCK:  No, Your Honor.

11         MR. ROBBINS:  No, Your Honor.

12         MR. SHOWALTER:  No, Your Honor.

13         THE COURT:  All right.  Well, then since I don't know

14   whether we're talking about one minute or five, I'll wait to

15   be called.

16         MR. STRUCK:  I will say that we're -- I was just

17   talking to Mr. Robbins and we feel pretty confident that we'll

18   get this case to the jury by Thursday, perhaps even Wednesday.

19         THE COURT:  Of?

20         MR. STRUCK:  Of next week.

21         THE COURT:  Of next week.  Yes.

22         I would have been surprised if your confidence level

23   had risen to the point where you're talking about this week.

24         MR. STRUCK:  I guess I should have been more

25   specific.

1          THE COURT:   I appreciate that.

2          MR. STRUCK:   All right.

3       (Recess taken at 9:01 a.m.)

4       (Open court, Juror No. 5 present and no other jurors

5       Present 9:13 a.m.)

6          THE COURT:   Please be seated.   The record will

7    reflect the presence of the parties and counsel and Juror No.

8    5 outside the presence of the other jurors and we still have a

9    juror missing.

10          Juror No. 5, I have your note -- you can stay seated.

11          I have your note and counsel also has it.

12          I was trying to be sympathetic.   You were

13   overestimating your availability when I said 4:00 and I moved

14   it to 3:30.   But I understand your note suggests that, if I'm

15   reading it correctly, that 3:30 is still not going to give you

16   enough time.

17          What kind of time were you thinking of?

18          JUROR NO. 5:   I'm thinking around three's o'clock.

19   Somewhere, I think three o'clock at the latest, would be fair,

20   if I could request that.

21          THE COURT:   We'll plan on that then.   We'll plan on

22   3:00 o'clock.

23          JUROR NO. 5:   Thank you very much.

24          THE COURT:   We understand the significance of that

25   day and understand what you're trying to do.   And I appreciate

UNITED STATES DISTRICT COURT

```
 1     your trying to serve the people as well.

 2               So we'll plan on three o'clock then.

 3               JUROR NO. 5:  I appreciate the Court's understanding.

 4               THE COURT:  We'll be in recess until we have our

 5     missing -- we may have -- and we have another juror that may

 6     be suffering some kind of condition that may require her to

 7     raise her hand and need a quick recess.  And if that happens,

 8     we'll do that.

 9               MR. ROBBINS:  All right.  Very good, Your Honor.

10         (Recess taken at 9:15 a.m.; resumed at 9:17 a.m.)

11               THE COURT:  Thank you.  Please be seated.

12               The record will reflect the presence of the parties

13     and counsel and ladies and gentlemen of the jury.

14               And good morning to all of you.

15               One of the points I usually make during or shortly

16     after voir dire is that we'll take the mid-morning and

17     mid-afternoon and noon hour break.  But I always try to think

18     to mention that I have learned over the years that even though

19     I'm a federal judge, Mother Nature doesn't necessarily always

20     follow my rules.

21               And so the possibility does exist that my schedule of

22     breaks won't necessarily coincide when, shall we say, Mother

23     Nature calls.

24               So if that should happen, just raise your hand and

25     we'll take a break when it happens without any further inquiry
```

DIRECT EXAMINATION -  ROBERT HEWITT

```
 1   on my part, if you get my drift.

 2          You may call your next witness plaintiffs.

 3          MR. ROBBINS:  Thank you, Your Honor.  We'll call

 4   Robert Hewitt, Detention Officer Robert Hewitt to the stand.

 5       (Witness duly sworn)

 6          THE CLERK:  Please state your name for the record,

 7   spelling your first and last name.

 8          THE WITNESS:  Robert Hewitt.  R-O-B-E-R-T.

 9   H-E-W-I-T-T.
```

**ROBERT HEWITT, WITNESS, SWORN**

**DIRECT EXAMINATION**

```
12   BY MR. ROBBINS:

13   Q   Could you please introduce yourself to jury by telling

14   them your name.

15   A   I'm Robert Hewitt.

16   Q   And, Officer Hewitt, you have a little bit of an accent.

17   A   Yes, I do.

18   Q   Where does that come from?

19   A   I'm Australian.

20   Q   And on the day that Ryan Bates was assigned to be --

21   assigned to a cell with Zach Daughtry, you were a detention

22   officer in the Maricopa County Sheriff's Office, correct?

23   A   Yes.

24          THE COURT:  Let's get the microphones also in front

25   of the questioner and the questioned.
```

DIRECT EXAMINATION -  ROBERT HEWITT

1          If you'll pull that microphone -- that microphone

2     will move and just move that closer.

3          Thank you, sir.

4          THE WITNESS:  All right.

5          MR. ROBBINS:  I've got no excuse.  You're new to

6     this, but I think you'll hear it better when you're closer to

7     the mic and the same for me.  So if you have any trouble

8     hearing me, just ask and I'll speak up.  Okay.

9     BY MR. ROBBINS:

10    Q    How long -- when did you start as a detention officer with

11    the Maricopa County Sheriff's Office?

12    A    It was in 2010.

13    Q    And the jury kind of understands, but a detention officer

14    is a jail guard, correct?

15    A    I'm sorry?  Say that again.

16    Q    A detention officer is a guard within the jail?

17    A    Yeah -- yes.

18    Q    You're in charge of security?

19    A    Exactly, yes.

20    Q    And when you become a detention officer and when you

21    became a detention officer, did you attend an academy?

22    A    I did.

23    Q    And did they teach you for about nine weeks about the

24    various things about how to do your job?

25    A    They did.

DIRECT EXAMINATION -  ROBERT HEWITT

1    Q    And you attempted to be the best detention officer that

2    you could be; is that fair?

3    A    Yes, I do.

4    Q    You take pride in it?

5    A    Yes, I do.  I take a lot of pride in it.

6    Q    And you follow the rules?

7    A    I follow the rules.

8    Q    And one of the most important things that you have to work

9    with would be information, correct?

10   A    Yes.  Correct.

11   Q    And if there's information that you can do your -- help

12   you to do your job better, you want that information, fair?

13   A    Yes.

14   Q    And a detention officer is taught from the very beginning

15   that you're in charge of the care, custody and control of the

16   inmates, correct?

17   A    Correct.

18   Q    And "care" is the duty that you have to care for the

19   inmates, fair?

20   A    Yes.  We do.

21   Q    And it's also fair to say that "care" includes mental

22   healthcare?

23   A    It does.

24   Q    If an inmate needs mental healthcare, then you're supposed

25   to contact someone from Mental Health, correct?

DIRECT EXAMINATION - ROBERT HEWITT

1  A   We do, yes.

2  Q   And that's because you may not be an expert at diagnosing

3  mental illness, but when you see it, you call in the people

4  that should recognize it, correct?

5  A   Correct.

6  Q   And you rely on them to do their job so you can do your

7  job?

8  A   Right.

9  Q   And "custody," let's talk about that for a second.

10      The "custody" part of the job is keeping people in

11  custody, correct?

12  A   Yes.

13  Q   And if someone wants to move from one cell to another, it

14  has to be you guys that tell them to do that.  They don't get

15  to just say I'd like to be this guy for my roommate, fair?

16  A   Yes.  We're the only ones who can do it.

17  Q   And then "control" is the duty to keep control over the

18  inmates, fair?

19  A   Yes.

20  Q   And when an inmate kills another inmate, that is a lack of

21  control, fair?

22          MS. HESMAN:  Objection, Your Honor.  Argumentative.

23          THE COURT:  Overruled.

24  BY MR. ROBBINS:

25  Q   If you would like me to repeat it, I can.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - ROBERT HEWITT

1    A    Yeah.  Would you repeat that again?

2    Q    Yeah.  When an inmate kills another inmate, there is a

3    lack of control, fair?

4              MS. HESMAN:  Objection, Your Honor.  Vague.

5              THE COURT:  Overruled.

6              THE WITNESS:  No.

7    BY MR. ROBBINS:

8    Q    Okay.  But in the academy they taught you the duty of

9    control includes the duty to keep inmates in the jails safe

10   from violence at the hands of other inmates, fair?

11   A    Yes.  We do everything we can.

12   Q    But that includes a duty to keep inmates free from

13   violence at the hands of other inmates and you were taught

14   that from the very beginning, right?

15             MS. HESMAN:  Objection, Your Honor.  Argumentative

16   and vague.

17             THE COURT:  Overruled.

18             THE WITNESS:  Would you repeat the question one more

19   time?

20             MR. ROBBINS:  Of course, I can, and feel free.

21   BY MR. ROBBINS:

22   Q    Have you ever testified in front of a jury?

23   A    No.  This is my first time.

24   Q    Okay.  Well, I have been in front of juries a lot and I'm

25   still nervous, so I understand, and just ask me to repeat any

DIRECT EXAMINATION -  ROBERT HEWITT

1    time.

2         But from the very beginning of your training through

3    the academy, they taught you that one of the jobs that you had

4    to do was to try to keep inmates safe from violence at the

5    hands of other inmates, correct?

6    A   That's one of the things we have to do, yes.

7    Q   And inside the jail it is fair to say that inmates can be

8    dangerous, correct?

9    A   Some inmates can be dangerous, yes.

10   Q   And you're trained to be aware of the potential for

11   violence as part of the training that you received as a

12   detention officer, correct?

13   A   Correct.

14   Q   And you have seen violence in the jails, correct?

15   A   Correct.

16   Q   Fights?

17   A   I'm sorry?

18   Q   Fights.  You've seen fights?

19   A   Oh, yes.

20   Q   It's not infrequent, correct?

21   A   Not infrequently, no.

22   Q   In areas -- how often would you say that you see fights?

23   A   I could probably see fights maybe once a week at least.

24   Q   And that's just -- and when you're assigned, you don't

25   walk through the entire jail to see if there's been a fight.

DIRECT EXAMINATION -  ROBERT HEWITT

1    You're usually stationed to a unit, correct?

2    A    Correct.

3    Q    And how big is a unit?

4    A    It will house -- can house up to 72 inmates.

5    Q    And how many units are there in the Fourth Avenue Jail?

6    A    There is around 2,000 I would imagine.

7    Q    And do you know how many --

8            There are four floors in the Fourth Avenue Jail?

9    A    Four floors, yes.

10   Q    And the first floor is for intake, correct?

11   A    Correct.

12   Q    Are there cells there?

13   A    There are holding cells, yes.

14   Q    Okay.  But those aren't the people that are actually being

15   kept in jail that have already gone through their first

16   hearing and assigned to be housed there, correct?

17   A    Yes.  They're just being brought in.

18   Q    And how many people would you estimate are in that area of

19   the Fourth Avenue Jail?

20   A    It can vary.  It can vary.

21   Q    What range?

22   A    Maybe twenty to a hundred.

23   Q    And then the second floor is the floor that we're dealing

24   with in this case.  You have that understanding?

25   A    Yes.

DIRECT EXAMINATION -  ROBERT HEWITT

 1   Q    And how many different units are there on floor No. 2?

 2   A    Are you talking about pods?

 3   Q    Yes.

 4   A    There are six.

 5   Q    And when you used the number "72," that was 72 per pod?

 6   A    Yes.

 7   Q    And then the third floor, are there also six pods?

 8   A    Yes.

 9   Q    And the fourth floor, are there also six pods?

10   A    Fourth floor is a little different, but basically, yes.

11   There is six pods.

12   Q    And fourth floor is a little different because that's

13   Closed Custody?

14   A    Right, SMU.

15   Q    But earlier when you said about one fight per week, that

16   was in one of the 18 or so pods that are in the Fourth Avenue

17   Jail?

18           MS. HESMAN:  Objection, Your Honor.  Misstates

19   testimony.

20           THE COURT:  Overruled.

21           THE WITNESS:  I'm sorry.  Say that again.

22   BY MR. ROBBINS:

23   Q    I thought you said "right," but what I said was when you

24   talked about the one fight per week, that was in one of those

25   18 pods, the six on the fourth, six on the third?

DIRECT EXAMINATION -  ROBERT HEWITT

1    A    Yes, the one that I was in.

2    Q    And you don't see all the fights, correct?

3    A    Correct.

4    Q    And sometimes you'll see people with black eyes and they

5    say, oh, I slipped in the shower and things like that?

6    A    That can happen, yes.

7    Q    Now, Classification is supposed to help you to do your

8    job, correct?

9    A    Correct.

10   Q    And they classify people as minimum, medium and maximum,

11   fair?

12   A    Yes.

13   Q    And of those classifications, do you know what minimum

14   custody level, what kind of people are held in minimum

15   custody?

16           MS. HESMAN:  Objection, Your Honor.  Foundation.

17           THE COURT:  Sustained.

18   BY MR. ROBBINS:

19   Q    Let me rephrase the question.

20           Do you have an understanding of what "minimum

21   custody" is?

22   A    Yes.

23   Q    And is it fair to say that that is the level which

24   indicates the lowest level of security required to manage the

25   inmate?

DIRECT EXAMINATION - ROBERT HEWITT

1          MS. HESMAN:  Objection, Your Honor.  Foundation.

2          THE COURT:  Overruled.

3          THE WITNESS:  Yes, it is.

4   BY MR. ROBBINS:

5   Q   And that's because for the most part they're nonviolent,

6   fair?

7          MS. HESMAN:  Objection, Your Honor.  Argumentative.

8          THE COURT:  Overruled.

9          MR. ROBBINS:  Do you need me to repeat?

10         THE WITNESS:  No.  "Minimum" is for your everyday

11  inmate that -- it's a DUI, it's trespassing, it's loitering,

12  whatever it is.  There's no violence attached to those.

13  BY MR. ROBBINS:

14  Q   Trespassers is one of the types?

15  A   Just A very minimal charge.

16  Q   And then medium is for people who are a little more

17  violent, correct?  Maybe have more disobedience, more harder

18  to manage?

19  A   It depends on the charge.  I mean, mediums don't have to

20  be violent at all.  It's just whatever they've done to get

21  them there.

22  Q   Would you go ahead, if you would, and look at Exhibit 114.

23  It should be --

24         Oh.  Ms. Williams will provide that to you.

25  BY MR. ROBBINS:

DIRECT EXAMINATION - ROBERT HEWITT

1   Q   Do you recognize Exhibit 114?

2   A   Yes.

3   Q   And what is Exhibit No. 114?

4          MS. HESMAN:  Objection, Your Honor.  Foundation.

5   This is a Classification policy.

6          THE COURT:  Overruled.

7   BY MR. ROBBINS:

8   Q   What is Exhibit 114?

9   A   It's a policy on inmate classification.

10  Q   And that's something that they taught you about in the

11  academy and since then about the different levels of

12  classification within the jail, correct?

13  A   Correct.

14         MR. ROBBINS:  Your Honor, I move for admission of

15  Exhibit No. 114.

16         MS. HESMAN:  It's admitted.

17         THE COURT:  According to our record it's in evidence.

18         MR. ROBBINS:  I'm going to present it to the jury.

19         THE COURT:  You may.

20  BY MR. ROBBINS:

21  Q   And go ahead and look at the bottom of it.  And I'll just

22  call it out so we can all read it.

23         Minimum -- or medium classification are inmates that

24  score in the medium range of security and are presumed to be a

25  moderate risk to the safety of staff, other inmates and the

DIRECT EXAMINATION -  ROBERT HEWITT

1    orderly operation of the facility.

2             Did I read that correctly?

3    A    Yes.

4    Q    And then maximum inmates are the ones -- inmates who score

5    the highest in the level of security to ensure the safety of

6    staff, other inmates and the orderly operation of the

7    facility.  This classification of inmates presents a higher

8    risk of violence, escape or require greater observations for

9    various reasons as supported by the current charge, criminal

10   history or documented institutional misconduct.

11             Did I read that correctly?

12   A    Yes.  You did.

13   Q    That's the highest level minimum, medium and maximums is

14   the highest level of those, correct?

15   A    Yes.

16   Q    Closed Custody are people -- and I'm probably -- but

17   Closed Custody would be someone -- if Hannibal Lecter were a

18   real person, he would be held in Closed Custody, correct?

19   A    Yes.

20   Q    They can't actually interact with the officers without

21   handcuffs on.  You cuff them before they come out of their

22   cell, correct?

23   A    Yes.

24   Q    But of the minimum, medium and maximum, if you're dealing

25   with maximum inmates, they can be very dangerous, correct?

DIRECT EXAMINATION -  ROBERT HEWITT

1   A   They could be.

2   Q   When you became an officer after you graduated from the

3   academy, you took an oath, correct?

4   A   Yes.

5   Q   And it was to up hold the Constitution of the United

6   States, correct?

7   A   Yes.

8   Q   And that oath meant that you were going to treat the

9   inmates in a way that met constitutional standards and norms,

10  fair?

11  A   Yes.

12  Q   And one of the things that would enable you to do that is

13  getting the information you need to do your job safely, fair?

14  A   Yes.

15  Q   You have no idea of who Ryan Bates was before you were

16  asked -- or before he walked into a sally port that you were

17  in, fair?

18  A   No.  He was just another inmate amongst other inmates at

19  that time.

20  Q   And when you say that, it's because you weren't assigned

21  to be in pod 2E every day for months and months and months and

22  years, correct?

23  A   You can't possibly get to know every single inmate because

24  inmates come and go.  You know, they just blend in with each

25  other.

DIRECT EXAMINATION -   ROBERT HEWITT

1    Q    Okay.  And that's because one of the things, you're not

2    stationed out in the middle of the pod where you're

3    interacting with them and you can -- you can hear them if they

4    yell out, correct?

5    A    No.  I'm not stationed in the pod, no.

6    Q    There's not a desk in the middle of the pod where you're

7    seated and you can hear what's going on and people come up and

8    ask you questions.

9         That's not the way the Maricopa County Jail is set

10   up.

11   A    Fourth Avenue Jail is not set up that way.

12   Q    The Fourth Avenue Jail, though, is set up that way that

13   there are no desks in the middle of the pod where you sit and

14   kind of can hear and interact with the inmates at all times?

15   A    Correct.

16   Q    In fact, let me show you -- with your permission I'm going

17   to put up that demonstrative.  Let me see if I can.

18        With defense counsel's permission we agreed that we

19   would use this as a representation of the pod.  It's not

20   exact.  It doesn't look exact to you, does it?

21   A    No.  It's not exact.

22   Q    But it does show us some things that we can talk about.

23        The day that Ryan Bates came into the sally port, you

24   were working in 2E, correct?

25   A    Correct.

DIRECT EXAMINATION - ROBERT HEWITT

1  Q   And I don't know if you touch the screen whether or not it

2  shows up, but if you put -- if you could put a circle around

3  where the floor office -- where your office was.

4  A   (Witness drawing)

5  Q   And where is the window in the floor office?

6  A   There is no window in the floor office.

7  Q   Okay.  So you can't really even see the inmates when

8  you're in the floor office, correct?

9  A   No.  The floor officer -- is tower officer can.

10  Q   Okay.  And that's the way the jail was designed.  You're

11  doing the best you can given that fact, correct?

12  A   Yes.

13  Q   Okay.  And when you're in 2E, you're responsible for both

14  the 100 and the 200 side, correct?

15  A   Yes.

16  Q   And would -- and really the 100 plus the 200 equals the

17  76 -- I think you said 76?

18  A   72.

19  Q   72.  That's where the 72 inmates are?

20  A   No.  Maximum 72 inmates per pod.

21      So 100 has 72 maximum.  200 has 72 maximum.

22  Q   So 72, 144 inmates that you're supposed to watch, correct?

23  A   Correct.

24  Q   And you're one of a team.

25      And the day that Ryan Bates walked into the sally

DIRECT EXAMINATION -  ROBERT HEWITT

1   port, you were one of two floor officers, correct?

2   A    Correct.

3   Q    And you and he are the people that walk the floor every

4   half hour to make sure that everyone is checked on?

5   A    It's 25 minutes, but, yes.

6   Q    So every 25 minutes, you're interacting potentially with a

7   144 inmates?

8   A    Potentially, yes.

9   Q    And when you get to the end of one walk, do you just start

10  it again?  Or do you have other things that you're also

11  supposed to do?

12  A    No.  There's other things that we do during those walks.

13  We're always stopped to talk to the inmates.

14          An inmate will get our attention.  He needs something

15  or he wants something.  We give out mail.  We give out forms,

16  soap, toothpaste, toothbrushes.  Nearly every walk we're doing

17  something.

18  Q    When you hear "Five-O," what does that mean?

19  A    Five-O?

20  Q    Five-O.

21  A    Oh.  It's usually when we come in the house.

22  Q    Five-O for like Hawaii Five-O?

23  A    Police, yeah.

24  Q    So they'll call it out so that they know you guys are

25  around?

DIRECT EXAMINATION - ROBERT HEWITT

1   A   Right.

2   Q   Fair to say that there's not a time when you guys put out

3   a desk on the floor and you bring up everyone and say:

4         Hey, how are you doing?

5   A   No.  We walk the lower tier and the upper tier.  We are

6   available for anybody that wants to talk to us.

7   Q   Well, the reason they call it Five-O is that most people

8   really don't want to talk to you, fair?

9         MS. HESMAN:  Objection, Your Honor.  Speculation.

10         THE COURT:  Overruled.

11         THE WITNESS:  No.  Most people will talk to us if

12   they want to at some point whether they -- even if they slip

13   us a note.

14   BY MR. ROBBINS:

15   Q   And so in the 25 minutes you have, you walk around the

16   bottom tier of 100.  Then you walk up the stairs.  You walk

17   the second story of that flight.  Then you go over to the

18   sally ports.

19         And let's take a minute to talk about the sally

20   ports.  The sally port has two doors in it, right?  If I'm

21   walking towards the sally port, the door will slide open and I

22   will walk in.

23   A   Correct.

24   Q   And then when I walk in, the door closes behind me?

25   A   Correct.

DIRECT EXAMINATION -  ROBERT HEWITT

1    Q    And then on the other side the door will open and I can

2    walk through into a hallway, correct?

3    A    Into a sally port across to the 200 side.

4    Q    Yeah.

5    A    Yeah.

6    Q    And then the door closes behind me and the same thing

7    happens when I go over to the 200 side.  I have to wait for

8    all the doors?

9    A    Right.

10   Q    And then as part of my every-25-minute duty, I then have

11   to walk the bottom flight, go up to the second floor, walk the

12   second one and the whole thing repeats itself and repeats

13   itself?

14   A    Every 25 minutes.

15   Q    Every 25 minutes.

16         So I'm interacting with 144 people in 25 minutes,

17   which means I've got about, what, 20 seconds per inmate?

18   A    Not every inmate wants to talk to us.  They're watching

19   TV.  They're playing cards.  If maybe two or three want to

20   talk to us, they will at that time.

21   Q    You don't remember Ryan Bates ever talking to you,

22   correct?

23   A    I don't remember.

24   Q    Before he -- you started interacting with him because he

25   walked into the sally port?

DIRECT EXAMINATION - ROBERT HEWITT

1   A   No.  I don't recall.

2   Q   Okay.  And the floor officers, we talked about what they

3   do.  But there's also a tower officer that can see what's

4   going on within the tower?

5   A   Yes.

6   Q   And you've worked as a tower officer, correct?

7   A   Yes.

8   Q   It's not -- is it round like it is in this picture?  Is it

9   a round tower?

10  A   It is basically round.  I mean, it's not --

11  Q   It's not a perfect circle but it's round?

12  A   There is windows completely around it.

13  Q   And the person in the tower -- first of all, there are no

14  cameras in any of the cells, correct?

15  A   Actually, in the cell, no.

16  Q   Okay.  And the tower officer, he's got 74 cells to look

17  at, correct?

18  A   Correct.

19  Q   And the cells have a window in them in the door, right?

20  A   In the doors and in the wall.

21  Q   There's another one that's up on the wall, correct?

22  A   Correct.

23  Q   And you've worked as a tower office and you can't see in

24  all the cells, right?

25  A   Correct.

DIRECT EXAMINATION -  ROBERT HEWITT

1    Q    You can see parts.  And if they're in the right spot, you

2    can see some of them; the inmates, that is?

3    A    Correct.  Yes.

4    Q    And what are the other duties the tower officer --

5         When you guys are making your walk, it's the tower

6    officer's duty to watch you guys make your walk, correct?

7    A    Correct.  Yes.

8    Q    That's because they want to make sure you're safe in

9    maximum security -- maximum security units?

10   A    Correct.  Yes.

11   Q    They can't take their eye -- they can't go and take a

12   phone call -- they're not supposed to, at least.  They're

13   supposed to watch you to make sure you're safe?

14   A    Yes.

15   Q    So you've got a tower officer that's watching you and then

16   you've also got a fellow officer that's walking with you to

17   make sure you're safe in this secured unit?

18   A    Correct.  Yes.

19   Q    What are the other things -- when the tower officer is not

20   watching you make your walk, I take it that if you're making a

21   walk and you stop at some point, then the tower officer is

22   supposed to watch you?

23   A    Yes.

24   Q    Okay.  Because if you stop the whole time and you're

25   talking about everyone and then you do a loop around and it

DIRECT EXAMINATION - ROBERT HEWITT

1    takes you all 25 minutes, the tower officer really doesn't get

2    to do anything other than watch you?

3    A    He can also watch you on camera.

4    Q    The walks take about -- to do the whole thing take about

5    ten minutes, right?

6    A    Yes, about ten minutes.

7    Q    So it's really not 25 minutes of interaction with the

8    inmates really.  It's usually about ten, fair?

9    A    Correct.  Yes.

10   Q    And that's the reason you walk every 25 minutes is you

11   want to be able to at least check in the cells, correct?

12   A    Correct.

13   Q    And you want to see living, breathing people?

14   A    Also, I think it's fair to tell you that we don't have 72

15   inmates out in one pod at one time.

16   Q    Definitely.

17   A    There's only half.  There's only 36 out maximum at a time.

18   They each have eight hours out.  The other group will have

19   another eight hours out.

20   Q    Very fair.  Very fair.

21         And so let's explain that.  So do you release the top

22   floor for eight hours and then you release the bottom floor

23   for eight hours?

24   A    Basically, yes.  There is a schedule so that the same

25   people are not out at the same time every day.

DIRECT EXAMINATION - ROBERT HEWITT

1    Q   Now, that's not the same in 2B, correct?

2    A   No.

3    Q   In 2B that's a disciplinary pod, correct?

4    A   Correct.

5    Q   And, in fact, in 2B the inmates are locked in a cell for

6    23 hours with another inmate?

7    A   Correct.

8            MR. ROBBINS:  Your Honor, may I step away from the

9    podium?

10           THE COURT:  You may.

11   BY MR. ROBBINS:

12   Q   Can you still see there?

13   A   Yes.

14   Q   Okay.

15           MS. HESMAN:  Your Honor, may I step over there so I

16   can see?

17           THE COURT:  You may.

18           MS. HESMAN:  Thank you.

19   BY MR. ROBBINS:

20   Q   Now, does that look like -- are all the cells in 2B and 2E

21   set up the same way about?

22   A   Yes.

23   Q   Okay.  And there is a bunk that's in there that has a top

24   bunk and a lower bunk?

25   A   There is.

DIRECT EXAMINATION - ROBERT HEWITT

1    Q    Let's wait for counsel.

2              Okay.  And there is a desk of sorts?

3    A    Yes.

4    Q    And there's a bench next to the desk that's cemented in?

5    It's not one that you move around?

6    A    Correct.

7    Q    And there's a toilet?

8    A    Correct.

9    Q    And there's a sink up on top of the toilet?

10   A    Yes.

11   Q    So if an inmate needs to drink, he can go there and get

12   water?

13   A    Right.  Correct.

14             MR. ROBBINS:  And, Your Honor, with your permission,

15   I would like to be able to look at the diagram.

16             THE COURT:  You may.

17   BY MR. ROBBINS:

18   Q    And this says that this whole thing is about 160 inches,

19   which is about 14 feet.  Is that about right?

20   A    That's about right, yes.

21   Q    And it's about 72 inches across which is about six feet?

22   A    That's pretty close, yes, I would say.

23   Q    And you have got enough room that you've got about 40

24   inches on the side of the bed so you can walk in there.

25             But if you're walking -- if you're both walking -- if

DIRECT EXAMINATION - ROBERT HEWITT

1   you have two people walking in there, sometimes you have to

2   move a little bit?  It's not very wide?

3   A   It's not very wide but it's wide enough you can get two

4   people past.

5   Q   Yeah.  You might have to kind of turn sideways or

6   something but it's big enough that two people can walk past

7   each other?

8   A   Yes.

9   Q   And I'll just take this down.

10         And in that 14 -- about 14 foot by 6 foot cell -- in

11  that 14 by 6 foot cell, two inmates, when they're in that

12  secured or Disciplinary Segregation, they're locked in there

13  23 hours together?

14  A   Correct.

15  Q   And if one of them stinks because they don't take showers,

16  they don't take care of themselves, they just aren't taking

17  care of themselves, it can be a pretty bad smell?

18         MS. HESMAN:  Objection, Your Honor.  Speculation.

19         THE COURT:  Sustained.

20  BY MR. ROBBINS:

21  Q   When you do your walks, you can sometimes smell the cells,

22  fair?

23  A   I would have to say no on that.

24  Q   Okay.  So when you open the traps, you have never had a

25  smell come out of a room where they had feces wiped all over

DIRECT EXAMINATION -  ROBERT HEWITT

```
 1   the walls?  You can't smell that?
 2   A   Yes.  If that happens, of course.
 3   Q   And can you -- have you ever -- you have not had the
 4   experience where someone has not taken care of themselves
 5   because of whatever reason for so long that they begin to
 6   actually stink?  You've not experienced that in the jail?
 7           MS. HESMAN:  Objection, Your Honor.  Vague.
 8   Speculation.
 9           THE COURT:  Overruled.
10           THE WITNESS:  I have.
11   BY MR. ROBBINS:
12   Q   Okay.  You wouldn't want to be in a cell with someone who
13   smelled like that, right?
14   A   No.
15   Q   Now, because you were moved around quite a bit, you really
16   didn't have the opportunity -- within the Fourth Avenue Jail
17   you really didn't have a chance to get to know all of the
18   inmates or even a few of them, fair?
19   A   No.  There was quite a few inmates that I had a rapport
20   with.
21   Q   Okay.  So out of the 144, you would have a rapport with a
22   few of them, right?
23   A   Yes.
24   Q   Have you done cell assignments?
25   A   Yes.
```

DIRECT EXAMINATION - ROBERT HEWITT

1    Q   And is it fair to say that you do not -- or strike that.

2           When you were doing cell assignments, there is no

3    written policy for cell assignments, correct?

4    A   I believe there is cell assignments.  I believe so.

5    Q   If there is, would you be surprised if it's not been

6    produced within this case?

7           MS. HESMAN:  Objection, Your Honor.  Argumentative.

8           THE COURT:  Sustained.

9    BY MR. ROBBINS:

10   Q   Do you have any citation or what is this alleged policy of

11   cell assignments?  What policy number is it?

12   A   I don't believe I know that.

13   Q   There ought to be one, right?  You would agree with that?

14          And if there's not, then -- if you don't know that

15   there's not, you're assuming there is because there ought to

16   be, fair?

17          THE COURT:  I'm sorry, but I think there were about

18   ultimately three questions folded into that question.

19          MR. ROBBINS:  Might have been four.

20          THE COURT:  Okay.

21          MR. ROBBINS:  I take the Court's observation with

22   great credibility.

23   BY MR. ROBBINS:

24   Q   There is -- there should be a written policy for cell

25   assignments.  You agree with that, correct?

DIRECT EXAMINATION -  ROBERT HEWITT

1   A    I'm not sure whether it should be a policy but a rule or a

2   guideline.

3   Q    There should be a written rule or guideline, right?

4   A    I'd say yes.

5   Q    Because that's a pretty darn important thing, fair?

6   A    Yes.

7   Q    When you're locking someone into a cell for 23 hours a day

8   with another human being, you would agree that the number one

9   danger for that person in that cell for either of the people

10  in the cell is the other person, right?

11  A    It's possible.

12  Q    And to the extent that you can make a better cell

13  assignment by having better information, you want to have that

14  information, correct?

15  A    Well, we have that information.

16  Q    You want to have as much as you can get if it helps you to

17  do your job, fair?

18  A    Of course, yes.

19  Q    And there is no written guideline requiring a

20  Classification officer -- strike that.

21       You don't know about Classification, obviously.

22       There's no written guideline that says:

23       For cell assignments that you should, if a person is

24  SMI, contact Mental Health.

25       Correct?

DIRECT EXAMINATION -  ROBERT HEWITT

1   A   If somebody is SMI, they would have already been

2   segregated before they hit me.

3   Q   So let me reask the question.

4        There is no written requirement or even suggestion or

5   rule or guideline that says that you need to call Mental

6   Health because they've been released, correct?

7   A   Yes.

8   Q   So there is no policy even if someone is SMI, paranoid

9   schizophrenic, there's no policy that says you should call

10  Mental Health before you make a cell assignment with that

11  person, correct?

12  A   That's already been established before they are in General

13  Population.

14  Q   Maybe I asked the question in an inartful way and I

15  apologize.

16       There are no written guidelines.  There are

17  nothing -- you don't call up Mental health and say:

18       Hey, this guy, I see on his records that he's

19  paranoid schizophrenic and he's acting really weird.  Should I

20  stick him in a cell with another human being?

21       That's not something you do, correct?

22  A   I have done that, yes.

23  Q   And it's not in any of the policies, correct?

24  A   Correct.

25  Q   And you weren't taught to do it that way at the academy,

DIRECT EXAMINATION -   ROBERT HEWITT

1    correct?

2    A    During the academy we're told if we have any kind of

3    doubts, if there's red flags, if the inmate's acting

4    strangely, to call Mental Health and ask them their opinion.

5    Q    And let's talk about that for a little bit because the red

6    flags are acting so bizarrely that you think that they might

7    belong in Mental Health, correct?

8    A    Yes.

9    Q    But you are never taught and you were never taught that

10   when you're classifying a -- or you're putting -- making a

11   cell assignment and you see "SMI" and you see that they have

12   something like paranoid schizophrenia that you should consult

13   with Mental Health and call them, correct?

14             That's true, correct?

15   A    Yeah -- yes.

16   Q    Okay.  But you don't always follow -- you don't -- even

17   though there's no policy that tells you that you have to do

18   it, you know it's important enough -- you know that it's

19   important enough that you have actually done it before,

20   correct?

21             You've called Mental Health and said:

22             I think -- I don't want to assign this guy because he

23   appears to be mentally ill and he might be having some

24   problems.

25             Is that fair?

DIRECT EXAMINATION -   ROBERT HEWITT

1    A    I will still put him into a cell but by himself.

2    Q    Okay.

3    A    Until, you know, I have called SMI -- or Mental Health.

4    Q    But that's the thing about not having a policy about it is

5    that you're aware that not everybody does what you do,

6    correct?

7    A    No.  I think everybody that I know of would do that, that

8    would finally put somebody into a cell.

9    Q    So as I understand it, if someone is mentally ill, has

10    paranoid schizophrenia, then all of the standard requires --

11    the standard requires that all of the people call up Mental

12    Health to ask them about the cell assignment.  At least --

13            MS. HESMAN:  Objection, Your Honor.

14    BY MR. ROBBINS:

15    Q    At least all the people you know?

16            MS. HESMAN:  Objection, Your Honor.  It's vague and

17    confusing.

18            THE COURT:  Overruled.

19            THE WITNESS:  See, I don't believe that any SMI

20    inmate has reached General Population that if they're having

21    difficulty with mental issues, that would have been reassigned

22    to somebody like the Psych wards over at LBJ.

23    BY MR. ROBBINS:

24    Q    Do you know a Detention Officer Huber?

25    A    I know him, yes.

DIRECT EXAMINATION -  ROBERT HEWITT

```
1    Q    Have you ever talked to him about what he considers to be
2    the revolving door of the Mental Health Unit?
3    A    I have not.
4    Q    Do you know what's referred to when they talk about the
5    revolving -- if the term "revolving door" of Mental health --
6    if that term is used, do you understand what that means?
7    A    Yeah, I know.
8    Q    Tell the jury, if you would.
9    A    "Revolving door" means that somebody keeps coming back for
10   whatever reason.  If it's mental, they'll be in the Psych
11   wards for a period of time.
12        The doctors will deem them okay to go back to General
13   Population.  They go back.  They can't handle it there and
14   then they come back again to Psych wards.  It's just a
15   revolving door.
16   Q    Now, if a -- if a person that you're assigning to a
17   particular cell is hearing voices and is paranoid, as the
18   tower officer -- or strike that.
19        Who does -- do the tower officers do the cell
20   assignments?
21   A    He can but floor officers can help with that too.
22   Q    Okay.  And if -- whoever is making that decision about
23   where to put an inmate, if there was information out there
24   that the person was hearing voices and was paranoid, that
25   would be something you would want to know, correct?
```

DIRECT EXAMINATION -  ROBERT HEWITT

1    A    Yes.

2    Q    Because you would either want to put him in a cell by

3    himself or send him to the Mental Health Unit, fair?

4    A    Correct.

5    Q    And if an inmate was bipolar and was given anti-psychotics

6    in the past but wasn't being given any medications now, that

7    would be some information that would be helpful to you in cell

8    assignment, fair?

9    A    Not necessarily.  If they were taking medications before

10   but they're not now means that they don't need them.

11   Q    That's what your hope is.

12        But if they need the medication now and they're not

13   being given medication, that would be something that you would

14   want to know, fair?

15   A    Yes.

16   Q    Have you been given any training about what types of

17   behaviors would help you identify someone that might be

18   paranoid schizophrenic?

19   A    Yes.

20   Q    And were you taught that paranoid schizophrenics can be

21   dangerous if they're floridly psychotic.

22        MS. HESMAN:  Objection, Your Honor.  Foundation.

23        THE COURT:  Sustained.

24   BY MR. ROBBINS:

25   Q    Let me rephrase that.

DIRECT EXAMINATION - ROBERT HEWITT

1          Did you have an understanding based upon your
2    training that paranoid schizophrenics who are actively
3    psychotic or floridly psychotic could be dangerous?
4          MS. HESMAN:  Objection, Your Honor.  Foundation.
5          THE COURT:  Sustained.
6    BY MR. ROBBINS:
7    Q   You do receive some training on the identification of
8    people who are paranoid schizophrenic, correct?
9    A   Correct.
10   Q   And did they teach you that people who were actively
11   paranoid schizophrenic could be dangerous from the viewpoint
12   of the detention staff?
13   A   Like I said before, if they were dangerous, that would
14   already have been established if they were violent.  Not
15   everybody is violent.
16   Q   Were you taught the significance of what a person being
17   paranoid schizophrenic and actively psychotic, what that would
18   mean --
19         MS. HESMAN:  Objection, Your Honor.  Foundation.
20   BY MR. ROBBINS:
21   Q   -- in terms of your job as a detention officer?
22         MS. HESMAN:  Same objection.
23         THE COURT:  Sustained.
24   BY MR. ROBBINS:
25   Q   At the time that you -- that Ryan Bates walked into the

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -  ROBERT HEWITT

1   sally port where you were, you did not know whether he was

2   paranoid schizophrenic, correct?

3   A   I didn't suspect he was.

4   Q   You didn't know whether he had ever been diagnosed before

5   with that, correct?

6   A   No.

7   Q   You didn't know that he was unmedicated, correct?

8   A   No.

9   Q   You didn't know that earlier in the day he had been

10  identified by a court as acting bizarrely and that that

11  bizarre behavior caused them to hold him pending Mental Health

12  coming and checking on him, correct?

13  A   I didn't know that, no.

14  Q   And you don't know that -- you weren't told and no one

15  told you that at least he said that he was on drugs, correct?

16  A   Correct.

17  Q   If someone is acting out, whether through mental illness,

18  do you run into many people who are under the influence of

19  drugs that can cause violent behavior?

20  A   You mean within the jail setting?

21  Q   Yes.

22  A   No.  Hopefully, they've -- they don't have any drugs in

23  their system when they get to me.

24  Q   And so if earlier in the day Ryan Bates had indicated that

25  he had somehow managed to get ahold of some drugs, that would

DIRECT EXAMINATION -   ROBERT HEWITT

1   be information that would you want to know, fair?

2   A   You mean if he was given drugs legally or illegally?

3   Q   No.  No.  No.  No.

4         That somehow he had managed through whatever means to

5   get ahold of drugs that were illegal; not administered by a

6   doctor, not anyone from Mental Health, but that he had somehow

7   managed to get illegal drugs?

8   A   I would like to have known that, yes.

9   Q   How would that have affected your interaction with him?

10  It would have made you more cautious, fair?

11  A   Yes.

12  Q   Now, you wrote a memo on -- I think you completed a memo

13  on your interaction with Ryan Bates and I think that you

14  completed it on July 10th; is that about right?

15  A   Approximately, yeah.

16  Q   It's Exhibit 5 in front of you if you would look at that.

17        Do you recognize Exhibit No. 5?

18  A   Yes.

19  Q   And is that your supplement?

20  A   Yes, it is.

21  Q   And is that a supplement -- are those types of supplements

22  completed in the regular course of your business?

23  A   Yes.

24  Q   That's something that you're taught how to write?  It's a

25  report that reflects what you saw that you felt was important

DIRECT EXAMINATION -  ROBERT HEWITT

```
 1   on the day you wrote it, fair?
 2   A   It's what I saw at the time, yes.
 3   Q   Okay.  And in Exhibit No. 5 do you mention the sally port
 4   incident with Ryan Bates?
 5   A   At this -- on this one, no.
 6   Q   Okay.
 7   A   That would have been separate incidences.
 8   Q   And, in fact, it wasn't until August 1st until someone
 9   called you up and asked you what you had seen in the sally
10   port, correct?
11   A   I don't recall the date.
12   Q   Okay.  Because when you wrote on July 10th -- in the
13   report you completed on July 10th, you don't mention the sally
14   port, you don't mention taking a mattress to -- to Mr. Bates,
15   you don't mention any of that, correct?
16   A   On this IR supplement, no.
17   Q   Go ahead and take a look at Exhibit No. 24.
18         Do you recognize what Exhibit No. 24 is?
19   A   It's a report.
20   Q   And --
21   A   An investigation report.
22   Q   It's a report from the Criminal Division of the Maricopa
23   County Sheriff's Office?
24   A   Uh-huh.  Yes.
25   Q   Okay.  And on the second page at the top, what date does
```

DIRECT EXAMINATION -  ROBERT HEWITT

```
 1    it say was the first time that they actually talked to you

 2    about what you had seen before you walked into the cell and

 3    see a murder scene?

 4              MS. HESMAN:  Objection, Your Honor.  Relevance.

 5              THE COURT:  Overruled.

 6              THE WITNESS:  I just seen an occurrence date 7/9.

 7    BY MR. ROBBINS:

 8    Q   I'm sorry.  I've got you looking at the wrong page.

 9              If you look at page No. 2, it's at the very top.

10    A   Sorry.

11    Q   No.  It's my fault.  August 1st, 2014, at approximately

12    9:18 in the morning, correct?

13    A   Correct.

14    Q   And you understood that this was a part of the criminal

15    investigation involving this case, correct?

16              This wasn't some quality assurance program where the

17    County was trying to investigate what might have gone wrong?

18              MS. HESMAN:  Objection, Your Honor.  Foundation.

19              THE COURT:  Sustained.

20    BY MR. ROBBINS:

21    Q   The officer who took the statement told you this was part

22    of the criminal case, correct?

23    A   Correct.

24    Q   And no one has ever come to you prior to having a lawsuit

25    or a Notice of Claim or something like that, no one ever came
```

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - ROBERT HEWITT

1  to you to try to figure out what had gone on for the purpose

2  of quality assurance where they told you:

3          Here's what we're doing.

4          MS. HESMAN:  Objection, Your Honor.  402.  403.

5          THE COURT:  Sustained.

6  BY MR. ROBBINS:

7  Q   To your knowledge, before Shari Ferreira filed the

8  lawsuit, was there any kind of investigation where you were

9  questioned and told that the purpose of it was to try and make

10 the jails better --

11         MS. HESMAN:  Objection, Your Honor.  402.  403.

12         THE COURT:  All right.  Give him a chance to finish.

13 BY MR. ROBBINS:

14 Q   -- better, safer or within constitutional requirements?

15         MS. HESMAN:  402.  403.

16         THE COURT:  Sustained.

17 BY MR. ROBBINS:

18 Q   On August 1st when you were questioned, you acknowledged

19 that there was a person with you when you -- when Ryan Bates

20 walked into the sally port, correct?

21 A   Correct.

22 Q   And that person's name was Detention Officer Johnson,

23 correct?

24 A   Correct.

25 Q   And have you ever read Detention Officer Johnson's report?

DIRECT EXAMINATION -  ROBERT HEWITT

1    A    I don't believe I have.

2    Q    Okay.  You don't remember -- you don't remember there

3    being an orange, that Bates had an orange with him, right?

4    A    I don't recall that, no.

5    Q    Okay.  But you do remember that Bates kept saying

6    something time and time again.

7              Do you remember what he said?

8    A    He was saying something to the nature of Junior was there

9    or Junior was doing something.  I don't recall the actual

10   words.

11   Q    Junior.  Where is Junior?  Something like that?

12   A    Something like that.

13   Q    And he wasn't really saying much other than Where's

14   Junior?  Where's Junior?  Right?

15   A    Correct.

16   Q    So the sally port that we talked about, the one between

17   those two sets of doors, about how much space is in there?

18   Bigger or smaller than that cell we have been talking about?

19   A    In the sally port itself?

20   Q    Yes.

21   A    The sally port is about six foot wide, maybe eight foot

22   wide by probably 20 foot long.

23   Q    Okay.  So it's a bigger area than --

24   A    A bigger area, yes.

25   Q    But he walks into there, right?

DIRECT EXAMINATION -  ROBERT HEWITT

1   A   Yes.

2   Q   And this is the first time you remember anyone doing that,

3   right?

4   A   Blatantly like that, yes.

5   Q   And he's asking:  Where's Junior?  Where's Junior?

6   A   Correct.

7   Q   There's not a guy named Junior that's missing that you

8   know of, correct?

9   A   Correct.

10  Q   There's not a guy named Junior that later you discovered,

11  hey, he was actually -- there's a guy that just disappeared

12  out of the cell.  He's reporting an escape.

13          There's no one like that, correct?

14  A   Correct.

15  Q   And you didn't know that he was schizophrenic and might be

16  having hallucinations, correct?

17  A   His demeanor to me did not show that he was having any

18  kind of mental episode or showing any red flags.

19  Q   He's the first --

20  A   He was just --

21  Q   Sorry.

22  A   -- blatantly refusing my commands to go back to their pod.

23  Q   Well, there's three things that he's doing.

24          First of all, he's the first guy that's blatantly

25  walked into that sally port because it is -- you cross -- you

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -  ROBERT HEWITT

1    cross a yellow line and you are not supposed to be there,

2    correct?

3    A    Correct.

4    Q    There's actually about how far from the door of the sally

5    fort is that yellow line that you're not supposed to cross?

6    A    It's probably ten feet.

7    Q    So you're not supposed to get within ten feet of that

8    sally port.  There's a yellow line and everyone knows you

9    don't cross that yellow line, right?

10   A    Correct.

11   Q    But there he is passed that yellow line and in the sally

12   port with you, right?

13   A    Yes.

14   Q    That doesn't strike you as odd?

15   A    No.  It's not odd because inmates will -- inmates don't

16   follow the rules pretty much is what I'm saying.

17   Q    Well, they manage to follow it in every case except this

18   one through your entire career.  He's the first guy that

19   blatantly walks into the sally port, right?

20        That does strike you as weird, right?

21   A    He is the only one that has come that far into the sally

22   port.  I have had inmates who will step or put their head

23   into -- kind of through the doors when they're open to let me

24   know that they need something, to bring a towel, bring soap,

25   bring something.

DIRECT EXAMINATION -  ROBERT HEWITT

1    Q   And that's something that you understand.  You seem like a

2    very compassionate fellow, fair?

3    A   I try to be.

4    Q   And thank you for that.

5             But people leaning in and saying, Hey, can you get me

6    some soap or something like that isn't what this guy does.

7             He comes right in there and isn't just kind of

8    skimming the rules.  He's just breaking it.  He's just walking

9    in there, right?

10   A   Yes.

11   Q   The only guy you remembered ever doing that, right?

12   A   Yes.

13   Q   You don't know that he had been reported as being

14   potentially mentally ill earlier in that day because you

15   weren't told that, right?

16   A   Yes.

17   Q   But that's not the only thing he does.

18            He walks into there.  But then he keeps asking:

19            Where's Junior?  Where's Junior?

20            And you have no idea what he's talking about,

21   correct?

22   A   Correct.

23   Q   That's number two.

24            But the third thing is you're a decent guy and you

25   say to him:

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -   ROBERT HEWITT

1              Go back to your cell.

2              Isn't that right?

3    A    Yes.

4    Q    That's because you were going to cut him that much of a

5    break but he does not leave, correct?

6    A    Correct.

7    Q    Now, at this point where he is not going to leave.  He has

8    been asked to leave.  He keeps asking about this Junior

9    character and he's walked into the sally port, at this point

10   is it -- whose decision is it:

11             Okay, he's going to need to go to Disciplinary Seg?

12   A    I made that decision.

13   Q    Okay.  And you didn't call a psychiatrist from Mental

14   Health to make that decision, correct?

15   A    Correct, because I did not think he was having a mental

16   episode.

17   Q    And --

18   A    He wasn't showing any of the signs.  He wasn't showing any

19   agitation.  He wasn't -- his eyes were looking right at me.

20   They weren't looking at the walls.  They weren't looking at

21   anything else.

22             He even had -- when he was talking to me, he even had

23   like a smirk on his face like he wasn't -- he was aware of

24   what he was doing.  He just wasn't going to follow my

25   commands.

DIRECT EXAMINATION - ROBERT HEWITT

1  Q   Now, it's interesting you'd would say that because you're

2  not -- you're trained to identify some of -- some symptoms of

3  mental illness but you're not a mental health expert, right?

4  A   No.  I'm not.

5  Q   And that's when someone is acting way out of character and

6  doing things that you have never seen done before.  And

7  they're saying stuff that you just don't understand.  But he's

8  looking at you with this intense gaze.  The person who needs

9  to diagnose him is Mental Health, correct?

10 A   Correct.

11 Q   And you've never been taught that before you impose

12 discipline that you need -- on a person who's been identified

13 as having mental illness or being in SMI, that you're supposed

14 to contact Mental Health, correct?

15 A   If I believe he is really having a mental episode, then,

16 yes.

17 Q   Okay.  Not quite my question.  Because my question

18 distinguishes the fact that you, the person who's deciding to

19 put him into discipline, was not taught that if you're going

20 to put a person whose been identified as SMI into discipline,

21 that you have to contact Mental Health, correct?

22         That's not the policy?

23 A   If I fully believe that he is having a mental illness or

24 mental episode, then, yes, I will call the right people.

25 Bates was not showing those signs.

DIRECT EXAMINATION -  ROBERT HEWITT

1   Q   Okay.  SMI plus discipline equals call to Mental Health.

2        You've not been taught that?  It is not the way

3   things are done at the MCSO, correct?

4   A   Yes.  We will call them.

5   Q   Okay.  So automatically what you're telling this jury is

6   that if you know someone is -- did you know that Bates was an

7   SMI?

8   A   I did not at that time, no.

9   Q   Okay.  So you didn't even ask the question:

10       Hey, I'm thinking of disciplining this guy.  I should

11  call Mental Health before I impose discipline because that was

12  not the policy, correct?  You followed the policy.

13  A   I followed the policy, yes.

14  Q   Okay.  And you didn't know -- and you didn't go to find

15  out whether or not he was an SMI, correct?

16  A   Correct.

17  Q   If Ryan Bates had been someone who thought that demons

18  were talking to him, that would be something you would want to

19  know, correct?

20       MS. HESMAN:  Objection, Your Honor.  Improper

21  hypothetical and assumes facts.

22       THE COURT:  Overruled.

23       MR. ROBBINS:  Do you remember the question?

24       THE WITNESS:  Yes.

25       If I had known that, yes.

DIRECT EXAMINATION -  ROBERT HEWITT

```
 1    BY MR. ROBBINS:

 2    Q   And if Mental Health had that information, you would have

 3    wanted that -- to know it, correct?

 4              MS. HESMAN:  Objection, Your Honor.  Foundation.

 5    Calls for speculation.

 6              THE COURT:  Overruled.

 7              THE WITNESS:  If I had known that Bates was hearing

 8    voices, I would have called Mental Health and have him

 9    assessed.

10    BY MR. ROBBINS:

11    Q   Instead of sending him straight to discipline, correct?

12              You would have kept him in the holding cell where he

13    was before he was taken over to the Disciplinary cell and you

14    would have had someone check him, correct?

15    A   He still could have gone to Segregation and still been

16    seen by mental health.  They would have pulled him out.

17    Q   But it would have been as a "house-alone" and not in a

18    cell with someone else, fair?

19    A   It could have been.

20    Q   Did you know anything -- strike that.

21              Did you know that Zach Daughtry was originally in the

22    county jail for a 30-day trespassing charge?

23    A   No.  I did not know that.

24    Q   Let's talk about the jails for a second about pretrial

25    detainees.
```

DIRECT EXAMINATION -  ROBERT HEWITT

1            What is a "pretrial detainee"?

2   A   Someone who is being held there before trial.

3   Q   And that means that under the constitution they are

4   presumed to be --

5   A   Innocent till proven guilty.

6   Q   And they're not supposed to be punished, correct?

7   A   In what way?

8   Q   Well, you're going to have to have some disciplining but

9   punishing a person -- strike that.

10           Do you have an understanding that punishing a person

11   that doesn't understand what is going on in terms of being

12   mentally ill and not having a grip on reality, that punishing

13   that person is a cruelty?

14           MS. HESMAN:  Objection, Your Honor.  Foundation.

15           THE COURT:  Overruled.

16           THE WITNESS:  Repeat that question for me again,

17   please.

18   BY MR. ROBBINS:

19   Q   Do you have an understanding that taking a mentally ill

20   person that doesn't understand reality and punishing them for

21   their behaviors is a cruelty because they just don't

22   understand.  They won't learn a lesson.

23   A   Correct.

24           MS. HESMAN:  Objection, Your Honor.  Counsel is

25   testifying.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -  ROBERT HEWITT

1           THE COURT:  Overruled.

2           THE WITNESS:  Yes.  That is cruel.

3   BY MR. ROBBINS:

4   Q   Did you know that the person whose cell Ryan Bates was put

5   into -- or strike that.

6           Within the jail they expect at least certain

7   behaviors.  The inmates themselves, correct?

8   A   Correct.

9   Q   They expect people to take -- to shower every once in a

10  while so they don't stink to high heaven, fair?

11  A   Yes.

12  Q   And, in fact, have you ever heard where even in a General

13  Population dorm where -- do they -- do they form up according

14  to racial lines within the jail at least within the maximum

15  security unit where there's a General Population?

16  A   You mean where they segregate themselves?

17  Q   Yeah.

18  A   Yes, of course.

19  Q   Where there will be a head of each of the different races?

20          MS. HESMAN:  Objection, Your Honor.  Relevance.

21          THE COURT:  Relevance?

22          MR. ROBBINS:  I'll get there, Your Honor.  Just give

23  me two questions and I'll promise you I'll get you to where we

24  need to be.

25          THE COURT:  So you're withdrawing this one?

DIRECT EXAMINATION -  ROBERT HEWITT

1          MR. ROBBINS:  No.  I'm going to ask this one and then

2     two more and I'll tell you where I'm headed.  It's just that

3     the race divisions will punish a person who doesn't shower

4     with chin checks or other forms of violence.

5          So that's where I'm headed; that it's known to the

6     Detention staff.

7          THE COURT:  Well, I still don't see the relevance, so

8     its sustained.

9     BY MR. ROBBINS:

10    Q    You know that people who don't shower and don't maintain

11    hygiene, that oftentimes they get beaten, correct?

12    A    In my experience that has never happened.

13    Q    You have never seen it?

14    A    No.

15    Q    You've never heard about it?

16    A    Inmates will ask me, you know, to get this guy showered.

17    And I have ordered people to have a shower.

18    Q    Okay.

19    A    I have never come across someone who has been beaten

20    because he won't shower.

21    Q    Never heard of a chin check?

22    A    A chin check?

23         MS. HESMAN:  Objection, Your Honor.  Relevance.

24         THE COURT:  Sustained.

25    BY MR. ROBBINS:

DIRECT EXAMINATION -  ROBERT HEWITT

1    Q    Have you ever heard of a torpedo?

2    A    Torpedo?

3    Q    Torpedo.

4    A    No.

5              MS. HESMAN:  Objection, Your Honor.  Relevance.

6              THE COURT:  Sustained.

7    BY MR. ROBBINS:

8    Q    A person who urinates on another person's --

9              Well, let's say they just urinate while they're just

10   sitting down and they just urinate in the cell.  Is that

11   something that will jeopardize a person's safety?

12             MS. HESMAN:  Objection, Your Honor.  Speculation.

13             THE COURT:  Sustained.

14   BY MR. ROBBINS:

15   Q    Based upon your experiences as a detention officer,

16   mentally ill inmates are considered vulnerable because their

17   odd behavior can cause them to be attacked by other inmates,

18   fair?

19             MS. HESMAN:  Objection, Your Honor.  Speculation and

20   foundation.

21             THE COURT:  Sustained on both counts.

22   BY MR. ROBBINS:

23   Q    Do you know whether in -- strike that.

24             In the academy when you went there they taught you

25   that mentally ill people were potentially vulnerable within

DIRECT EXAMINATION -  ROBERT HEWITT

```
 1    the population because sometimes they are taken advantage of
 2    and sometimes they are physically assaulted, correct?
 3            MS. HESMAN:  Objection, Your Honor.  Foundation.
 4    Calls for speculation.
 5            THE COURT:  Overruled.
 6            THE WITNESS:  We are told that they are vulnerable
 7    for one reason or another.
 8    BY MR. ROBBINS:
 9    Q   The mentally ill inmates are vulnerable.  They do things
10    that are unacceptable at times and that exposes them to
11    danger, fair?
12    A   It's possible.
13    Q   Like urinating on a roommate's mattress.  You would expect
14    there to be a fight after that happens, right?
15    A   Yes.
16    Q   But if a guy can't control himself to keep from doing
17    silly things like that, it would be a cruelty to punish them
18    for that, fair?
19            MS. HESMAN:  Objection, Your Honor.  Foundation.
20    Calls for an improper hypothetical.
21            THE COURT:  Sustained.
22    BY MR. ROBBINS:
23    Q   Masturbating in the middle of a pod can cause someone to
24    be targeted for violence, fair?
25            MS. HESMAN:  Objection, Your Honor.  Calls for
```

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -  ROBERT HEWITT

```
 1   speculation.  Foundation.
 2           THE COURT:  Sustained.
 3   BY MR. ROBBINS:
 4   Q   How about touching another inmate in a way that actually
 5   gets noticed by detention officers?  Is that something that
 6   they do a lot where you report someone for touching another
 7   inmate?
 8           MS. HESMAN:  Objection, Your Honor.  Compound.
 9           MR. ROBBINS:  Let me withdraw the question.
10           THE COURT:  Sustained.
11   BY MR. ROBBINS:
12   Q   It was compound.
13           Let me just ask you this.
14           How many times have you reported that an inmate was
15   touching another inmate?  Have you ever done that?
16           MS. HESMAN:  Objection, Your Honor.  Vague.
17           THE COURT:  Overruled.
18           THE WITNESS:  Can you explain "touching"?
19   BY MR. ROBBINS:
20   Q   Well, if the jury sees something that says:
21           Unknown officer indicates patient was moved to a
22   different pod after touching another inmate.
23           Have you ever had an instance where someone touching
24   another inmate caused them to be moved to a different pod?
25   A   No.  I have never come across that.
```

DIRECT EXAMINATION - ROBERT HEWITT

1   Q   That would be extremely odd behavior in your experience,

2   correct?

3            MS. HESMAN:  Objection, Your Honor.  Speculation.

4            THE COURT:  Overruled.

5            THE WITNESS:  I'm not understanding what was the

6   touching.  Was it sexual touching?  Was it violent touching?

7   Was it -- what kind of touching was it?

8   BY MR. ROBBINS:

9   Q   Well, what type would, in your mind as a detention

10  officer, justify moving someone to a different pod?  It would

11  have to be kind of nonconsensual or --

12           You tell me.  You've worked in the maximum security.

13  You've worked in the Fourth Avenue Jail for a long time.  Are

14  you still working in Psych by the way?

15  A   No.

16           MS. HESMAN:  Compound, Your Honor.

17           THE COURT:  Sustained.

18  BY MR. ROBBINS:

19  Q   Where are you working now?

20  A   I work at the clinic score at the County Hospital.

21  Q   So the County Hospital they have a section where they can

22  treat people?

23  A   We have holding cells that we take inmates who have

24  medical appointments for whatever reason.  We take custody of

25  them and take them to their appointment and then take them

DIRECT EXAMINATION -  ROBERT HEWITT

1   back to their facility.

2   Q    Okay.  But going back to the question about touching, what

3   kind of touching would prompt you as a detention officer to

4   move a person?

5            Would it be aggressive?  Casual or sexual?  I mean,

6   would those be the types of things that would cause you to

7   request that a person be moved?

8            MS. HESMAN:  Objection, Your Honor.

9            THE WITNESS:  It could.

10           MS. HESMAN:  Objection.  The question is compound and

11  I don't see the relevance.  Foundation.

12           THE COURT:  Compound.  Sustained.

13  BY MR. ROBBINS:

14  Q    Touching another inmate, if it causes another detention

15  officer to be concerned about it, is something that you are

16  concerned about as a detention officer, fair?

17           MS. HESMAN:  Objection, Your Honor.  Speculation.  I

18  also don't see the relevance.

19           THE COURT:  Sustained.

20           Let's take a slightly later than mid-morning but

21  nonetheless mid-morning recess for 15 minutes.

22           Remember the admonition.

23     (Recess taken at 10:36 a.m.; resumed at 10:54 a.m.)

24           THE COURT:  Thank you.  Please be seated.

25           The record will reflect the presence of the parties

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -  ROBERT HEWITT

```
 1    and counsel and ladies and gentlemen of the jury.

 2            You may continue.

 3            MR. ROBBINS:  Thank you, Your Honor.

 4    BY MR. ROBBINS:

 5    Q   Have you ever seen any of the videos of you and Ryan

 6    Bates?

 7    A   Yes.

 8    Q   You saw the video of you walking in with a mattress at

 9    some point to the cell where Ryan Bates had been put into with

10    Zach Daughtry?

11    A   I have.

12    Q   And you've seen the video of you going into the cell

13    later, correct?

14    A   Going into the cell?

15    Q   Or dealing with Bates after --

16    A   Oh, yes.  Yes.

17    Q   It occurs within 15 minutes of the mattress, correct?

18    A   Correct.

19    Q   And I want to take you back because we know what you did

20    once you got into 2B.  But that's not where you had the

21    initial interaction with Bates, correct?

22    A   Correct.

23    Q   Have you seen any video from 2E where he first walked into

24    the sally port?

25    A   I have not, no.
```

DIRECT EXAMINATION -  ROBERT HEWITT

1   Q   Have you seen what he was doing during the time out when

2   he was -- would have been walking around before he got to you?

3   A   No.  I haven't seen that.

4   Q   And we were talking -- I'm going to show you a page from

5   Exhibit No. 34 and it's at page 49.

6          Do you recognize what Exhibit 34 --

7          Officer Hewitt, it's right there.  I'll even show you

8   at the very bottom there's an exhibit and a page number.

9          So if you would rather read it, then you can get to

10   the page that way.

11   A   Okay.

12   Q   What is Exhibit 34, page 49?

13          MS. HESMAN:  Objection, Your Honor.  Foundation.

14          THE COURT:  Sustained.

15   BY MR. ROBBINS:

16   Q   Do you know what Exhibit No. 34, page 49 is?

17   A   Yes.  It's a referral for Psych Services.

18   Q   And that is a document that you are taught to fill out,

19   correct?

20   A   Yes.

21   Q   And I'm going to blow up part of it.  And it says:

22          Reason for Referral.  Inmate Daughtry's behavior is

23   of concern for his safety as when you try to talk to him he

24   stares at the wall or floor, giggles and acts as if you are

25   not there.  He sits on the floor in a meditation-style pose

DIRECT EXAMINATION -   ROBERT HEWITT

1    for long periods of time.   His odd behavior may endanger

2    himself as other inmates will perceive it as odd.

3                 Did I read that correctly?

4    A    Yes.

5    Q    And it talks about mood-related behavior -- depressive or

6    manic behaviors and it checks "Unusual Physical and/or Verbal

7    Isolation."

8                 Do you see that?

9                 MS. HESMAN:   Objection, Your Honor.   Foundation.

10                THE COURT:   Overruled.

11   BY MR. ROBBINS:

12   Q    Do you see that?

13   A    Yes, I do.

14   Q    And do you see under "Odd or Unusual Behavior" it says

15   "Unusual and Repetitive Mannerisms."

16   A    Yes.

17   Q    You didn't know about this document when you made the

18   decision to put Ryan Bates -- or strike that.

19                You didn't make the decision to put Ryan Bates in the

20   cell with Zach Daughtry?

21   A    No.   I didn't make that decision.

22   Q    But you agree that those types of odd behaviors are the

23   types that can be perceived by other inmates as being odd and

24   as being the fuel for an assault, fair?

25                MS. HESMAN:   Objection Your Honor.   Speculation.

DIRECT EXAMINATION - ROBERT HEWITT

```
1              THE COURT:  Overruled.
2              THE WITNESS:  It's possible, yes.
3    BY MR. ROBBINS:
4    Q    And do you have Exhibit No. 78 in front of you?
5    A    Exhibit 78?  No.
6    Q    That's because I wasn't good enough to give Ms. Williams
7    the exhibit, so I apologize.  Once again, it's my fault.
8              Is that 78?  Did I say 76 or 78?
9    A    78.
10   Q    Do you have 76?
11             MR. ROBBINS:  Sorry, Ms. Williams.  If you have a
12   Fitbit on, you'll do great because of my questioning.
13             THE WITNESS:  Thank you.
14   BY MR. ROBBINS:
15   Q    Do you recognize who is pictured on the cover of page 76?
16   A    Yes.  That's Ryan Bates.
17             MR. ROBBINS:  Move for admission of Exhibit No. 76,
18   Jail File of Ryan Bates.
19             MS. HESMAN:  Objection, Your Honor.  402.  403 and
20   foundation.
21             THE COURT:  Your response?
22             MR. ROBBINS:  It's the jail file.  They're all
23   documents from the jail.  They were produced by the
24   defendants.
25             They're documents which we have used in this case and
```

DIRECT EXAMINATION -   ROBERT HEWITT

```
 1    they all are relevant.  They are not prejudicial.  And the

 2    foundation we have been told we're not supposed to need to

 3    call a custodian of records to establish any foundation.

 4             THE COURT:  And what's the foundation problem?

 5             MS. HESMAN:  Your Honor, we will withdraw the

 6    foundation objection.

 7             THE COURT:  And the 403 problem?

 8             MS. HESMAN:  We will withdraw all the objections.

 9             THE COURT:  76 is received.

10        (Exhibit No. 76 admitted in evidence.)

11             MR. ROBBINS:  Thank you, Your Honor.

12    BY MR. ROBBINS:

13    Q   Let me publish the picture.

14             That's Ryan Bates, correct?

15    A   Yes.

16    Q   Go ahead.  And if you would, look at the interview of

17    Johnson -- let me see.

18             Look at 25.  Do you see Exhibit No. 25?

19    A   Page 25?

20    Q   No, just Exhibit 25.  Sorry.

21    A   Oh.  Okay.

22    Q   Is Exhibit No. 25 basically the same as the interview that

23    you gave in the criminal investigation but it is for Detention

24    Officer Johnson?

25    A   Yes.  Looks like it.
```

DIRECT EXAMINATION -  ROBERT HEWITT

1          MR. ROBBINS:  Move for admission of Exhibit No. 25.

2          MS. HESMAN:  No objection, Your Honor.

3          THE COURT:  25 is received.

4     (Exhibit No. 25 admitted in evidence.)

5   BY MR. ROBBINS:

6   Q   And would you look at page No. 2?

7          Are you there?

8   A   Yes.

9   Q   Let me blow it up so the jury can see it as well.  I'm

10  going to call out the second paragraph so we can all read it.

11  And it says:

12         I explained to Johnson -- and Johnson, again, is the

13  officer that's with you when you're in the sally port?

14  A   Correct.

15  Q   Why I contacted him and he asked -- or I contacted him and

16  asked if he remembered the incident.  Johnson said he

17  remembered.  I asked him to tell me what his involvement was.

18  Johnson said he believed he was working in 2E pod which was

19  right next to 2B pod where the incident occurred.  He said

20  during the security walk, Bates walked into the sally port

21  which was a restricted area.  Johnson said he and his partner

22  Officer Hewitt, number B1861, told Bates he could not be in

23  there and he needed to return to his cell.  He said Bates was

24  eating an orange and saying something about "Junior, Where is

25  Junior," and appeared to be in a daze.

DIRECT EXAMINATION - ROBERT HEWITT

1           Did I read that correctly?

2   A    You did.

3   Q    And you don't disagree with his observation that Bates was

4   eating an orange?

5   A    I don't recall an orange.

6   Q    Okay.  So you would tend to rely on his because it has

7   more detail than yours?

8   A    I will rely on his statement about the orange because he

9   was not actually interacting with Bates and I was interacting

10  with him directly.  So he had time to look around.

11  Q    Fair enough.  I mean, you've got to be a little concerned

12  for your safety because this guy is walking into your space?

13  A    Exactly.

14  Q    And so his observation that Bates looked dazed, you

15  wouldn't disagree with that, correct?

16  A    To me he wasn't dazed.

17  Q    But to the person who was observing this without the fear

18  and adrenaline and all that, you would rely on his

19  observation, fair?

20  A    No.  I would not.

21  Q    Okay.  At some point when you put the mattress in this

22  cell there's a video of it, right?

23  A    Yes.  There is.

24  Q    And you went -- you saw this cell after the attack, right?

25  A    Yes.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -  ROBERT HEWITT

1    Q    And there were no cards laying on the floor, correct?

2    A    I don't recall.

3         MR. ROBBINS:  Your Honor -- well, let me first see if

4    I can lay some foundation.

5    BY MR. ROBBINS:

6    Q    Let me show you Exhibit No. 32 and I'll just show these to

7    the -- they will not be published until they are admitted.

8         Okay.  Do you recognize what Exhibit No. 32, page

9    No. 1 is?

10   A    Yes.

11   Q    And what is that?

12   A    It's a photo of the outside of Cell 3 in 2 Bravo.

13   Q    And page No. 2 is a closer picture of that, correct?

14   A    Correct.

15   Q    And page No. 3 is the actual photograph and -- I'm sorry.

16        Do you recognize page No. 3 that is the interior of

17   the cell?

18   A    Yes.

19   Q    And that looks accurate and fairly depicts the scene?

20   A    From what I recall, yes.

21   Q    And there's no bodies in it but there is blood, fair?

22   A    Yes.

23   Q    And do you remember seeing the writing on the wall?

24   A    Yes, I do.

25   Q    Is that a fair depiction of the writing that you saw?

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - ROBERT HEWITT

1    A    Yes.

2         MR. ROBBINS:  Move for admission of Exhibit No. 32.

3         MS. HESMAN:  Objection, Your Honor.  402 and 403 and

4    Defendant's Motion in Limine No. 1.

5         THE COURT:  This is 32 consisting of what did I

6    count?  Four pictures?

7         MR. ROBBINS:  Yes.

8         MS. HESMAN:  And we have no objection to the first

9    and second, Your Honor.

10        THE COURT:  Well, what's the relevance?

11        MR. ROBBINS:  It shows the actual cell.  I had asked

12   the question of whether or not there were cards.

13        I believe the defendant stated in opening statement

14   that they were playing cards or something like that.  And I

15   wanted to show the interior of the cell to refresh the

16   witness' recollection.  Because I had asked him whether he saw

17   cards and he did not recall.  And I believe it's an admissible

18   picture to show to the jury.

19        Let me get you to the -- oops.

20        THE COURT:  So you're telling me that somehow this

21   contradicts something that was said in opening statement about

22   cards?

23        MR. ROBBINS:  Correct.  And it also shows the actual

24   cell so that we can see the exterior, the pod and the cells --

25   or the cell.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - ROBERT HEWITT

1    THE COURT:  I would certainly agree with you it shows

2    that, but I'm trying to understand the relevance to the issues

3    in this case.

4        MR. ROBBINS:  Well, we've talked about the issue of

5    damages in the argumentation.  We've talked about our desire

6    not to offend or to shock the jury.

7        But we've also -- we also believe it is necessary for

8    us to be able to show them what occurred in order to allow

9    them to assess damages, to assess testimony, to be able to see

10   the interior of the cell itself.

11       There are some issues that deal with -- with the

12   opening statement as well as I have already --

13       THE COURT:  Opening statements don't define issues.

14   Pretrial order defines issues.

15       So I'm still struggling to find the relevance of

16   these to the issues in the case.

17       MR. ROBBINS:  Well, it shows -- I mean we've already

18   introduced, I think, the actual layout of the jail cell.  But

19   I would like the jury to be able to see it, to be able to see

20   the cell in a way that I don't believe is shocking but --

21       THE COURT:  Well, shocking or not, I'm still

22   struggling with the relevance.

23       I'll sustain the objection with -- I'll sustain the

24   objection because I haven't heard what the relevance is.  If I

25   later see the relevance and am impressed with the relevance,

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -  ROBERT HEWITT

1    then I'll reconsider it.

2           And by the way, on the 403 objection -- on the 403

3    objection, that's overruled.  I don't see a 403 problem with

4    these pictures and I will make that clear.

5           MR. ROBBINS:  Let me then publish -- oh.

6           And as to the fourth photograph which shows what it

7    shows, I don't intend to articulate on that without publishing

8    it.  But that does show what Ryan Bates did in the cell which

9    is one of the big issues in this case because the defendants

10   have said that they are -- do not believe that he was

11   psychotic or mentally ill.

12          And I think that's evidence that the jury can assess

13   and will help them.

14          THE COURT:  Well, I don't know whether it shows that

15   or not.  And, again, without -- without prejudice to laying

16   the foundation and showing potential relevance in the future,

17   I'm sustaining the relevance objection at this point.

18          MR. ROBBINS:  Okay.

19   BY MR. ROBBINS:

20   Q   Let's go back to the question that I originally asked.

21          Did looking at these photographs refresh your

22   recollection as to whether or not there were any cards

23   anywhere in the cell to be seen?

24   A   In those photographs I don't see any cards.

25   Q   And you don't recall seeing any when you looked into the

DIRECT EXAMINATION - ROBERT HEWITT

```
1    cell afterwards, correct?

2    A    Say that again?

3    Q    You don't recall seeing any at the time.  Your memory

4    isn't -- the picture is the most accurate memory you have

5    because it actually shows what you remember, fair?

6    A    Yes.

7    Q    Okay.  And there was writing in blood on the wall.  Do you

8    remember that?

9    A    I remember writing on the wall, yes.

10   Q    And it was written in blood?

11   A    Yes.

12   Q    And there was blood on the floor?

13   A    Yes.

14   Q    There was blood in the toilet?

15   A    Maybe.  I don't know about that.

16   Q    Okay.  But there was blood all over the floor?

17   A    Yes.

18   Q    And did you see Zach Daughtry?

19   A    Yes, I did.

20   Q    Describe for us, if you would, what you saw.

21            MS. HESMAN:  Your Honor, objection.  402.  403.

22            THE COURT:  Again, the relevance of seeing -- of his

23   seeing the blood is what?

24            MR. ROBBINS:  Well, we're talking now about Zach

25   Daughtry's physical condition as he observed it after the
```

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -  ROBERT HEWITT

1    beating, so it goes to damages, Your Honor.

2            THE COURT:  Goes to damages?

3            MR. ROBBINS:  Yes.

4            THE COURT:  Seeing blood goes to damages?

5            MR. ROBBINS:  No.  The blood we've already talked

6    about.  It came in without objection.  Now what we're talking

7    about is the description of Zachary Daughtry after the beating

8    which would show the physical injuries that he sustained.

9            THE COURT:  Blood would?

10           MR. ROBBINS:  Blood -- well, I haven't asked him to

11   describe the blood.  We've already described it as being --

12   we're -- I'm asking him what Zachary Daughtry looked like,

13   what his physical condition looked like when he was able to

14   see him.

15           THE COURT:  Go ahead and ask your question again.  I

16   think I have lost track of what the question is.

17           MR. ROBBINS:  Thank you, Your Honor.

18   BY MR. ROBBINS:

19   Q   When you were able to see Zach Daughtry, would you please

20   describe for us what he looked like.

21           MS. HESMAN:  Objection, Your Honor.  402.  403.

22           THE COURT:  Let me see counsel at sidebar.

23       (At sidebar on the record.)

24           THE COURT:  I think we had a brief conversation about

25   this maybe at the pretrial conference.  And I understand

DIRECT EXAMINATION -  ROBERT HEWITT

1    that -- this is a death case, so it's the -- in a death case

2    it's the fact of death, not what they looked like, et cetera,

3    et cetera, that's relevant.

4            Now, I understand we've got a pre-death pain and

5    suffering claim, but blood and what he looks like to a layman

6    can't be relevant to what he suffered because we don't know

7    whether -- we don't know -- I mean he's a layman.  He can't

8    testify about what --

9            MR. ROBBINS:  He can describe injuries but they need

10   to know what the injuries were.

11           THE COURT:  But how can he tell us -- he's not a

12   medical doctor.

13           MR. ROBBINS:  He can say what his face looked like.

14           THE COURT:  Well, we don't know if this is the face

15   of a dead person, comatose person.

16           MR. ROBBINS:  He wasn't dead yet.

17           THE COURT:  Well, if he's comatose, then he's

18   suffering.

19           MR. ROBBINS:  And the fact that he sustained -- he

20   didn't sustain those injuries by self-inflicted wounds.

21           THE COURT:  That's true.

22           MR. ROBBINS:  And we certainly think that the

23   evidence of the injuries themselves is evidence of what he

24   went through.

25           THE COURT:  Well, if some doctor is going to tell us

DIRECT EXAMINATION -  ROBERT HEWITT

1    that, that might be interesting.  But my points is -- my point

2    is if the first blow caused these horrible looking injuries --

3    and I have seen the pictures -- rendered him immediately

4    unconscious and from that point till they pull off the life

5    support and he's unconscious, in that period of time I assume

6    he's not had any pain and suffering.

7          MR. ROBBINS:  Well, and I think that that's -- I

8    don't think that the case law supports that.

9          We quoted the *Blocker* case in our briefs where we're

10   talking about an unexpected explosion.  We don't know whether

11   the people lived.  How long they were conscious.

12         It's evidence that a jury can use to determine

13   pain -- pre-death pain and suffering.

14         The KAL case, Korean Airlines and the World Trade

15   Center cases both dealt with situations like this.  You can't

16   say exactly what happened but you can say how they died and a

17   jury can use that to determine damages --

18         THE COURT:  (Inaudible)

19         MR. SHOWALTER:  Your Honor, as he said --(Inaudible)

20         MR. ROBBINS:  KAL was the one I was thinking of.

21         MS. HESMAN:  Your Honor, there is no --

22         MR. ROBBINS:  I mean you even said it.  You said

23   presumably the jury could assume from this.  And they're

24   allowed to look at the evidence.  They're allowed to have at

25   least some evidence that they can draw some inferences from

DIRECT EXAMINATION -  ROBERT HEWITT

 1    that an expert can't do.

 2          I mean, you can't have an expert say, well, he got

 3    punched and was it a single cold cock?  There's no way to do

 4    that.

 5          THE COURT:  But you can't let the jury just draw

 6    inferences from pictures without medical, expert-type

 7    testimony.  Now maybe you'll lay the foundation with somebody,

 8    but just to say here, folks, here's some ugly looking pictures

 9    and you guys figure out what the pain and suffering is.

10          MR. ROBBINS:  I'm following your order.  You said

11    don't take in the last two and I'm not even trying.  But I was

12    asking him to describe it and just describe what he saw.

13          THE COURT:  The reason in my opinion you can't just

14    talk about blood.  You can have blood without any pain and

15    suffering, I guess.  Let me give her a chance.

16          MS. HESMAN:  Thank you, Your Honor.  They deposed the

17    Medical Examiner and there is no testimony, expert testimony,

18    doctor testimony that he was suffering, that he was conscious,

19    that he was unconscious.

20          And I believe you said when they -- at the final

21    pretrial when they went to submit these pictures, that the

22    testimony from a Medical Examiner is far more reliable as far

23    as pre-death pain and suffering from the photographs.

24          THE COURT:  I said that?

25          MS. HESMAN:  You did, yes.  So they have that

DIRECT EXAMINATION - ROBERT HEWITT

1    testimony.

2         THE COURT:  Well, I don't see the relevance.  But

3    moreover, on the 403 basis, whatever relevance there might be

4    there, which I don't see, is outweighed by the prejudice of

5    simply showing the blood.

6         Now, although I have said there's not a -- there's

7    not a -- if they're otherwise relevant and the 403 is the

8    argument, I would then conclude we don't have a 403 problem.

9         But for the moment, without prejudice to taking a

10   different tact her, I'm going to sustain the objection.

11        MR. ROBBINS:  Yes, Your Honor.

12        MS. HESMAN:  Thank you.

13        MR. SHOWALTER:  Your Honor, can I ask a clarifying

14   question for our future stuff?  If we are able to get into

15   evidence that people heard screams and fighting and it would

16   show consciousness, then can we revisit this issue?

17        THE COURT:  Well, you can -- I don't answer a

18   hypothetical question but if -- my ruling is that it will be

19   without prejudice to approach it however you're going to.  And

20   I can imagine there may be some approaches that will get you

21   there.  Maybe not.  I don't know.

22     (End of discussion at sidebar.)

23        THE COURT:  You may proceed.

24        MR. ROBBINS:  Thank you, Your Honor.

25   BY MR. ROBBINS:

DIRECT EXAMINATION -  ROBERT HEWITT

1    Q   Just to make it very clear, there are no written policies

2    that you're aware of that require you as a detention officer

3    before imposing discipline to contact -- on a person who is

4    mentally ill or has been identified by the system as being

5    mentally ill -- that you contact Mental Healthcare, correct?

6    A   There is -- there is a policy -- well, not a policy, but

7    rules, guidelines to inform before that we -- before we impose

8    discipline if there's reason to call Mental Health.

9    Q   So as I understand it, what you're now -- what you're

10   testifying to the jury is that there is a policy on discipline

11   and it says before you impose discipline on a person who has

12   been identified by our system as having mental illness, that

13   you have to contact Mental Health.

14            That is what you're testifying?

15            MS. HESMAN:  Objection, Your Honor.  Misstates

16   testimony.

17            THE COURT:  Overruled.

18            THE WITNESS:  Like I said, I don't believe there's a

19   policy on it.

20   BY MR. ROBBINS:

21   Q   Okay.  Did you ever -- you worked in Disciplinary

22   Segregation, correct?

23   A   I have, yes.

24   Q   Did you ever discipline someone for not leaving -- for not

25   rolling up and going off to court or not leaving Disciplinary

DIRECT EXAMINATION -  ROBERT HEWITT

1    Segregation?

2    A   I don't believe I have ever disciplined anybody for not

3    leaving.

4    Q   Okay.  And I wanted to clarify too something that you had

5    talked about because you worked on one pod and would have seen

6    about one fight a week, but you didn't work 24 hours a day,

7    correct?

8    A   Correct.

9    Q   And there was also another floor officer who may have seen

10   things as well, correct?

11   A   Correct.

12          MS. HESMAN:  Objection, Your Honor.  Speculation.

13          THE COURT:  Wait.  Wait a minute.

14          The objection speculation is sustained and the answer

15   stricken.

16   BY MR. ROBBINS:

17   Q   You're only one of two officers on duty in a pod at a

18   given time, correct?

19   A   One of three.

20   Q   Okay.  And you don't know what the other officers might

21   have seen that you didn't, fair?

22   A   Fair.

23   Q   And would you have wanted to know that a person who had

24   been identified as mentally ill had a habit or had in the past

25   peed on their roommate's bed before placing him in a cell with

UNITED STATES DISTRICT COURT

CROSS EXAMINATION -  ROBERT HEWITT

```
 1   another human being?
 2   A   Yes.  That would have -- hopefully, that would have
 3   already been taken care of before I came on.
 4            MR. ROBBINS:  That's what you would hope.
 5            Thank you.
 6            THE COURT:  All right.  Cross-examination.
 7                       CROSS EXAMINATION
 8   BY MS. HESMAN:
 9   Q   Good morning, Officer Hewitt.
10   A   Good morning.
11   Q   I believe you testified on direct exam that you have been
12   with MCSO since 2010?
13   A   Yes.
14   Q   And that you went through a nine-week academy training?
15   A   Yes.
16   Q   Can you describe for the jury the type of subject matter
17   that you were trained under in the academy?
18   A   I'm sorry.  Say that again.
19   Q   Can you explain for the jury the subject matter or types
20   of courses that you were trained on during in the academy?
21   A   There were a lot.  One of them was the games that inmates
22   play, segregation units, security walks, knowing the jail
23   system, computer systems, just a variety of things, tasers,
24   pepper ball, self-defense, cuffing.  The list goes on.
25   Q   And was identification of mental illnesses one of the
```

CROSS EXAMINATION -  ROBERT HEWITT

1   subject matter that you were trained on?

2   A   Yes.

3   Q   And can you describe that training?

4   A   The training was just to watch for inmates who were -- who

5   had mental illnesses, things like suicide watching.

6           If they had some bad news, they came back from court,

7   they were going to jail for the next 50 years, they might try

8   to kill themselves, that type of nature.

9   Q   Were there signs and symptoms that you were trained on to

10  look out for?

11  A   Yes.  Aggravation.  Somebody who was just acting

12  abnormally, throwing up red flags that you could perceive as

13  having a mental issue.  The way they talk and the way they're

14  acting, just that type of thing.

15  Q   And I believe Mr. Robbins asked you whether there was a

16  written policy on identifying mental illness.

17          Do you recall that?

18  A   Yes.

19  Q   And I believe you said there wasn't a written policy but

20  that you were trained and there was a practice; is that

21  accurate?

22  A   Yes.

23  Q   And what was that practice?  Is that what you just

24  described?

25  A   Yes.

CROSS EXAMINATION -   ROBERT HEWITT

1    Q    Were you trained to make a referral to Mental Health if

2    you ever encountered someone who was exhibiting those signs

3    and symptoms that you were trained on?

4    A    Yes.

5    Q    And have you ever done that?

6    A    Many times.

7    Q    Approximately, how many times in your career do you think

8    you have made a referral to Mental Health?

9    A    Over ten times at least.

10   Q    And does Mental Health always come and see the inmate?

11   A    Yes, always.

12   Q    Have you ever had a situation or seen a situation where

13   there was a referral and Mental Health didn't come?

14   A    No.

15   Q    Is there an open line of communication between Detention

16   and Mental Health?

17   A    Yes.   There is always.

18   Q    Is there an open line of communication between

19   Classification and Detention?

20   A    Yes.

21   Q    And Mr. Robbins asked you a little bit about a term "SMI."

22          Do you recall that?

23   A    Yes.

24   Q    And what is SMI?

25   A    "SMI" stands for Seriously Mentally Ill.

CROSS EXAMINATION - ROBERT HEWITT

1   Q   And in your experience, is every inmate who is designated

2   SMI dangerous?

3   A   No.

4   Q   Is every inmate who is designated SMI violent?

5   A   No.

6   Q   What has been your experience with respect to SMI

7   inmates -- well, strike that.

8       In your experience dealing with SMI inmates, are they

9   typically dangerous and/or violent?

10  A   Not typically, no, they're not.

11  Q   Mr. Robbins asked you about your interactions with the

12  inmates on a daily basis.

13      Do you remember that?

14  A   Yes.

15  Q   And you -- I believe you testified that one of the things

16  you did was develop a rapport with some of the inmates.

17  A   Yes.

18  Q   And is that one of the things you were trained on is

19  developing rapport with inmates?

20  A   Yes.  You don't have to be friends with them but have a

21  working relationship.

22  Q   And you did that, correct?

23  A   Yes.

24  Q   And I'm going to take you back to July 9, 2014, and that's

25  the date of the incident, the reason why we're here, correct?

CROSS EXAMINATION - ROBERT HEWITT

```
 1   A    Correct.

 2   Q    And you were working that day?

 3   A    Yes.

 4   Q    And you were working at Fourth Avenue Jail?

 5   A    Yes.

 6   Q    And describe for the jury a typical day when you arrive at

 7   Fourth Avenue Jail.  What's the process before you start your

 8   shift?

 9   A    First thing we would do, we go to the fourth floor where

10   our briefing room is.  We would be briefed on aspects of the

11   previous shift plus anything that was happening on our shift.

12   Q    If there were any issues with inmates or otherwise on the

13   previous shift, is that something that would have been talked

14   about at that briefing?

15   A    Yes.

16   Q    If someone was acting out or acting up on previous shift

17   or had some kind of mental issue, is that something that would

18   have been talking about at that briefing?

19   A    It would have, yes.

20   Q    And can you recall times when you learned of incidents

21   during briefing?

22   A    Yes.

23   Q    And the briefing serves as a communication between two

24   different shifts coming on and off as to what's happening?

25   A    Exactly, yes.
```

CROSS EXAMINATION -  ROBERT HEWITT

1    Q    After you received the briefing, what happens next before

2    you begin your shift?

3    A    We would sign in.  There's a sheet that we sign into and

4    it tells us where we will be stationed that day.  At the end

5    of the briefing, we would go to those duty posts.

6    Q    And how many shifts are there in a day?

7    A    Three.

8    Q    Do you recall what shift you were working on July 9th?

9    A    July 9th?

10   Q    2014.  The day of this incident.

11   A    Oh.  I believe it was the second shift.

12   Q    And how long does second shift run from?

13   A    It runs from 2:30 till 10:30.

14   Q    And do you recall what duty post you were assigned to that

15   day?

16   A    Two-Edward.

17   Q    And what specific role you were assigned to in 2E?

18   A    Yeah.  I was going to be one of the floor officers.

19   Q    And describe for the jury what the duties and

20   responsibilities are of a floor officer.

21   A    The floor officer provides security for the inmates.  We

22   take care of basically their needs.  We hand out forms.  We do

23   security walks every 25 minutes.  We feed them chow.  We do

24   their mail.  We hand them mail.  We pick up mail.  Any forms

25   that need to be filled out, they give them -- the filled-out

CROSS EXAMINATION -  ROBERT HEWITT

1   forms they give back to us, whether it be a grievance or

2   anything that they need.

3          If they need soap, they need toothbrushes, they need

4   toothpaste.  We take them to church.  Take them for visits

5   with their families.  Just a whole host of stuff that we do.

6   Hair cuts.

7   Q   And you mentioned forms?

8   A   Yeah.

9   Q   Can you describe for the jury what type of forms you're

10  handing to the inmates?

11  A   There's grievance forms.  There's -- grievance forms.

12  There's the inmate -- I can't think of the word at the moment.

13  Q   Inmate Request Forms?

14  A   Inmate Request Forms, yes.

15         Whether they can request anything, whether they need

16  blankets or something like that.  All these forms are in

17  Spanish and English, so nobody gets missed.

18  Q   And are the -- one of the ways they can utilize the form

19  is to request a cell reassignment or to be moved.  Can you

20  describe the various ways that they utilize that Inmate

21  Request Form?

22  A   Yeah.  Basically, the Inmate Request Form, they can

23  request anything.  Whether they get it or not is something

24  else.

25         Like an inmate -- or, I mean, a cell movement,

CROSS EXAMINATION - ROBERT HEWITT

1  there's got to be a very good reason why we would move them

2  from another cell just because they want to move.  It doesn't

3  fly.

4  Q   And can you explain to the jury when you hand out the

5  forms where you put them, if you hand out multiple forms?

6  A   I will walk the pod with a handful of forms.  Anybody who

7  needs one, wants one, even more than one, they can come to me.

8  I'll hand them straight out to them.

9       I'll even put a bunch of forms on one of the day room

10  tables so they can just take one as they need it.

11  Q   And in addition to all of the duties and responsibilities

12  you've just described, I believe you testified when

13  Mr. Robbins was asking you questions that you also do security

14  walks every 25 minutes?

15  A   Yes.

16  Q   And that's in addition to all those other things that you

17  just talked about?

18  A   In addition, yes.

19  Q   So on July 9th, 2014, you received a duty post in 2E as

20  the floor officer?

21  A   Right.

22  Q   And describe that day before this incident.  Was there

23  anything that stood out to you?

24  A   No.  There was just another day, another regular day.

25  Q   And who was assigned -- I understand based on your earlier

CROSS EXAMINATION - ROBERT HEWITT

1  testimony that there's two floor officers for each pod.

2  A   Yes.

3  Q   And then there's also a tower officer?

4  A   And a tower officer.

5  Q   In addition to those three officers, are there any other

6  officers who are assigned to a particular level at the Fourth

7  Avenue Jail?

8  A   I'm sorry.  Can you say that again?

9  Q   Sure.  The Fourth Avenue Jail has various levels?

10 A   Yes.

11 Q   And on each level within each unit there are two floor

12 officers and the tower officer.  But also on that level are

13 there additional post duties, other officers that are

14 assigned?

15 A   Yes.  There's -- out in the hallway there's the level

16 officer.  So we have a Level 2 officer, a Level 3 officers and

17 a Level 4 officer.  And their job is to -- if there's inmates

18 that are coming in that need to be housed, he will determine

19 what house that they will go to.  He has a lot of work to do

20 actually.

21 Q   So there's one level control officer or can there

22 sometimes be more than one?

23 A   No.  Usually just one.

24 Q   So tower officer, two floor officers and a level control

25 office?

UNITED STATES DISTRICT COURT

CROSS EXAMINATION -  ROBERT HEWITT

1    A    Yes.

2    Q    And each person has a different duty and responsibility

3    with respect to that level?

4    A    Yes.

5    Q    And you've worked with MCSO since 2010?

6    A    Yes.

7    Q    You've had occasion to go in several pods and units at

8    Fourth Avenue Jail during that time?

9    A    Yes.  Yes.

10   Q    Describe a typical day.  How loud is it inside those pods?

11   A    Inside the pods are very loud.  They're very loud.  You

12   get 36 people all talking at once.  The TV is going.  Toilets

13   are flushing.  They don't -- they're not very silent.

14   Q    Even in the evening when the day room -- the TVs aren't

15   going, are there times when the pod can still be loud as you

16   described?

17   A    Yes.  They'll talk to each other from cell to cell in

18   which they've got to really yell do get their voices out

19   through the doors and then be able to be heard through the

20   next door.

21   Q    What about when officers enter onto the unit?

22   A    That doesn't change.

23   Q    It's still loud?

24   A    It's still loud.

25   Q    Medical?

CROSS EXAMINATION -  ROBERT HEWITT

1    A    Yes.  It doesn't matter who is in there.

2              MS. HESMAN:  And, Kristen, if we could pull up 324?

3              Your Honor, may I publish this to the witness?

4              THE COURT:  You may.

5    BY MS. HESMAN:

6    Q    Officer Hewitt, do you see a video that's on your screen?

7    A    Yes.

8    Q    And do you recognize that video?

9    A    Yes.  It looks like it's the hallway of Level 2.

10   Q    And you recognize that based on the time you've spent in

11   the Fourth Avenue Jail and on that particular level?

12   A    Yes.  And the right-hand side of the screen has got 2C-3.

13             MS. HESMAN:  Your Honor, defendants move for

14   admission of Exhibit No. 324.

15             MR. ROBBINS:  No objection, Your Honor.

16             THE COURT:  Thank you.

17             Exhibit 324 is received.

18        (Exhibit No. 324 admitted in evidence.)

19             MS. HESMAN:  Your Honor, can I publish this to the

20   jury?

21             THE COURT:  You may.

22             MS. HESMAN:  Can you pause it please?

23   BY MS. HESMAN:

24   Q    Officer Hewitt, I'm going to have the video played.

25             And if you could just sort of describe what's

CROSS EXAMINATION - ROBERT HEWITT

1  happening in the video to the jury as it's played.  And then

2  once you come onto the screen, identify yourself.

3  A   Okay.  Right there is Officer Johnson putting our -- he's

4  taking off the handcuffs.  Looks like to Bates if he's in

5  there.  And I walked into the sergeant's office which is

6  directly across from the hallway.

7  Q   So Mr. Bates is in a cell where the officers are in front

8  of and they're removing him?

9  A   Yes.  Right there.

10 Q   And is that you on the right-hand side?

11 A   Right-hand side, yes.

12 Q   And I want to back up a moment.  When did you first

13 encounter Ryan Bates?

14 A   When he came off 2 Edward into the sally port.

15 Q   And describe for the jury what happened when you saw him.

16 A   I had told him to go back into -- into 2 Edward repeatedly

17 and which he refused.

18         And I ended up telling him to just turn around.  I

19 put the cuffs on him and I took him to the holding cell.

20 Q   And is that the holding cell that we just saw him being

21 taken out of?

22 A   Yes.

23 Q   You took him there?

24 A   Yes.

25         And pending a write-up, I informed 2 Bravo that we

CROSS EXAMINATION -   ROBERT HEWITT

```
 1   had him there.
 2           I let my Sergeant know.  Also, I let him know that he
 3   had -- he was talking strangely, talking about Junior, if
 4   Junior was there or something like that.  And he called
 5   Medical for an interview with him and also -- and Sergeant, I
 6   guess, he went out to talk to him as well.
 7   Q   Okay.  So after you see him in the sally port and he
 8   refuses your direct commands, you cuff him up.  You take him
 9   to the holding cell.  And then that's where you call your
10   sergeant and I believe you said his name Sergeant Garcia?
11   A   Sergeant Garcia.
12   Q   And he calls Medical?
13           MR. ROBBINS:  Objection, Your Honor.  Hearsay.
14           THE COURT:  Sustained.
15   BY MS. HESMAN:
16   Q   Describe what you saw after Sergeant Garcia came to the
17   holding cell.
18   A   Sergeant Garcia came out and he -- I believe he talked to
19   him.  He said:
20           Would you ask Bates to turn around.
21           And Bates did a complete 360 and ended up facing him
22   again.
23           Sergeant Garcia wanted him to turn around so he could
24   to -- so the cuffs could be removed.  And then Sergeant Garcia
25   went back to his office and we took out Bates and took him to
```

UNITED STATES DISTRICT COURT

CROSS EXAMINATION - ROBERT HEWITT

1    2 Bravo.

2    Q    Were you the one that made the decision to issue

3    disciplinary to Bates?

4    A    Yes.

5    Q    And you called your Sergeant to confirm that, correct?

6    A    Yes, I did.  Yes.

7    Q    So you weren't the one who actually issued the

8    disciplinary?

9    A    No.

10   Q    And that was Sergeant Garcia?

11   A    That was Sergeant Garcia, yes.

12   Q    Is that why you called him?

13   A    Yes.  I was informing my sergeant what's going on.

14   Q    And if we could have 324 back up, please, Kristen.

15          Thank you.  So Mr. Bates is in the cell on the

16   left-hand side.  You've already placed him there and he's done

17   the spin-around with Garcia at this point?

18   A    Right.

19   Q    And now he's being taken out and escorted to 2B?

20   A    Yes.  The cuffs are being placed on.

21   Q    And based on your review of this video and your

22   recollection, was there anything that stood out as a red flag

23   or an indicator that he had some kind of mental issue at this

24   time?

25   A    No, nothing at all.  I mean, he was very calm.  He's

CROSS EXAMINATION -  ROBERT HEWITT

1   pretty much doing obeying everything we asked him to do.

2   Q   And where did you go from here?

3   A   We went to enter 2 Bravo.

4   Q   Did you retrieve Bates' property before you went into

5   2 Bravo.

6   A   No.  It was afterwards.

7   Q   And what were your duties and responsibilities after you

8   placed Bates in the holding cell but before he was actually

9   placed into the cell in 2B?  What was your role?

10  A   We went back to complete our security walk which had been

11  interrupted by Bates coming onto the Sally port.

12  Q   And at some point you retrieved Bates' property from 2E to

13  bring to him in 2B?

14  A   Yes.

15  Q   And Mr. Robbins was asking you about some of the comments

16  that Bates was making when he was found in the 2E sally port.

17  Do you recall that?

18  A   Yes.

19  Q   And I believe you testified that he was talking about

20  someone named Junior?

21  A   Yes.

22  Q   How long did he talk about Junior?

23  A   Maybe 30 seconds, 45 seconds.

24  Q   Once you placed the handcuffs on him and he knew that he

25  was going to be disciplined did he continue to talk about

CROSS EXAMINATION - ROBERT HEWITT

1   Junior?

2           MR. ROBBINS:  Objection, Your Honor.  Foundation.

3           THE COURT:  Overruled.

4           Oh, I'm sorry.  I see your point.

5           Sustained.

6   BY MS. HESMAN:

7   Q   After you placed the handcuffs on him and while you were

8   still in 2E with him during your escort, did he continue to

9   talk about Junior?

10  A   No, he didn't.

11  Q   Did he talk about Junior at any other time once the

12  handcuffs were placed on him while you were with him?

13  A   No.

14  Q   And what did that indicate to you?

15  A   That he was playing a game.

16          The whole time he was talking to me about Junior and

17  I was trying to get him to go back, he had like a smirk on his

18  face like he was just disobeying orders just for the heck of

19  it.

20  Q   And did your observation of him doing the 360 when asked

21  to turn around also confirm what you just said?

22          MR. ROBBINS:  Object, Your Honor.  Foundation to

23  render expert opinions on mental health.

24          THE COURT:  Sustained.

25  BY MS. HESMAN:

CROSS EXAMINATION - ROBERT HEWITT

1  Q   Based on your training as a detention officer -- and I

2  believe that you testified you were specifically trained on

3  games inmates play.

4          Did his reaction to Officer Sergeant asking him to

5  turn around and he spun around 360 indicate that he was

6  playing games?

7          THE WITNESS:  Yes.

8          MR. ROBBINS:  I object, Your Honor.  Foundation.

9          THE COURT:  Overruled.

10 BY MS. HESMAN:

11 Q   We watched the video where Bates was taken out of the

12 holding cell and about to be taken into 2 Bravo?

13 A   Yes.

14         MS. HESMAN:  Kristen, if we can bring up Exhibit 236.

15         Your Honor, May I publish it to the witness?

16         THE COURT:  236 is in evidence?

17         MS. HESMAN:  It is not.

18         THE COURT:  You said to the witness.

19         Yes, you may.

20 BY MS. HESMAN:

21 Q   And Officer Hewitt, do you recognize this video?

22 A   Yes.

23 Q   And what is it?

24 A   It is one under part of 2 Bravo.

25 Q   And do you recognize some of the officers that are in this

CROSS EXAMINATION -   ROBERT HEWITT

1    video?

2    A    I honestly don't recognize that one.

3    Q    Are you standing behind the stairwell?

4    A    I'm standing behind the railing and Johnson is behind me.

5    Q    And is this an accurate depiction of 2 Bravo on the day of

6    the incident?

7    A    Yes.

8         MS. HESMAN:  Your Honor, defendants move to admit

9    Exhibit 326.

10        MR. ROBBINS:  No objections, Your Honor.

11        THE COURT:  Thank you.

12        326 is received.

13        MS. HESMAN:  Your Honor, may I publish to the jury?

14        THE COURT:  You may.

15        MS. HESMAN:  Thank you.

16     (Exhibit No. 326 admitted in evidence.)

17   BY MS. HESMAN:

18   Q    As we did with the other video, if you can kind of

19   describe for the jury what's happening here as it plays.

20   A    At the time we're handing out commissary that the inmates

21   have ordered.  I have just come into the -- end of the pod.

22   Q    And you're standing behind the stairwell?

23   A    Yes.  I'm standing behind the stairwell.

24   Q    At this point is Bates already placed in the cell?

25   A    Yes.

CROSS EXAMINATION -  ROBERT HEWITT

1   Q   And how long had it been since he had been placed in the

2   cell?

3   A   Probably 15, 20 minutes, maybe.

4   Q   You weren't the one who originally placed him in the cell?

5   A   No.  No.

6   Q   And you weren't the one who did the cell assignment?

7   A   No.

8   Q   You're just bringing him his assignment?

9   A   Right.

10  Q   So you leave the pod?

11  A   I'm leaving and I'm going over -- it looks like I'm going

12  to go to 2 Edward property and bring it back in.

13  Q   And it looks like you have a bag and the officer with you

14  has a mattress?

15  A   Yes.

16        MS. HESMAN:  Can you pause it, Kristen.

17  BY MS. HESMAN:

18  Q   Typically, when an inmate moves cells, can you describe

19  the process for the jury as to how his property gets to him in

20  the new cell and what's entailed with that.

21  A   If it's a cordial cell move, we'll ask -- we'll give him a

22  bag and ask him to put all his property in it and then we'll

23  make the move.

24        If it's a situation like this, we'll make the move

25  first, get him out and then go collect his property and the

CROSS EXAMINATION - ROBERT HEWITT

1   mattress and then take it to wherever he is.

2          MS. HESMAN:   Okay.  Can you play it please, Kristen.

3   BY MS. HESMAN:

4   Q   So you have his property.

5   A   Yes.

6   Q   And you're placing it in the cell?

7   A   Yes.

8   Q   Is there any conversation that happens at this point?

9   A   Not that I know of.  The only conversation there would

10  have been would have been for him to empty his property out of

11  the plastic bag that we gave him.

12  Q   And when a cell is first open, what do you observe?

13  A   The two of them sitting on the bed, on the bottom bunk

14  playing cards.

15  Q   And did either one of them say anything to you?

16  A   No.

17  Q   Did either one of them request to be moved or indicate

18  that there would be a problem?

19  A   No.  No.

20  Q   Is there a button in each cell Knowledge?

21  A   Yes.  There is.

22  Q   And explain to the jury what that is and what that does.

23  A   It's an intercom button.  It's connected to the tower

24  officer.  They just pull that or push that and they can talk

25  to the tower officer.

CROSS EXAMINATION - ROBERT HEWITT

1   Q   What are some of the ways that inmates utilize that call

2   button?

3   A   It's only supposed to be used for an emergency, but

4   inmates will use it constantly for anything and everything.

5         You know, like:  What's the date today?  What time is

6   it?  You know, what's the weather outside like?

7         They'll use it for anything.

8   Q   And those calls, I believe you just testified, go to the

9   tower officer?

10  A   Go right to the tower officer, yes.

11  Q   And he can address them directly in their cell.

12  A   Yes.

13  Q   So if there's a problem and someone needed to be removed

14  from a cell, they could utilize that button?

15  A   Yes, they could.

16  Q   When you found Bates in the 2E sally port was he able to

17  understand what you were saying?

18        MR. ROBBINS:  I object to form and foundation.

19        THE COURT:  Foundation sustained.

20  BY MS. HESMAN:

21  Q   What was your impression of him when you encountered him

22  in the 2E sally port?

23  A   That he was just -- he was doing something just to get

24  moved or just to be stupid, basically.

25  Q   Going back to when you placed his property in the cell,

CROSS EXAMINATION - ROBERT HEWITT

1   what happens if an inmate refuses to either go into a cell or

2   wants to be removed from a cell?  What happens?

3   A   If an inmate doesn't want to go into a cell, we don't

4   force them.  We pretty much try and accommodate him, maybe put

5   him into another cell that he wants to go into, which again,

6   is not something we do very often.

7         If there's an available cell, maybe we'll throw him

8   in there.  But somebody who wants to move to a different cell,

9   there's got to be a very good reason why.

10  Q   Regardless, under any circumstances, you take them out of

11  the cell they don't want to be in; is that accurate?

12  A   Like I said, there has to be a good reason why he wants to

13  be out of that cell.  It's not like a hotel where they can

14  just change rooms.

15  Q   Did that happen here?  Did either one of them indicate

16  that they didn't want to be in the cell?

17  A   No.

18  Q   Did Bates ever appear to be violent?

19  A   No.

20  Q   Dangerous?

21  A   No.

22  Q   Agitated?

23  A   No.

24  Q   And you testified that you were working in 2E as the floor

25  officer on the day of the incident?

CROSS EXAMINATION -  ROBERT HEWITT

```
 1   A    Yes.
 2   Q    And you also testified that you had developed a rapport
 3   with some inmates?
 4   A    Yes.
 5   Q    Had you developed a rapport with any inmates in the 2E
 6   housing unit that were there on that date?
 7   A    Yes.  I would imagine I would have.
 8   Q    What about an inmate named Inmate Gonzales?
 9   A    No.  I never -- I didn't know him.
10   Q    Did you know Bates's former cellmate?
11   A    I do now after the incident.  But Gonzales was not a --
12   not a person that I had known.
13   Q    And after this incident happened, did you go back and
14   speak to Inmate Gonzales?
15   A    Yes, I did.
16   Q    And what did you learn?
17        MR. ROBBINS:  Object to form, Your Honor.
18   Foundation.  Hearsay.
19        THE COURT:  Hearsay?
20        MS. HESMAN:  Your Honor, I'm not offering it for the
21   truth of the matter.
22        THE COURT:  You're not offering it for the truth of
23   the matter?
24        MS. HESMAN:  No.
25        MR. ROBBINS:  Then add relevance.
```

CROSS EXAMINATION -  ROBERT HEWITT

1          THE COURT:  And the relevance would be?

2          MS. HESMAN:  The relevance would be that I know

3    they're going to elicit testimony from another witness that

4    without saying what that testimony is makes what Gonzales said

5    relevant.

6          THE COURT:  On that avowal the objection is overruled

7    and you may answer.

8          MR. ROBBINS:  It's still hearsay, Your Honor.

9          THE COURT:  Well, she says she's not offering it for

10   the truth of the matter.

11         MR. ROBBINS:  Thank you, Your Honor.

12   BY MS. HESMAN:

13   Q   And what did you learn?

14   A   I asked Gonzales what Bates was like having been his

15   cellmate.  And Gonzales just said that he was a little strange

16   but, you know, there was nothing that he found was violent or

17   anything like that.

18   Q   Was he scared of him?

19   A   No.

20         MR. ROBBINS:  Your Honor, I move to strike that as it

21   was, in fact, offered exactly for what the avowal was made

22   that it would not be offered for.

23         THE COURT:  Well, I think she's avowed that she will

24   connect it by a second witness.  And so you can hold your

25   motion in your pocket.

CROSS EXAMINATION - ROBERT HEWITT

 1             And we'll take our -- unless you have one more
 2     question or something, we'll take our noon break.
 3             MS. HESMAN:  The break is good, Your Honor.
 4             THE COURT:  All right.
 5             We will be in recess till one o'clock.  And please
 6     remember the admonition.
 7             Do we have a video -- video witness at one o'clock?
 8             MR. ROBBINS:  Yes.  We do, Your Honor.
 9             THE COURT:  So we'll need to interrupt this witness
10     for that purpose?
11             MR. ROBBINS:  Yes, Your Honor.
12             THE COURT:  All right.  We'll be in recess till then.
13             Remember the admonition, please.
14        (Recess taken at 12:00 p.m.; resumed at 1:10 p.m.)
15             THE COURT:  Thank you.  Please be seated.
16             The record will reflect the presence of the parties
17     and counsel and ladies and gentlemen of the jury.
18             Forgive us for being a few minutes late starting, but
19     we have some relatively complicated audio-visual matters to
20     deal with.  And so we're going to interrupt the witness who's
21     on the stand and the plaintiffs will call their next witness.
22             MR. ROBBINS:  Thank you, Your Honor.
23             We'll call Richard Gause.
24             THE COURT:  All right.  As you can tell, ladies and
25     gentlemen, this is by video but live.

DIRECT EXAMINATION - RICHARD GRAUSE

```
 1            And you'll swear him in, Ms. Williams?  I knew you
 2    would.
 3        (Witness duly sworn.)
 4            THE CLERK:  Please state your name for the record,
 5    spelling your first and last name.
 6            THE WITNESS:  Richard Legrand Gause.  R-I-C-H-A-R-D.
 7    G-A-U-S-E.
 8            THE CLERK:  Can you spell your middle name?
 9            THE WITNESS:  L-E-G-R-A-N-D.
10            MR. ROBBINS:  Okay.  You can put down your hand.
11            MR. STRUCK:  Your Honor, may I position myself to
12    where I can see the witness?
13            THE COURT:  Yes, you may.
14            And let me introduce myself.  I'm Judge Teilborg and
15    defense counsel will introduce himself.
16            MR. STRUCK:  Dan Struck.
17            THE WITNESS:  Okay.
18        (The Witness Richard Gause appears via video
19    teleconferencing.)
20            RICHARD LEGRAND GRAUSE, WITNESS, SWORN
21                      DIRECT EXAMINATION
22    BY MR. ROBBINS:
23    Q   Richard, where are you right now?
24    A   I'm in Lewis Complex Prison.
25    Q   Okay.  And you were an inmate in Disciplinary Segregation
```

DIRECT EXAMINATION - RICHARD GRAUSE

1   on the day that Zach Daughtry was beaten, correct?

2   A    Correct.

3   Q    And I want to talk to the jury for a bit about

4   Disciplinary Segregation.

5              How long were you there?

6   A    I don't recall exactly why I was there that time but the

7   couple times I was there, I believe it was 30 days at a time.

8   Q    Okay.  And when you went to Disciplinary Segregation, was

9   Zach Daughtry there when you were there at least during the

10  last --

11  A    Yes.

12  Q    Tell us what you observed of Zachary Daughtry.

13  A    That he was just like -- that he was -- he had some mental

14  issues and just wasn't meant -- wasn't fit to be there in the

15  house with regular people.

16  Q    When you say that, let's describe it in what you could see

17  or hear or smell.

18             What are the things that brought you to that idea?

19  A    Well, he stank real bad and like instead of sleeping,

20  like, on top of the mattress, like, and using your sheets and

21  blankets to cover up with and sleep on, he slept inside of his

22  mattress.

23             He ripped his covering open and slept inside of it,

24  inside of the hard plastic covering on the foam and stuff like

25  that and didn't even use his sheets or blankets.

DIRECT EXAMINATION - RICHARD GRAUSE

1    And just he would start with banging and yell like

2    obscenities and stuff like that.

3    Q    So he would bang and you said yell obscenities?

4    A    Yeah.

5    Q    What do you remember?

6    A    I don't recall -- I don't recall specifics.  I just

7    remember that he wasn't all there.

8    Q    When you say that you talked about the smell, what were

9    the things -- did you observe anything that stank other than

10   Zach himself?

11   A    I can't quite recall.  I don't recall too clearly.

12   Q    Okay.  And I wanted to make clear, you had something that

13   affected your ability to remember things?

14   A    Correct.  I was in a motorcycle accident that -- a severe

15   brain injury on April 25th, 2013, and my memories -- my

16   recollection of things aren't like perfect, like, I guess you

17   should say.

18   Q    Okay.

19   A    Some things I forget and some things -- I'll be talking

20   about something and I'll remember some more about it as I talk

21   about it, but yeah.

22   Q    Mine is not perfect either, so when you say that Zach's

23   cell smelled, would he come out and hang out with you guys?

24   A    I don't remember him ever coming out, no.  He was just

25   always just laying in his bed.

DIRECT EXAMINATION - RICHARD GRAUSE

1  Q   And how were you able to smell him?

2  A   It just -- just walking by him room, the stench coming out

3  of his room.

4  Q   And in terms of -- did he --

5  A   And his mattress.  Those are the two things.

6  Q   Okay.  And let's talk a little bit about Disciplinary

7  Segregation on 2B which is where you were.

8       What kind of -- so you're in a cell.  Do you have a

9  recollection as to what cell number you were in?

10 A   Somewhere in the middle like 6 or 7 or 8ish is where I

11 would say or somewhere around there.  I don't quite recall.

12 Q   Okay.

13 A   But I know I was a few doors down from him towards the

14 middle.

15 Q   Okay.  So a few doors down from the cell that Zachary

16 Daughtry was in but more towards the middle?

17 A   Correct.

18 Q   Okay.  And when you guys would --

19      MR. STRUCK:  Your Honor, would it be possible for me

20 to get a microphone?  I suspect I may be making an objection.

21      THE COURT:  I'm sorry.  What did you say, speaking of

22 microphones, but speak up.  That's all right.

23      MR. STRUCK:  I just asked for a microphone.

24      THE COURT:  Oh.  Very well.

25 BY MR. ROBBINS:

DIRECT EXAMINATION - RICHARD GRAUSE

1   Q   So when you were in Disciplinary Segregation, what were

2   the time -- how much time would you spend inside the cell with

3   the cellmates?

4   A   23 hours a day.  And you come out for one hour for

5   showers, I believe, every other day; but it might have been

6   every day.  I'm not quite sure.

7         But you would come out for a shower like with three

8   or four other rooms for one hour for showers.

9   Q   And while you were in the Disciplinary Segregation Unit,

10  how many fights would you see on a weekly basis?

11  A   There was quite a few of them.  It just depends on where

12  you're at.  But -- I don't think you could put like an exact

13  number.  It just depends on the area you're at.  But the area

14  of Disciplinary Segregation there's a lot of fights right

15  there.  That's what most people are there for.

16  Q   When you say that most people are there for fighting, what

17  do you mean?

18         MR. STRUCK:  Objection.  Foundation.

19         THE COURT:  Sustained.

20  BY MR. ROBBINS:

21  Q   How did you learn what other people were in the unit for?

22  A   This is a real small unit.  Everybody talks about what

23  they're there for.  What's going on.  I mean, you're pretty

24  knowledgeable about what most people are there for.

25  Q   And the night that -- the night that Zach Daughtry was

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - RICHARD GRAUSE

1   attacked, you actually talked with the officers?

2   A   Yes.  I believe I did, yes.

3   Q   Why would you do that?

4   A   Because I remember they -- the guy telling him get him out

5   of there and I was telling them that they were telling him to

6   fight.

7        MR. STRUCK:  Excuse me.  Objection, Your Honor.

8   Hearsay.  Move to strike.

9        THE COURT:  Sustained.  It's ordered stricken.

10  BY MR. ROBBINS:

11  Q   Let me just add.

12       Why did you -- a lot of times inmates won't talk to

13  the police.  Why did you step up and say "I want to talk"?

14  A   Well, because I'm in Protective Custody here in prison.

15  And even though in County Jail I was in General Population

16  where it's against the rules of the Code, I guess you would

17  say, of prisoners not to talk to cops --

18       Like if I had done that in General Population, my

19  life would be in danger.  But since I'm here in Protective

20  Custody already in prison, it doesn't put my life in jeopardy

21  because it's just here it's every man for themselves and it

22  doesn't really matter.  I can be a regular human being here is

23  the best thing that you could say.

24  Q   I would like to take you back to that night.  Okay?

25  A   Okay.

DIRECT EXAMINATION - RICHARD GRAUSE

1   Q    What do you remember clearly from that night?

2   A    I remember the cops -- that the guy who beat him --

3   telling him to get him out of there.  He didn't want to live

4   there.

5            MR. STRUCK:  Objection.  Hearsay.

6            THE WITNESS:  He didn't want to live there.

7            MR. STRUCK:  Your Honor, hearsay.  He's asked for a

8   narrative and he's responding with hearsay responses.

9            THE COURT:  Your response?

10           MR. ROBBINS:  My response is that the words that were

11   said are words that the officers would have heard as well so

12   it's not hearsay.

13           THE COURT:  Well, what's it being offered for?

14           MR. ROBBINS:  To show what the officers heard in

15   terms of a warning about what was going to possibly occur

16   should he go into the cell.

17           THE COURT:  Sustained.

18   BY MR. ROBBINS:

19   Q    Did you see when the officers came into the unit?

20   A    Yes.  I don't quite recall it but -- yes, I do.

21   Q    And how would you know that someone was coming into the

22   unit?

23   A    You can hear the big slider door opening.

24   Q    And when you look out your door towards the slider door,

25   what are you able to see?

DIRECT EXAMINATION - RICHARD GRAUSE

1  A    You can see there were people coming in right there.  You

2  can see the slider door that opens up into the outside little

3  slider where you have to come into the pod.  There's only one

4  door that comes in.

5  Q    Did you see Zachary Daughtry walking in with two detention

6  officers?

7  A    Um, is he the one who got killed or the one who attacked

8  the guy?

9  Q    That was really a bad question because I got it all

10  backwards.

11       Ryan Bates, did you see Ryan Bates coming in with two

12  detention officers?

13  A    Yes.

14  Q    And later on some detention officers brought him, I guess,

15  a mattress and some belongings.

16       Did you see that as well?

17  A    Yes.

18  Q    Do you remember whether or not the detention officers --

19  or what -- did Ryan Bates do anything before he went into the

20  cell?

21  A    I remember him grabbing something like a sack lunch like

22  off something like off a cart and that's all that I can really

23  recall.

24  Q    Was there any conversation that you overheard between Ryan

25  Bates and the detention officers?

DIRECT EXAMINATION - RICHARD GRAUSE

1          MR. STRUCK:  Objection.  Hearsay.

2          THE COURT:  And your response?

3          MR. ROBBINS:  My response is that it's a warning.

4  It's not for the truth of the matter asserted.  It's to show

5  that they heard the words.  That he heard the words that they

6  should have also been able to hear, so it was a warning.

7          THE COURT:  So you're not offering it for the truth

8  of the matter asserted but merely for the fact of those words?

9          MR. ROBBINS:  Correct.

10          THE COURT:  On that basis the objection is overruled.

11  BY MR. ROBBINS:

12  Q    Please tell us what you remember of the words that were

13  spoken.

14  A    Ryan Bates, I guess, the guy who attacked him, he didn't

15  want to house with the other guy because of house he stank and

16  probably the living conditions.

17          But he told the cops:

18          Move him.

19          And then the cops told him:

20          You have to fight to get moved.  Not right now, but

21  on my next walk, if you're fighting whenever I walk, I will

22  move you then.

23          That's a normal thing that they would do there.

24          MR. STRUCK:  Your Honor, move to strike.  Hearsay.

25          THE COURT:  And your response?

DIRECT EXAMINATION - RICHARD GRAUSE

1          MR. ROBBINS:  What he said isn't hearsay.  It wasn't

2  offered for the proof of the matter asserted.  It was to talk

3  about the words that were said.

4          THE COURT:  On that basis the objection is overruled.

5  BY MR. ROBBINS:

6  Q   Now, one of the things that we have -- or strike that.

7          Some years later you went and you also talked to an

8  investigator that was hired by the County, correct?

9  A   Correct.  Correct.

10 Q   And you talked -- the words that you told the County

11 originally and the words of their investigator have all been

12 typed out.

13 A   Okay.

14 Q   Did you even know that?

15 A   No.  I didn't.

16 Q   Okay.

17         THE COURT:  Counsel, I just want to explain to the

18 jury.

19         At some point I will explain that certain items

20 will -- and I think I did explain it in the preliminary

21 instructions.

22         Certain items will come into evidence for a limited

23 purpose.  And in these two, I think, well, maybe now three

24 instances, where there's been, for example, a hearsay

25 objection and I ask whether or not the words were being

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - RICHARD GRAUSE

1   offered for the truth of those words or not and the

2   explanation has been they have been offered for the fact those

3   words were spoken.

4           That would be an example and those are examples where

5   evidence has been admitted for a limited purpose.

6           You may proceed.

7           MR. ROBBINS:  Thank you, Your Honor.

8   BY MR. ROBBINS:

9   Q   So in terms of talking with the Detective for the County

10  and then later on the investigator for the County, did you

11  tell them the truth?

12  A   Yes.

13  Q   And let me talk a little bit about the pod itself.

14          We've talked about the people that were there.  Were

15  there people that -- that you could observe that acted

16  peculiarly in a way that was -- or in a strange way?

17  A   Um, I'm not understanding what you're asking.

18  Q   Sure.  Were there people that acted oddly?  You know, that

19  they were strange, and you're, like, something is odd.

20          MR. STRUCK:  Objection, Your Honor.

21          THE WITNESS:  Well, we're in prison.

22          MR. STRUCK:  Vague.

23          THE COURT:  Overruled.

24          Mr. Gause, can you hear?  From time to time you'll

25  hear Mr. Struck make an objection.  He's got a microphone.

DIRECT EXAMINATION - RICHARD GRAUSE

1    Can you hear that when he does so?

2             THE WITNESS:  Yes, I can.

3             THE COURT:  Okay.  When you hear that, then hold off

4    giving your answer till I get a chance to rule on the

5    objection.  Okay?

6             THE WITNESS:  Okay.

7             THE COURT:  All right.

8             THE WITNESS:  Yes.

9    BY MR. ROBBINS:

10   Q   Now, I was talking about whether or not you observed

11   behavior that made you think that something might be wrong

12   with someone.

13   A   Correct.  And, yeah, a lot of people in here have mental

14   issues.  It's just prison life, I guess you would say.

15   Q   And in the maximum security unit of the Maricopa County

16   Jail had you seen anyone else or any other instances where

17   County detention officers told someone to fight in order to

18   get out of a cell?

19            MR. STRUCK:  Objection, Your Honor.  Hearsay.

20   Foundation.  Relevance and 403.

21            THE COURT:  Overruled.

22            MR. ROBBINS:  Do you remember the question?

23            THE WITNESS:  Yes.

24            And, yes, I do.  I had a cellie who was a problem

25   with the correctional officers there.  And they did the same

DIRECT EXAMINATION - RICHARD GRAUSE

1   thing to him.  They moved him in with another race inmate, a

2   black guy, knowing that as a white inmate, he can't house with

3   him.

4          And he told them I can't house with a black guy.

5   It's against the politics in prison.

6          The cops told him, well, when you go in, go in

7   swinging.  Otherwise, we're not moving you.  And so he had to

8   go in fighting the guy just to get moved.  And that's what

9   they commonly do to people who are problematic, I guess you

10  could say.  Yes, that happened to my cellie in there.

11         MR. STRUCK:  Move to strike.  Hearsay.

12         THE COURT:  And your response?

13         MR. ROBBINS:  No, Your Honor.  He said he heard it.

14  He said he saw it.  You know, he heard the words that were

15  said.  They told him to fight.  And he observed -- well, I'm

16  going to get in his observation of whether or not there was a

17  fight.

18         THE COURT:  So are you offering it for the fact of

19  those words rather than the truth of those words?

20         MR. ROBBINS:  Yes, Your Honor.

21         THE COURT:  For that limited purpose they will be

22  received and the objection is overruled.

23         MR. ROBBINS:  They're also statements of employees of

24  the County, so I think it would also fit under that exception.

25  BY MR. ROBBINS:

DIRECT EXAMINATION - RICHARD GRAUSE

1  Q   Do you recall the name of the inmate who was your

2  roommate?

3  A   I do not recall.  I just remember he was European.  He has

4  a European name.  He was from another country.  He was from

5  another country, another country's last name like Polish or

6  something.  I'm not a hundred percent sure.

7  Q   Okay.  If I said the name, would it assist you?

8  A   Possibly, yes.

9  Q   Do you remember the name Dusko Krstic?

10  A   Yes.  That was him.  Yes.

11  Q   Do you know whether he, in fact, did, in fact, get into a

12  fight after --

13  A   Yes, he did, as soon as they moved him in, yes.

14  Q   And was that the evening of the same night that --

15  A   I don't recall if it was the same day, if that's what

16  you're asking.  I just remember that it happened.

17  Q   Do you remember the name of the person who he was put into

18  a cell with?

19  A   No.  I just -- no.  I just remember he was a black guy.

20  Q   So I would like to talk for a second about at some point

21  did you become aware that there was a fight going on inside

22  cell number -- in the cell that this person had been placed

23  into?

24  A   Yeah.  You could hear the bumping.

25  Q   And was it preceded by screams?

DIRECT EXAMINATION - RICHARD GRAUSE

1      MR. STRUCK:  Objection, Your Honor.  Leading.

2      THE COURT:  Sustained.

3  BY MR. ROBBINS:

4  Q   What did you hear before the bumping?

5  A   Right before it, nothing.  I just remember hearing it.

6      MR. ROBBINS:  Let me -- I'm going to show the witness

7  page 3, Daughtry 8978, to refresh his memory based on a prior

8  statement.

9      May I approach?

10      THE COURT:  You may.

11  BY MR. ROBBINS:

12  Q   Let me show you the document that was prepared after you

13  spoke to the County's investigator.

14  A   Okay.

15  Q   Can you see that?

16  A   Yes.

17  Q   And does that refresh your recollection as to whether or

18  not you may have heard screams?

19  A   Yeah.  I mean, kind of sort of, but it's been a long time

20  ago.  I remember the thumping.  I mean maybe.  I'm not a

21  hundred percent sure on the screams and stuff.

22  Q   Okay.  Do you feel that -- do you feel that --

23      Well, this was the statement -- the statement was

24  done on December 29th of 2016, so it's only about four or five

25  months ago.  Do you believe that you would have -- if you

DIRECT EXAMINATION - RICHARD GRAUSE

1  recalled it then, that it would be more accurate than today,

2  your testimony?

3  A   Yeah.  Yeah, probably, yeah.

4  Q   All right.  The final thing I wanted to talk to you is a

5  little bit more happy.

6         You're getting out?

7  A   All right.  I am getting out very soon.

8  Q   And when are you going to be released?

9  A   Right now I believe it's in September but there's a

10 possibility in July.

11 Q   Now, you -- in all honesty and sincerity, you kind of did

12 belong in maximum security.  Do you agree with that?

13         MR. STRUCK:  402.  403.  Foundation.

14         THE WITNESS:  Yes.

15         THE COURT:  And the relevance is?

16         MR. ROBBINS:  I'm just talking about the kind of

17 people that were in maximum security in that whole same unit.

18         THE COURT:  And the relevance of that would be?

19         MR. ROBBINS:  Because it's a dangerous place and I

20 wanted to demonstrate that.

21         THE COURT:  Sustained.

22 BY MR. ROBBINS:

23 Q   Okay.  If a roommate -- or if you had had a roommate -- if

24 Zach Daughtry was in your room and you couldn't move and if

25 you couldn't just ask to be moved, would you have fought him?

CROSS EXAMINATION - RICHARD GAUSE

1          MR. STRUCK:  402.

2          THE WITNESS:  Absolutely.

3          MR. STRUCK:  403.  Speculation.  Foundation.

4          THE COURT:  Sustained on all counts.

5          MR. ROBBINS:  Thank you, Richard.

6          I appreciate your willingness to testify in a court.

7  Thank you.

8          THE WITNESS:  Sure.  Okay.  Okay.

9          THE COURT:  We're not done yet.

10          Mr. Struck is going to get a chance to ask you some

11  questions.

12          MR. STRUCK:  May I approach?

13          THE WITNESS:  Okay.

14          MR. STRUCK:  And give the microphone back.

15          THE COURT:  You may.

16          MR. STRUCK:  Just a moment, sir.

17          THE WITNESS:  That's all right.

18                    **CROSS EXAMINATION**

19  BY MR. STRUCK:

20  Q   My name is Dan Struck and I represent the County

21  defendants in this case.

22  A   Okay.

23  Q   You and I have never met, have we?

24  A   No.

25  Q   And we've never had any discussions at all about this

CROSS EXAMINATION - RICHARD GAUSE

1    case, correct?

2    A    No.   Correct.

3    Q    Have you ever spoken to Mr. Robbins or anybody from his

4    office before?

5    A    Um, I believe so, yes.   Yes.

6    Q    When was that?

7    A    I had a video conference or we had a telephone call with

8    him, I believe, after your guys' investigator came to see me

9    and then just recently last week, I believe.

10   Q    And it was a phone call or did they come out to the

11   prison?

12   A    Phone call.   No.   It was a phone call.

13   Q    I'm sorry.   How long did the phone call last?

14   A    No more than 30 minutes.   I don't know the exact time

15   frame but the calls can't be more than 30 minutes.

16   Q    Okay.

17   A    I remember it was close to the 30 minutes though.

18   Q    And which facility are you housed in?

19   A    Lewis Complex, Rax Max Unit.

20   Q    Okay.   And so you are in the maximum custody unit?

21   A    I'm in the closed custody part of the Max.   The unit is

22   called Rax Max.

23   Q    Two you remember what day it was that you had the phone

24   call with Mr. Robbins?

25   A    I believe it was a week ago today.

CROSS EXAMINATION - RICHARD GAUSE

1   Q   All right.  Do you remember what time of day it was that

2   you had the phone call?

3   A   In the morning about ten o'clock.

4   Q   And was it a -- it wasn't an attorney-client privileged

5   phone call, was it?

6   A   I don't understand what you mean by that.

7   Q   Well, you know, when you're in prison you can -- when you

8   make a phone call just to, say, a family member or a friend,

9   those calls are recorded.  You understand that?

10  A   Right.  Yeah.

11  Q   But when you make a phone call, say, to your attorney, you

12  can make a phone call that's not recorded because there's

13  attorney-client privilege involved.  You understand that?

14  A   Um, yes, I do understand that.

15  Q   Okay.

16  A   And I do not know if this was attorney-client privilege or

17  not.  I don't know how they do that here.

18  Q   Okay.  Now, you said that you smelled something that

19  smelled like feces coming out of Mr. Daughtry's cell.  Do you

20  remember that?

21  A   Yes.  Yes.

22  Q   Did you actually see feces in his cell?

23  A   I can't -- I don't -- something in his cell but I just

24  can't clearly recall, no.  I don't know.

25  Q   And I'm going to ask you to repeat your last answer

CROSS EXAMINATION - RICHARD GAUSE

1   because the image froze and we couldn't tell exactly what you

2   were saying.  Would you mind repeating your answer?

3   A   Yeah.  I don't quite recall clearly.  I mean, I seem to

4   recall that there was feces in his room but I just can't quite

5   recall.  I don't know.

6   Q   All right.  So when you possibly saw feces in his room,

7   was it on the date when he and Mr. Bates got into a fight?

8   A   I couldn't -- I couldn't recall that clearly.  I don't

9   know.  I can't say that one way or the other.

10   Q   And can you tell us how many days that you were housed in

11   the Segregation Unit with Mr. Daughtry?

12   A   I couldn't clearly tell you that either.

13   Q   Okay.  When you saw and you told us about a conversation

14   that you heard between Mr. Bates and the officers when

15   Mr. Bates was being placed into the cell; is that right?

16   A   Correct.  I believe so, yes.

17   Q   And I think you said you actually could look out your

18   window and see the -- see them having this conversation?

19   A   I couldn't see them having the conversation but I could

20   see him coming in.  But you can hear pretty much everything in

21   there.

22        So everything echos, like, the sound quality in there

23   so you can hear everything in there.  I couldn't see him

24   specifically in the room, but I could see him walking up close

25   to the door.  I mean, you could get a pretty good view of

CROSS EXAMINATION - RICHARD GAUSE

1    stuff.

2    Q    But you say you saw Mr. Bates before he went into the cell

3    run and grab a sack lunch?

4    A    I believe that's what it was, yes.   Yep.

5    Q    And did you see the officers holding onto Mr. Bates's arms

6    when Mr. Bates -- before Mr. Bates went into the cell?

7    A    I can't quite recall but that's something that they're

8    supposed to do.

9    Q    I'm going to show you a transcript from the interview that

10   you had with the investigator that -- another page from what

11   Mr. Robbins has showed you to see if it refreshes your

12   recollection with respect to whether or not you saw the

13   officers holding Mr. Bates' arms before Mr. Bates went into

14   the cell.   Okay?

15   A    Okay.

16   Q    Can you read that?

17   A    Okay.   I can.

18   Q    Does that refresh your recollection with respect to you

19   actually seeing the officers holding Mr. Bates's arms?

20   A    Um, specifically, no.   I mean, I remember talking about

21   that but I can't clearly recall it like visually.

22   Q    All right.   How long did this conversation occur -- the

23   conversation before Mr. Bates went into the cell between the

24   officers and Mr. Bates.

25                How long did it take for that conversation for them

CROSS EXAMINATION - RICHARD GAUSE

1   to have that conversation?

2   A   I couldn't tell you.  I don't quite recall.  This is a

3   long time ago, man.  I mean, it's stuff I hadn't even thought

4   about until your investigator came.  I mean, we see stuff like

5   this in here all the time.

6   Q   But you heard Mr. Bates and the officer say things back

7   and forth to one another before Mr. Bates went into the cell,

8   correct?

9   A   I believe so, yes.  Yes.

10  Q   And isn't it true that you told the investigator that

11  immediately upon Mr. Bates going into the cell, you started

12  hearing that banging; isn't that right?

13  A   If I -- if it's in the transcripts, then that's what I

14  said.  I can't quite recall though.

15  Q   Well, let me show you the transcript.

16  A   Okay.  Okay.

17  Q   Now, do you see that?  You said:

18          Okay.

19          And then you heard -- how long did you hear banging?

20          Right away soon.  Soon as they shut the door.  They

21  were still in the pod whenever he started getting him right

22  away.

23          Isn't that what you told the investigator?

24  A   Okay.  I guess, yes.

25  Q   So that means you thought that Mr. Bates and Mr. Daughtry

CROSS EXAMINATION - RICHARD GAUSE

1   started fighting immediately upon him being placed in the cell

2   even before the officers left the housing unit, correct?

3   A    Okay.  Okay.

4   Q    Could you see the two officer who were putting Mr. Bates

5   into the cell?

6   A    What do you mean?  Like whenever they -- whenever they

7   came in with him or while they were at his cell front.

8   Q    Let me ask a different question.

9             How many officers were there that were putting

10  Mr. Bates into the cell?

11  A    Well, obviously two.  You just said two.

12  Q    And could you identify either one of them?  Did you

13  recognize either one of them?

14  A    I could not.  You could tell me their names and show me

15  pictures of them the only way I could recollect it.

16  Q    But was it one of those two officers that was talking to

17  Mr. Bates and using those words that you told Mr. Robbins?

18  A    Yes.  Yes.

19  Q    All right.  And did you see whether either one of those

20  officers was wearing a taser?

21  A    I don't recall.

22  Q    Did you hear Mr. Bates say repeatedly that he didn't want

23  to go into the cell?

24  A    Like I can't even really recall.  I remember him saying

25  something to that effect.  I don't remember the exact details

UNITED STATES DISTRICT COURT

CROSS EXAMINATION - RICHARD GAUSE

1    of it.

2    Q   Well, let me show you again the transcript from your

3    interview with the investigator.

4           And isn't it true that you told him -- the

5    investigator asked you:

6           Okay.  And then when did you hear Bates tell the

7    officer he didn't want to go into the cell.

8           And your answer was:

9           He was saying it repeatedly, right as soon as he

10   could see what was in -- what was going in there and the smell

11   coming from out.  He was like, hell, nah, I ain't going in

12   that room.

13          So does that -- that's what you told the investigator

14   that you heard him say it repeatedly?

15   A   That rings a bell.  At least -- (Inaudible audio)

16          But as of right now, like sitting here, I can't

17   really recollect that scenario happening in my head.  But I do

18   recall somewhat saying that to the investigator.  I do recall

19   somewhat that's how it happened.

20          My brains, sometime it works good and sometimes it

21   doesn't.  Like memory recollection, sometimes I'll get events

22   switched up and it is just time frames and things like that.

23          So, specifically, no, I can't really recall that but

24   it recalls to me as being correct, yes.

25   Q   Now, you also testified about your cellmate being put into

CROSS EXAMINATION - RICHARD GAUSE

1   a cell with an African-American inmate and told to fight him;

2   is that right?

3   A   Correct.  Correct.

4   Q   And it's your -- you're positive that your cellmate was

5   actually assigned into a cell.  That's -- you're positive that

6   they were assigned into a cell together?

7   A   One hundred percent because I remember him because the

8   reason I remember that so clearly is because in prison before

9   I came to protective custody, I had political status.

10          I guess what you would call a shot caller in there

11   for a little bit.  And he's like: Man, I got to go in there

12   swinging on this dude.  I don't want to hurt this dude because

13   he's a big boy.  Man, I don't want to hurt this dude.  Well,

14   but, man, I ain't getting this jack on me when I go to prison.

15          You gotta do what you gotta do, man.  That's just why

16   I recall that situation so clearly.

17   Q   Were you a shot caller for the Aryan Brotherhood?

18   A   Yeah.  I mean, I wasn't an Aryan Brotherhood member but to

19   an extent, yeah.

20   Q   What gang were you a shot caller for?

21   A   No.  I mean, yeah, the Aryan Brotherhood, yeah, but I

22   wasn't a full-fledged member or nothing to that effect.

23   Q   Well, a "shot caller" is somebody who is one of the

24   leaders.

25   A   Well, no.  No.  Most of the Aryan Brotherhood are slammed

CROSS EXAMINATION - RICHARD GAUSE

1  down so they have I guess like what you said.  They have

2  probates and minions that run the yards for them because this

3  place is pretty good at getting them off the yards.  And so

4  they have their probates who run the yards for them.

5  Q   Okay.  So when you say you're a shot -- you were a shot

6  caller for the Aryan Brotherhood, what you're saying is you

7  were a shot caller but you weren't a full-fledged member of

8  the Aryan Brotherhood?

9  A   Right.  I hadn't killed no one yet to get my patch.

10 Q   So you hadn't killed anyone yet to get your -- to patch

11 into the gang?

12 A   Correct.  Correct.

13 Q   And what you're saying is that if a white inmate is placed

14 in a cell with a black inmate, the Aryan Brotherhood would

15 require him to fight them?

16 A   Yeah.  Not just black.  Any other race.

17 Q   Okay.

18 A   They're segregated and all races are.  Population.

19 Q   But it is -- as you sit here today -- and I know you say

20 your memory is fuzzy because of the brain injury that you

21 sustained -- but do you have a specific recollection of your

22 cellmate getting assigned into a cell with an African-American

23 inmate?

24 A   Yeah.  I remember him going and fighting the guy right

25 away as soon as it happened.  Yes.

REDIRECT EXAMINATION - RICHARD GAUSE

```
 1              MR. STRUCK:  Just a moment, Your Honor.  I may be
 2    finishing up here.
 3              THE COURT:  Sure.
 4              MR. STRUCK:  I don't have anything further.
 5              THE COURT:  Redirect?
 6                        REDIRECT EXAMINATION
 7    BY MR. ROBBINS:
 8    Q    Richard, why are you in -- why are you in Protective
 9    Custody now?
10    A    Um, it's kind of complicated, but because I was a probate
11    under a guy, it's the step up before you become a full patch
12    member, I was supposed to do some stuff when I got out on the
13    street to get my patch.  And I was getting kind of short and a
14    different brother than the one I was under wanted me to stab
15    some cops and hold them hostage in here.
16              And I wasn't going to spend the rest of my life in
17    here and I refused to do that and that's why I'm in Protective
18    Custody is for refusing a direct order.
19    Q    And you were in the maximum security unit with the history
20    that you have on the day that Zach Daughtry -- or that Ryan
21    Bates was put into Zach Daughtry's cell?
22    A    Correct.
23              MR. ROBBINS:  Thank you.
24              THE COURT:  All right.  We thank you, sir.
25              THE WITNESS:  Okay.
```

CROSS EXAMINATION - ROBERT HEWITT

1        THE COURT:  And that concludes this witness's

2   testimony.

3        THE WITNESS:  All right.  Thank you.

4        THE COURT:  And you may call your next witness.

5        MR. ROBBINS:  I think that we are --

6        THE COURT:  I'm sorry.  You're correct.

7        We have a witness on the stand on cross-examination.

8        Thank you.

9        You may continue.

10        MS. HESMAN:  Thank you, Your Honor.

11            **ROBERT HEWITT,  WITNESS, DULY SWORN**

12               **CROSS EXAMINATION (cont'd)**

13   BY MS. HESMAN:

14   Q   Officer Hewitt, during Mr. Robbins' questioning he showed

15   you a picture of the cell.  Do you recall that?

16   A   Yes.

17   Q   And do you recall whether there were any feces inside the

18   cell based on that picture?

19   A   I don't recall, no.

20   Q   Do you recall whether there were any feces when you went

21   into that cell on the night of the incident?

22   A   No.

23   Q   Would seeing that picture again refresh your recollection

24   as to whether or not there were feces in the cell?

25   A   Maybe.  Maybe.

CROSS EXAMINATION - ROBERT HEWITT

1          MS. HESMAN:  Sure.  Your Honor, may I step away from

2    the podium?

3          THE COURT:  You may.

4          MS. HESMAN:  And can I publish Exhibit 32 to the

5    witness?

6          THE COURT:  You may.

7    BY MS. HESMAN:

8    Q    And Officer Hewitt, do you have that photo in front of

9    you.

10   A    Yes.

11   Q    And is this the condition of the cell after the fight

12   occurred between Bates and Daughtry?

13   A    Yes.

14   Q    And do you see any feces any where in that cell?

15         MR. ROBBINS:  I object to form and foundation, Your

16   Honor.  I think you have to establish that it's close enough

17   to be able to judge.

18         THE COURT:  Overruled.

19         THE WITNESS:  No.

20         MS. HESMAN:  Okay, thank you.

21   BY MS. HESMAN:

22   Q    When you brought Bates's property and mattress to him in

23   2B, do you recall whether or not the cell was -- had any kind

24   of smell?

25   A    No.  There was no smell to it.

REDIRECT EXAMINATION -  ROBERT HEWITT

1    Q    It didn't smell bad?

2    A    No.

3    Q    Do you recall whether Daughtry smelled bad?

4    A    No.

5              MS. HESMAN:  I don't have anything further, Your

6    Honor.

7              THE COURT:  Redirect?

8              MR. ROBBINS:  Thank you, Your Honor.

9                        REDIRECT EXAMINATION

10   BY MR. ROBBINS:

11   Q    The good news is I don't have a lot of questions for you.

12   A    Okay.

13   Q    I would like to show the witness a picture.

14             This is the same one that you were looking at that

15   the defendant showed you, correct?

16             Oops -- no.  You can't actually duly see it unless I

17   do something here.  Let's see.  Okay.

18             Is this picture actually adequate to be able to tell

19   whether there was feces anywhere in the cell or not?

20             MS. HESMAN:  Objection, Your Honor.  Foundation.

21             THE COURT:  Overruled.

22             THE WITNESS:  Judging by this picture, yes.  I could

23   tell if there was any feces on it.

24   BY MR. ROBBINS:

25   Q    Is there anything that covers the floor that might hide

UNITED STATES DISTRICT COURT

REDIRECT EXAMINATION - ROBERT HEWITT

1    feces?

2          MS. HESMAN:  Objection, Your Honor.  402.  403.  We

3    discussed this at sidebar.

4          THE COURT:  Overruled.

5          THE WITNESS:  Looking at this picture, no.  There's

6    nothing that could.

7    BY MR. ROBBINS:

8    Q   Are you telling the jury that you could see whether or not

9    there was feces in the blood that's on the floor?

10          MS. HESMAN:  Objection, Your Honor.  Asked and

11   answered.

12          THE COURT:  Overruled.

13          THE WITNESS:  Judging from this picture, it does not

14   look like there's any feces in it.

15          MR. ROBBINS:  Your Honor, I move for admission of

16   Exhibit No. 32, page No. 3.

17          MS. HESMAN:  Objection.  402.  403.  We had a

18   discussion about this at sidebar.

19          THE COURT:  Sustained.

20   BY MR. ROBBINS:

21   Q   Let's talk for a moment about what opportunity you had to

22   smell what was going on inside that cell.  You did not put

23   Ryan Bates in that cell, correct?

24   A   Correct.

25   Q   That was a different officer that actually had the door

REDIRECT EXAMINATION - ROBERT HEWITT

1    open, correct?

2    A    Correct.

3    Q    Now, you walked up with the mattress and shoved it through

4    a little slider or a little -- you didn't even open the door.

5    You put it through a hole in the door.

6            MS. HESMAN:  Objection, Your Honor.  Misstates the

7    testimony.

8            MR. ROBBINS:  Go ahead.

9            THE WITNESS:  No.  I --

10           MR. ROBBINS:  No.

11           THE WITNESS:  The door has to be open to get a

12   mattress in --

13           THE COURT:  Wait a minute.  Wait a minute.

14           I heard something that sounded like an objection.

15           MR. ROBBINS:  We're moving on without the objection

16   being ruled on, so just wait for the Judge.

17           MS. HESMAN:  Objection.  Misstates testimony.

18           THE COURT:  Overruled.

19   BY MR. ROBBINS:

20   Q    You tossed the mattress in and then you stood back about

21   20 feet away from the door.

22           Do you remember that from the video?  Yes or no.

23   A    Yes.

24   Q    Okay.  Now, you testified about a fourth floor briefing.

25   And would you agree with me that there was no briefing about

REDIRECT EXAMINATION - ROBERT HEWITT

1  the kind of crazy things that Zach Daughtry was doing on 2B,

2  correct?

3  A   Correct.

4  Q   That wasn't discussed, correct?

5  A   Correct.

6  Q   And you weren't briefed about Ryan Bates and about

7  information that the jail had on Ryan Bates, correct?

8  A   Bates wasn't doing anything to him.

9  Q   They didn't tell you anything, did they?

10  A   No.

11  Q   And in terms of these briefings, the testimony that you

12  gave me this morning was truthful, honest and you were trying

13  to help the jury to understand what goes on in the jail,

14  correct?

15  A   Correct.

16         MR. ROBBINS:  Thank you.

17         THE COURT:  All right.  Any objection if this witness

18  is excused?

19         MR. ROBBINS:  No objections, Your Honor.

20         MS. HESMAN:  We're going to object, Your Honor.  We

21  want to subject him for recall.

22         THE COURT:  Very well.  Then he will remain under the

23  rule of exclusion and subject to recall.

24         Thank you, sir.

25         And you may call your next witness.

DIRECT EXAMINATION -  WILLIAM HOVANEC

1        MR. SHOWALTER:  Plaintiff calls William Hovanec.

2     (Witness duly sworn)

3        THE CLERK:  Please state your name for the record,

4   spelling your first and last name.

5        THE WITNESS:  William Hovanec.  W-I-L-L-I-A-M.

6   H-O-V-A-N-E-C.

7              **WILLIAM HOVANEC , WITNESS, SWORN**

8                    **DIRECT EXAMINATION**

9   BY MR. SHOWALTER:

10  Q   Good afternoon.  My name is Jesse Showalter.

11       Would you mind introducing yourself to the jury.

12  A   My name is William Hovanec.

13  Q   May I call you -- how would you like to be addressed?

14  William?  Mr. Hovanec?

15  A   William is fine.

16       THE COURT:  Maybe we'll go even with --

17       How do you pronounce your last name again?

18       THE WITNESS:  Hovanec.

19       THE COURT:  Well, why don't we go with Mr. Hovanec?

20  How is that?

21       THE WITNESS:  That's fine.

22       MR. SHOWALTER:  My apologies.  We're in federal court

23  and that's how we address people.

24  BY MR. SHOWALTER:

25  Q   Mr. Hovanec, am I getting the pronunciation right?

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    Hovanec.

2    A    Yes.

3    Q    Okay.   Mr. Hovanec, are you currently working for Maricopa

4    County Sheriff's Office?

5    A    No.

6    Q    Did you work for Maricopa County Sheriff's Office on July

7    9th of 2014?

8    A    Yes.

9    Q    And at that point how long had you worked for the Maricopa

10   County Sheriff's Office?

11   A    Approximately, two years.

12   Q    So approximately since roughly 2012?

13   A    Yes.

14   Q    Would it have been summer of 2012?

15   A    I'm not sure when I was hired.   I would have to look at my

16   resume.   I don't remember.

17   Q    Did you -- but is 2012, sometime in 2012?

18   A    Yes.

19   Q    And when did you leave Maricopa County Sheriff's Office?

20   A    June, 2015, I want to say, approximately.

21   Q    Did you attend the academy for detention officers?

22   A    Yes.

23   Q    And did you receive training at that academy?

24   A    Yes.

25   Q    What training did you receive there about recognizing

DIRECT EXAMINATION -   WILLIAM HOVANEC

1   people who may suffer from mental illness?

2   A   I don't recall.  It's been a long time.

3   Q   Do you recall if you received any training about

4   disciplining inmates in the Maricopa County Jail?

5   A   We don't discipline.

6   Q   You don't give discipline?

7   A   No.  That's the hearing officer does what they do.  We

8   write DARs.

9   Q   Okay.  And what training did you receive for writing DARs?

10  A   You're going to have to be more specific.  I don't

11  understand the question.

12  Q   Were you trained on how to write a DAR?

13  A   Yes.

14  Q   And what was take training?

15  A   I don't recall.  I don't remember the training

16  specifically.

17  Q   Were you trained in providing discipline to an inmate --

18  I'm sorry.  Strike that.

19          Were you trained that when you're writing a DAR, you

20  need to check to see if the detainee involved has any kind of

21  mental health issues?

22  A   If they had mental health issues and they have gone

23  untreated, they would be in -- they wouldn't be in General

24  Population.

25  Q   So is it your testimony that there's nobody in General

DIRECT EXAMINATION -   WILLIAM HOVANEC

```
 1   Population, based on your experience -- strike that.

 2           While you were a detention officer at the Maricopa

 3   County Jail, did you encounter detainees who had what appeared

 4   to you, based on your training, to be mental health issues?

 5   A   I don't have --

 6           MR. STRUCK:  Objection, Your Honor.  Foundation.

 7           THE COURT:  Overruled.

 8           THE WITNESS:  I'm not a medical professional.  I

 9   can't determine whether somebody is mentally ill or not, so I

10   don't understand what you're asking me, I suppose.

11   BY MR. SHOWALTER:

12   Q   Have you ever see somebody who acted -- and not just in

13   the jail, but just in general life -- have you ever been

14   driving down the road and seen somebody who was acting in a

15   bizarre fashion that was outside the norms of human behavior?

16   A   You have to determine.  What do you mean by "outside the

17   norms"?

18   Q   Well, have you ever driven down the street or been walking

19   down the street and seen somebody who's disheveled, walking,

20   shouting at themselves, making frenetic movements, things like

21   that?

22   A   Yes.  I have seen people walking down the street shouting

23   and making the movements, I suppose, you're talking about.

24   Q   And they're just -- there doesn't appear to be any

25   rational reason for what they're doing.
```

DIRECT EXAMINATION -   WILLIAM HOVANEC

1              You've seen that?

2    A   I don't know the rationale behind somebody else's actions.

3    Q   Are you able to --

4              Well, are you able to recognize if somebody is doing

5    something bizarre or odd or out of the norm for human actions.

6    A   Not in a mental illness state.   I can possibly send them

7    to see somebody that's a medical professional but I can't

8    determine whether they have a mental illness or not.

9    Q   Now, in your experience at the Maricopa County Jail, did

10   you ever witness an inmate engaged in self-destructive

11   behaviors?

12   A   What do you mean by "self destructive"?

13   Q   Like banging their head against the wall of their cell.

14   A   I don't recall if that's ever specifically happened to me

15   but I'm sure it has happened.

16   Q   You know it's happened.   You just can't recall any

17   specific incidents?

18   A   It's never happened to me that I can recall.

19   Q   Oh, I see.   So you're saying that you're sure it could

20   have happened but you have no personal knowledge of it?

21   A   Correct.

22   Q   Have you ever observed an inmate smearing feces on the

23   wall of a cell?

24   A   Yes.

25   Q   Now, we were talking earlier about bizarre and odd

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    behavior where did you observe that?

2    A    In the jail.

3    Q    In the Psych Unit or in General Population?

4    A    I didn't work in the Psych Unit.

5    Q    So you observed somebody in the General Population of the

6    jail smearing feces on the wall?

7    A    I have seen that, yes.

8    Q    And when you observed that, did you recognize that as odd

9    or bizarre behavior?

10   A    That is -- yes.  It's not normal behavior.

11   Q    And you were able to recognize it was outside the norms of

12   human behavior?

13   A    Yes.

14   Q    Did you recognize that because of your training on how to

15   recognize mental health issues at the academy or was it just

16   based on your own personal experience as a human?

17   A    I don't recall the training at the academy specifically,

18   but, I mean, if somebody is rubbing feces or touching feces, I

19   mean, it's -- it doesn't appear normal to anybody, so.

20   Q    Okay.  And that's -- and that's a situation you observed

21   in the Maricopa County Jail General Population, correct?

22   A    No.  I didn't say General Population.

23   Q    Well, I'm sorry.  I thought you said it was not in Psych?

24   A    It was not in Psych.

25   Q    Where was it?

DIRECT EXAMINATION -   WILLIAM HOVANEC

1   A    Level 4 in Closed Custody housing.

2   Q    Okay.  So we're now talking about the Fourth Avenue Jail

3   on the 4th floor?

4   A    Yes.

5   Q    Closed custody.

6         The reason I think I'm confused is you testified

7   earlier that if an inmate has mental health issues, they're in

8   Psych.  Do you recall that?

9   A    Yes.

10  Q    But you observed an inmate with mental health issues who

11  was in custody at Closed Custody on Fourth Avenue, correct?

12         MR. STRUCK:  Foundation.  402.  403.

13         THE COURT:  Overruled.

14         THE WITNESS:  I'm sorry.  Can you repeat what you

15  asked?

16  BY MR. SHOWALTER:

17  Q    You testified earlier that if an inmate had mental health

18  issues, they're in Psych, correct?

19  A    Yes.  I said that, yes.

20  Q    But you also testified that while you were at the Fourth

21  Avenue Jail, among non-Psych inmates, you recognized behaviors

22  that are associated with mental health problems?

23  A    Okay.

24  Q    Is that correct?

25  A    Yes.  And we would report them when they would spread

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    feces.

2    Q    Is that a relatively common occurrence?

3    A    I don't have -- I don't know how many times it's happened.

4    Q    How many times did you see it happen?

5    A    I couldn't give you a number.  I don't know.

6    Q    Well, for me, I have never seen anybody do that.

7              MR. STRUCK:  I object, Your Honor.  Move to strike.

8    Counsel is testifying.

9              THE COURT:  Sustained.

10   BY MR. SHOWALTER:

11   Q    Is the reason you can't give a specific number because it

12   happened enough times that you can't distinguish between the

13   different times it happened in your memory?

14             MR. STRUCK:  Foundation.  402.  403.

15             THE COURT:  Overruled.

16             THE WITNESS:  I just couldn't give you as many times

17   as I have seen it.  It's not something that I would like to

18   think about.

19   BY MR. SHOWALTER:

20   Q    That's fair.

21             So you worked for Maricopa County Sheriff's Office

22   from 2012 until 2015, fair?

23   A    Approximately.

24   Q    And June of 2015 is when you left.

25             Where were you assigned during that time period?

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    A    Define "assigned."  A specific date or a jail or --

2    Q    Which jails did I work at during that time period?

3    A    Fourth Avenue Jail and the tent facility.

4    Q    And you said the tent facility?

5    A    Yes, sir.

6    Q    How long were you -- excuse me.

7            During the roughly three years that you worked for

8    the Maricopa County Sheriff's Office, what proportion -- what

9    portion of that time were you working at Fourth Avenue?

10   A    I couldn't give you the dates.  Roughly two years.

11   Q    So about -- and that's fine.  So you spent about two years

12   working at Fourth Avenue?

13   A    Approximately.

14   Q    And when you worked at Fourth Avenue, where were you

15   assigned?

16   A    Define "assigned," please.

17   Q    Did you have a routine assignment where you were always in

18   the same place and you could get to know the inmates there?

19   A    No.

20   Q    So would you move around within the jail frequently with

21   respect to your duty posts?

22   A    Yes.  Wherever I was assigned during briefing that day.

23   Q    And so it's been a while, I understand, but how often

24   would you work the same duty posts on two consecutive days on

25   average?  Was that a common occurrence or rare occurrence?

DIRECT EXAMINATION -   WILLIAM HOVANEC

1  A   Without looking at where I was assigned for that time

2  frame, I really can't answer that.

3  Q   Well, let's go back to July 9th of 2014.

4        Do you remember what your duty assignment was on that

5  day?

6  A   Yes.  I was working 2 Bravo.

7  Q   You were working 2 Bravo.  And what is 2 Bravo?

8  A   Like it's a housing unit.

9        MR. SHOWALTER:  Ms. Williams, may I have the Elmo?

10        I'm going to show the demonstratives that we have

11  been using.

12  BY MR. SHOWALTER:

13  Q   Are you able to look at this?  It's a demonstrative of the

14  layout.  It's not a hundred percent accurate.  It's something

15  that Maricopa County's attorneys -- I'm not sure who -- but

16  they created this document.

17        Have you seen this map before or this layout before?

18  A   Yes.  It is similar to a housing unit in Fourth Avenue

19  Jail.

20  Q   Okay.  But it's not a hundred percent accurate as far as

21  the distances.  And also, I think an example I'll give you is

22  that if you look at 2B 100 or 2B 1, isn't there a staircase

23  that's not depicted?

24  A   I don't see any staircases.

25  Q   Well, I do.

DIRECT EXAMINATION -   WILLIAM HOVANEC

1          Let me take you back to your memory of working at 2B.

2    Do you remember that there, in fact, was a staircase that led

3    from the lower level up to the upper level?

4    A   Yes.  One on each side.

5    Q   And do you see that depicted in these -- in this diagram?

6    A   No.

7    Q   Okay.  And also this only shows the first floor of the

8    pods, correct?

9    A   Yes.

10   Q   And it doesn't show that there is like a second floor like

11   where -- sometimes they're called a mezzanine?

12          Does that make sense?

13   A   The second tier is where I would call it, but, yes.

14   Q   The second tier.

15          Now 2B and 2E, you were the tower officer for 2B; is

16   that correct?

17   A   Yes.

18   Q   Where were you at -- on the evening of July 9th, 2014, on

19   this diagram, if you could point, I think the screen should

20   pick up where you point to.

21   A   I was in 2 Bravo tower.

22   Q   And if you could actually touch the screen?

23   A   (indicating).

24   Q   Okay.  So you're making a red line there?

25   A   Oh.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    Q    Are you able to see it?

2    A    So approximately in this area.

3    Q    So you're approximately in this area.

4    A    On the second story.

5    Q    And you're on the second story.  So does that put you

6    level with the second tier or are you slightly above the

7    second tier?

8    A    I'm not sure.  It's been a long time since I been in one,

9    so.

10   Q    Okay.  So from your position in the tower, what are you

11   able to observe at 2B?

12   A    I mean, you can see some things.  You can not see other

13   things.  I mean, I don't recall exactly what I could see or

14   what I couldn't see.  I have cameras.

15   Q    And let's make it real simple.  Is the tower enclosed or

16   does it have windows?

17   A    Windows.

18   Q    And so through the windows, do you have a view of all of

19   2B including 100 and 200?

20   A    I don't really recall.  I haven't been in a tower in a

21   long time.

22   Q    You worked for the Maricopa County Sheriff's Office for

23   more than for almost three years.  And you just testified that

24   about two years of that was spent at the -- I'm sorry -- at

25   the Fourth Avenue Jail, correct?

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    A    Correct.

2    Q    Was it unusual for you to be a tower officer?

3    A    I don't have a ratio of when I was working the tower or

4    the floor but I'm not sure what you're asking.

5    Q    I'm asking you, was July -- let me retract and strike.

6          To the best of your recollection is July 9th of 2014

7    the only time you ever worked as a tower officer?

8    A    No.

9    Q    Did you work in that duty post enough times that you can

10   remember the basics of what you did as a tower officer there?

11   A    Define "basics."

12   Q    Okay.  Well, what does a tower officer do for the Maricopa

13   County Sheriff's Office, 2B, Disciplinary Segregation?

14   A    It's been a long time.  I mean, I'm sure there's a policy

15   on it that you can look at.  I don't remember every single

16   thing that I did in that tower.

17   Q    Is there some reason you're reluctant to testify?

18   A    No.

19   Q    Is there some reason that --

20         Do you have any kind of memory issues or anything

21   that could interfere with your ability to remember this stuff?

22   A    I don't think so.

23   Q    How many weeks did you spend in the Maricopa County

24   Sheriff's Academy?

25   A    Eight weeks, I think it was.

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    Q    And did you take an oath at the end of that or at the

2    beginning of it?

3    A    Uh-huh.  There's an oath.

4    Q    And what was the oath to do?

5    A    I don't remember it verbatim.

6    Q    But what was the --

7         Did it involve the constitution?  Did it involve

8    duties you were undertaking?

9    A    I don't remember.  I don't remember what it was.

10   Q    You don't remember anything about the oath you took?

11        MR. STRUCK:  Objection, Your Honor.  Asked and

12   answered and 402, 403.

13        THE COURT:  Sustained.

14   BY MR. SHOWALTER:

15   Q    Do you remember assigning Ryan Bates to a cell with Zach

16   Daughtry?

17   A    Yes.

18   Q    Do you remember that?

19   A    Yeah.

20   Q    About what time did you make that decision on July 9th of

21   2014?

22   A    Approximately, in between 9:00, 9:30 or so, approximately.

23   I don't know exactly what time I got the phone call.

24   Q    So set the scene for me.

25        Where are you when you make that decision?

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    A    In the tower.

2    Q    So you're in the tower.   What are you looking at?

3              MR. STRUCK:   Objection, Your Honor.   Vague.

4              THE COURT:   I'm sorry.   Your objection was vague.

5              Overruled.

6              THE WITNESS:   What was I looking at?   I don't know

7    what I was looking at when I took the phone call.

8    BY MR. SHOWALTER:

9    Q    So you received a phone call?

10   A    Yes.

11   Q    Who was the phone call from?

12   A    The level control officer.

13   Q    And do you know who that was?

14   A    I don't remember exactly who it was, no.

15   Q    Where is the level control officer stationed in 2B?

16   A    In the level control office.

17   Q    Is it shown on this diagram?

18   A    No.

19   Q    Okay.   And what were you directed to do in that phone

20   call?

21   A    To house an inmate in 2 Bravo.

22   Q    And what were you told about that inmate?

23   A    I know he needed -- he was going to be put in 2 Bravo

24   pending some kind of DAR.   I don't know exactly what was said

25   to me though.

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    Q    You don't recall?

2    A    I don't recall.

3    Q    So you receive it -- receive information that you need to

4    house an inmate in 2 Bravo which is maximum security

5    Disciplinary Segregation, correct?

6    A    Yes.

7    Q    What do you do next?

8    A    Find an open cell.

9    Q    So what did you look at to find an open cell?

10   A    The housing roster.   JMS.

11   Q    Once you had the housing roster, what did you do?

12   A    Found an open cell.

13   Q    Do you remember if you just looked for the first open cell

14   going down the roster from top to bottom?

15   A    That's a practice that I try to do.   I don't remember.

16        Yeah, I looked for the first available cell, so.

17   Q    And once you found the first available cell, what did you

18   do next.

19        And, you know, I take that back.   It's not the first

20   available cell, necessarily.   It could be the first available

21   bed, right?

22   A    Correct.   The first available place to put an inmate;

23   housing, yes.

24   Q    And so once you find the first available bed, what do you

25   do next?

DIRECT EXAMINATION -  WILLIAM HOVANEC

1    A    Well, you got to look up some things in JMS.

2            You're going to look for "keep-aways,"  "lower tiers,

3    lower-bunk" and if they're "house alone," if I remember

4    correctly.

5    Q    And so what is the screen you would look at on the JMS?

6            Does it have a number or a name?

7    A    An inmate's name?

8    Q    Is there a command function like D0005?

9    A    I think that's correct.

10   Q    So you would enter a command function D005 and then would

11   you enter -- what would you do next?

12   A    I haven't used JMS in a long time, but I know that I would

13   check for if they were "house-alones," the classification, if

14   they had any "keep-aways" or if they were lower-tier-level

15   bunk.

16           I'm just not exactly sure where that would be because

17   I haven't used the system.

18           MR. SHOWALTER:  Ms. Williams, can I have you -- can

19   you provide the witness with -- I think it's Plaintiff's

20   Exhibit 285.

21           THE CLERK:  You mean defendant's?

22           MR. SHOWALTER:  I'm sorry.  Defendant's Exhibit 285.

23   BY MR. SHOWALTER:

24   Q    Mr. Hovanec, do you recognize that document?

25   A    That's what we call a "housing roster."

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    Q    It's a --

2    A    A headcount roster.  I'm sorry.

3    Q    Okay.  A headcount roster.  Does it have a date?

4    A    Yes.  July 9, 2014.

5    Q    And does it have -- does it state the floor, house and pod

6    number?

7    A    Floor is 2.  House is Bravo.  And the pod 1.  And then

8    there should be -- let's see.  There's three -- there's four

9    sheets.

10   Q    There's four sheets.  And is that a document that you

11   recognize that you used when you were at the Maricopa County

12   Sheriff's Office?

13   A    I have used a similar document, but this one, this

14   particular one was not my own.

15   Q    This one is not your own.  How do you know that?

16   A    Because my number is not on it.

17   Q    And where would your number be found?

18   A    Well, so the floor officers do the headcounts and mark it

19   on here, who is present and who is not.  I was not a floor

20   officer on this -- on July 9th, 2014, so I would have

21   possibly -- I probably had one of these up there.

22          I'm certain I had one up in the tower but this

23   official headcount roster was from the floor officers in 2

24   Bravo.

25   Q    But you're able to identify this as an official headcount

DIRECT EXAMINATION -   WILLIAM HOVANEC

1   of the sort you used that would have been available at the

2   jail and would have been in use there, correct?

3   A   Yes.

4         MR. SHOWALTER:  Move Defendant's Exhibit 285 into

5   evidence.

6         MR. STRUCK:  No objection, Your Honor.

7         THE COURT:  285 is received.

8      (Exhibit No. 285 admitted in evidence.)

9         MR. SHOWALTER:  And may I have permission to publish

10  it to the jury?

11        THE COURT:  You may.

12  BY MR. SHOWALTER:

13  Q   So when you were referring to the numbers being on or not

14  on it, where would that be found?  At the very top?

15  A   That's correct.  The identification numbers to the

16  officers.

17  Q   And is there a significance of them putting their

18  identification numbers in at various times?

19  A   That's who completed the headcounts at that time.

20  Q   And then would your list, to the best of your knowledge,

21  the headcount that you had, would have been essentially the

22  same as this except that any strike marks or additions would

23  have been in your own writing?

24  A   Yes, but it would just -- if I had one of these up in the

25  tower, it would have just been for my own reference, not like

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    an official headcount.  It would be just almost like a

2    secondary so I can -- I have another resource to judge where

3    inmates are and what cells are open.

4    Q    And so you would need to have one of these so that you

5    would know which cells are open so that you could assign

6    inmates to cells?

7    A    I don't need to have one.  It wasn't mandatory to have

8    one, if I remember correctly up in the tower, because JMS

9    would tell you that.

10   Q    But you testified earlier that when you were informed that

11   you needed to find a house -- I'm sorry -- a bed for Ryan

12   Bates, you went to the headcount roster, correct?

13   A    Not the headcount roster that was downstairs.  They're

14   both headcount rosters; one is official and one is just for

15   reference.

16   Q    The for-reference one that you had upstairs in the tower,

17   that's what you actually used, correct?

18   A    Yes.  I said that and JMS.

19   Q    And JMS.  So you start with the headcount like this and

20   you go down it.  And what was the first empty cell that you

21   found or the first empty bed that you found?

22   A    It should have been 302.  But I'm not sure if I found that

23   off of the headcount roster or JMS.  You can find it in both,

24   so --

25   Q    I thought you testified earlier that you go to the

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    headcount -- that you, in fact, went to the headcount roster.

2         Am I --

3    A   Well, there's two ways of doing it.   There's JMS.   There's

4    the headcount roster.   And then there's both.

5         It was practice for me to -- normal practice for me

6    to look at this, the headcount roster that I had up in the

7    tower, and then if there's an available cell, cross-reference

8    that with listing the cells on JMS.

9    Q   Do you have -- you have no specific recollection of doing

10   this with regard to Ryan Bates, correct?

11   A   No.   It was a long time ago.   I mean, the exact procedure

12   was that I put them in there.   I couldn't tell you what I was

13   thinking, what I was eating, you know, specifics, things of

14   that nature and witness also what was happening.   I do

15   remember that it happened.

16   Q   Can I have you scroll down.   And so you recognize the

17   names at C-O3, bunk one, as Zachary Daughtry.

18        You can read that there, correct?

19   A   Correct.

20   Q   And can you also see that 002 is Bates?   It just says

21   "Bates" and then it has a booking number.

22   A   Correct.

23   Q   And then if you go to C-05 it's got "Gause, Richard."   Do

24   you see that?

25   A   Yes.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    Q    And then below that crossed out it has "Dusko Krstic."   Do

2    you see that?

3    A    Yes.

4    Q    Did you know any of those people?

5    A    Well, I know the inmates on a personal level.

6    Q    Would you have recognized any of them?

7    A    No.

8    Q    Would you have had any interaction with them on a regular

9    basis that you're aware of?

10    A    Not that I'm aware of.   I may have seen them before, but I

11    don't -- I don't know.

12    Q    So what is the written policy on cell assignment in

13    Segregation at the Maricopa County Jail?

14          MR. STRUCK:   Excuse me, Your Honor.   Asked and

15    answered and cumulative.

16          MR. SHOWALTER:   It hasn't been asked.

17          MR. STRUCK:   Not of this witness but other witnesses.

18          THE COURT:   Overruled.

19          THE WITNESS:   You're going to have to refer to MCSO

20    policy.   I don't recall.

21    BY MR. SHOWALTER:

22    Q    If I avow to you that I have looked through the MCSO

23    policies and we've asked other witnesses and we haven't been

24    able to find one, would you have any reason to disagree with

25    me?

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -   WILLIAM HOVANEC

1          MR. STRUCK:   Your Honor, counsel is testifying.

2     Objection.

3          THE COURT:    Sustained.

4     BY MR. SHOWALTER:

5     Q   So you're personally not aware of any written policy on

6     cell assignment?

7     A   Not that I can think of off the top of my head.

8     Q   Do you recall who trained you to make cell assignments at

9     the tower in Disciplinary Segregation?

10    A   No.  It was a long time ago.  I don't know who trained me

11    up there besides my FTO, I'm sure, and that was something that

12    we went over.  But that was something that was passed along on

13    how to do it.

14          My common practice was just to put somebody in the

15    first available cell.

16    Q   And, sir, it was just something that was passed along that

17    that's how you were trained.  This is how we do it.  And some

18    other detention officer trained you in that, correct?

19    A   I don't recall exactly who trained me in that.

20    Q   You just said it was passed along.  I'm not staying who

21    exactly.  I'm just saying you learned it by doing and were

22    taught by maybe a training officer or some other officer,

23    fair?

24    A   Fair.

25    Q   Now, the information you were taught to use in doing that

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    was the headcount and then the JMS screen D005?

2    A    If that's what D005 was, then, yeah, I would check both of

3    them.

4    Q    What information were you trained to look for in making

5    cell assignments?

6    A    The classification, if they had any medical, lower-tier,

7    lower-bunk, If they were a "keep-away" from somebody in that

8    cell or whatever it specifically was and -- I'm sorry.  I'm

9    drawing a blank here.

10   Q    Is it your understanding -- is it your understanding that

11   the tower officer makes the cell assignments because he's the

12   person who knows the most about the individual inmates?

13   A    I'm not sure why -- okay.

14          So when somebody needs to be housed in 2 Bravo, they

15   would call me to tell me that somebody was coming in.

16          I would find a place for them and either the floor

17   officers or the level control officers move him into that

18   cream.  So I don't know if that answers your question.

19   Q    Were you ever trained about the need to recognize the

20   dangers of individual inmates or the vulnerabilities of

21   individual inmates?

22          MR. STRUCK:  Objection, Your Honor.  Compound.

23          THE COURT:  Sustained.

24   BY MR. SHOWALTER:

25   Q    Were you ever trained to recognize the dangers of

DIRECT EXAMINATION -  WILLIAM HOVANEC

1    individual inmates?

2    A   I don't understand what you mean by "danger."

3    Q   Well, were you ever trained to look into the criminal

4    background or history of individual inmates?

5            MR. STRUCK:  Objection, Your Honor.  Foundation.

6    Vague.  402.

7            THE COURT:  Overruled.

8            THE WITNESS:  That would be Classification classifies

9    inmates.

10   Q   Classification has that information, correct?

11   A   They should.

12   Q   And you received training at the academy about what

13   Classification did, right?

14   A   Correct, at some point, I suppose.

15   Q   And did you have an understanding that Classification's

16   job within the jail is to gather information and classify

17   inmates?

18   A   Yes.

19   Q   And did Classification provide all the information that it

20   gathered about individual inmates?  Did it provide that

21   information to you as a detention officer making cell

22   assignments?

23           MR. STRUCK:  Objection, Your Honor.  Vague.

24           THE COURT:  Overruled.

25           THE WITNESS:  We don't investigate inmates.  We go

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    off their classification, so --

2    BY MR. SHOWALTER:

3    Q   Are you -- are you concerned about -- well, let me strike

4    that.

5           So you would agree with me that you don't have more

6    information about individual inmates than Classification?

7    A   What kind of -- what information are you talking about?

8    Q   Well, if Classification has information about the

9    histories of individual inmates as you were trained they did,

10   then they would have more information about individual inmates

11   than you as the tower officer.

12   A   I mean, I don't know Classification's job.  Classification

13   makes an inmate either a minimum, a maximum or medium or a

14   Closed Custody inmate in different tiers through whatever

15   information that they have.  So I don't make that judgment on

16   what classification they are.

17   Q   I want to show you a document that's in evidence as

18   Exhibit No. 34 and I'm going to publish it to the jury as

19   well.  Do you recognize this person?

20   A   No.  I can read who it is, but --

21   Q   And who is it?

22   A   That is Zachary Mikol Daughtry.

23   Q   So that's Zachary Mikol Daughtry?

24   A   Yes.

25   Q   And you have never seen him before?

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    A    Not that I recall.

2    Q    And you have no recollection -- and so you hadn't -- well,

3    strike that.

4          Now, I'm going to go down a page and this is a

5    document that was produced to us as Zachary Daughtry's

6    Classification file.

7          Did you have any of this information --

8          MR. STRUCK:  Objection, Your Honor.

9          Again, counsel is testifying and that's not how it

10   was produced to them.

11         THE COURT:  Sustained.

12   BY MR. SHOWALTER:

13   Q    Did you have any of the information contained in Exhibit

14   34 that I'm showing you about Zach Daughtry?

15   A    No, I didn't write any of them.

16   Q    And did you have access to a file on Zach Daughtry like a

17   physical file folder full of documents when you made his cell

18   assignment?

19   A    No.

20   Q    Did you have access to a physical file about Ryan Bates

21   when you made that cell assignment?

22   A    I didn't -- with Daughtry I didn't assign Daughtry a cell.

23   Q    You're right.  I was incorrect.

24         You assigned Bates into the cell with Daughtry,

25   correct?

DIRECT EXAMINATION -   WILLIAM HOVANEC

1          THE COURT:  Let's take a midafternoon break.

2          Let's make it ten minutes.  And please remember the

3     admonition.

4       (Recess taken at 2:44 p.m.; resumed at 3:01 p.m.)

5          THE COURT:  Thank you.  Please be seated.

6          The record will show the presence of the parties,

7     counsel and the ladies and gentlemen of the jury.

8          Counsel, you may continue.

9          MR. SHOWALTER:  Thank you.

10    BY MR. SHOWALTER:

11    Q   Mr. Hovanec, when we left, we were talking about cell

12    assignment and was it your understanding from the entire time

13    that you worked at the Fourth Avenue Jail that it was the

14    tower officer's responsibility to make cell assignments.

15    A   I usually took on that responsibility.  I would monitor

16    who went where.  It doesn't necessarily mean that it would

17    have to be the tower officer.  I'm sure anybody could assign

18    somebody as long as they had access to JMS and the headcount

19    roster.

20    Q   So anybody could make a cell assignment?

21    A   Anybody in that house, if necessary.

22    Q   And you don't remember there being any written policy that

23    actually said it had to be the tower officer?

24    A   No.  I don't recall.

25    Q   Did you ever -- you never worked at the Lower Buckeye

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    Jail, did you?

2    A    No.  I didn't.

3    Q    During your time at the Fourth Avenue Jail, did you

4    ever -- did you work other positions other than the tower

5    officer?

6    A    Yes.  I worked the floor officer, level control.  There

7    were a few positions, not too many, but a few positions inside

8    the jail.

9    Q    And the tower officer, are they required to stay in the

10   tower for the duration of their shift?

11   A    Yes.  You can't get out of the tower unless somebody comes

12   in there to relieve you because there's only one -- well, yes.

13   Q    And so you can't go down and meet inmates or get to know

14   any kind of inmates?

15   A    Not from the tower.  You do have -- there's a

16   communication system.

17   Q    You have an intercom system?

18   A    Yes.

19   Q    How many fights would there be in 2B on an average week?

20   A    I really couldn't give you that statistic.

21   Q    Based on your experience, how many fights did you say on a

22   weekly basis?  Would you see one fight?  More?

23   A    Unfortunately, I don't keep track of that kind of stuff

24   and it's been a long time ago.  I haven't worked there in a

25   while, so I don't know.  I mean, I couldn't give you an

DIRECT EXAMINATION -   WILLIAM HOVANEC

1   accurate answer at all.

2   Q   Do you have in front of you Defendant's Exhibit 259 which

3   is not admitted into evidence?

4   A   Yes.

5   Q   Can I have you take a look at that?

6   A   Yes.

7   Q   And can I have you look at page 6.

8   A   All right.  I'm on page 6.

9   Q   Are you on page 6?

10   A   Yes, sir.

11   Q   What kind of a document is this?

12   A   This is the Operations Journal is what it appears to be,

13   yes.

14   Q   And did you use -- did you refer to the Operations Journal

15   when you were working for the Maricopa County Jail?

16   A   Everything that we did, within reason, was logged in OJ as

17   a time line of events.

18   Q   And so would the person who made the entry put in their

19   name and their number?

20   A   Yes.  I believe it automatically did that when you put an

21   entry into the system.

22   Q   And was it the tower officer's responsibility to keep the

23   OJ log?

24   A   Yes.

25   Q   Okay.  Do you recognize this as the Operations Journal,

DIRECT EXAMINATION -   WILLIAM HOVANEC

1  the log for July 9th of 2014?

2  A   Yes.  It should be.

3  Q   And there's -- the third entry down, do you see that entry

4  at 5:40 p.m.  It's actually in 24-hour military time 1740?

5  A   1740.  Yes.  Correct.

6  Q   Could you read that entry for me?

7  A   Inmate Krstic and Straughter were observed in a fight

8  inside their cell during headcount by Officer Wade.  Both

9  inmates were taken out of the pod. Reference.  Krstic, Dusko

10  T081980.  Straughter, Geortis Georta T039460.  Reference:

11  Officer Sgt. J. Wade A7644 and then signed by me, Officer

12  Hovanec, B2469.

13  Q   And so do you recognize this as a record kept in the

14  ordinary course of business?

15  A   Correct.

16  Q   Do you have a specific recollection of that fight

17  occurring?

18  A   I do not.

19  Q   Given that it's in there and that you made the entry into

20  the OJ log and it's one of the records kept by Maricopa

21  County, you believe it accurately reflects what happened on

22  July 9th at 5:40 p.m.?

23  A   That's correct.  But I don't understand who Officer

24  Sergeant Wade is, where that person comes into it as a

25  reference.

DIRECT EXAMINATION -   WILLIAM HOVANEC

1  Q    That's fine.  But you don't dispute that there was a fight

2  on pod 2B at 5:40 p.m. about four hours before the assault on

3  Zachary Daughtry?

4  A    No.  That's what appears to have happened, yes.

5  Q    Is the fact of having two assaults on one pod in one

6  evening, is that particularly unusual or is that something

7  that could happen from time to time at the Maricopa County

8  Jail?

9  A    I guess it could happen from time to time.  I mean, it's

10  just -- those individuals, it's their decision to fight, so.

11  Q    If somebody told you that in the entire course of 2014 for

12  all of the Maricopa County jails, all six facilities at that

13  time, that there were only 59 fights, would you find that

14  credible?

15  A    Depending on the source.

16          Is it a credible source?

17  Q    But based on the fact that you were a documentary witness

18  to two fights in one night on one shift on one pod, you would

19  find it difficult to believe that there's really 59 fights is

20  the total number of fights in the whole Maricopa County Jail

21  system?

22          MR. STRUCK:  Foundation.  402.  403.

23          THE COURT:  Overruled.

24          THE WITNESS:  I can't really attest to that.  I don't

25  know if it's -- I don't understand what you're trying to ask,

DIRECT EXAMINATION -  WILLIAM HOVANEC

1    really, I guess.

2    BY MR. SHOWALTER:

3    Q    Okay.  Would you agree with me that making a cell

4    assignment in Disciplinary Segregation for maximum security

5    inmates creates a risk to the inmates involved?

6              MR. STRUCK:  Objection, Your Honor.  Vague.

7              THE COURT:  Sustained.

8    BY MR. SHOWALTER:

9    Q    In your experience are inmates dangerous?

10   A    Every inmate is potentially dangerous, so it's a common

11   practice to treat every inmate like they're dangerous, so

12   safety for yourself as an officer.  That's how I did it, so.

13   Q    And if you're in minimum security units or medium security

14   units, it's often the practice that a floor officer come out

15   by themselves and their partner is a tower officer, right?

16   A    I believe for minimum security units.  I know we had some

17   mediums in Fourth Avenue at one point, but I don't really

18   recall.  I know we always walked with two officers because it

19   was a max facility, so.

20   Q    So you always walked with two officers because it was a

21   max facility?

22   A    Correct.

23   Q    And because you recognize that although every -- in fact,

24   every human has a potential for violence, fair?

25   A    Yes.

DIRECT EXAMINATION -   WILLIAM HOVANEC

1   Q   And when you're in jail, when you're in jail you're

2   dealing with people who have, you know, some history that's

3   landed them in jail and then they may have a greater potential

4   for violence than people outside, fair?

5   A   I think just the environment itself, it's different than

6   anywhere else.  So, you know, you have to be careful when

7   you're in the pod or you're dealing with any inmate.

8        We don't know what they're thinking, what they have

9   going on, so, you know, it's best to be, you know,

10   precautious.

11   Q   And when you were at the tents, what security level was

12   that?

13   A   Well, they were sentenced inmates, so I don't know if they

14   had -- I don't remember exactly if they had an actual

15   classification.

16   Q   Based on your training at the academy, you knew that

17   maximum security inmates had already been determined to be

18   more danger than minimum and medium, correct?

19        MR. STRUCK:  Your Honor, vague.

20        THE COURT:  Was that an objection?  I just didn't

21   hear it.

22        MR. STRUCK:  Yes, Your Honor.  Object to vague.  The

23   question was vague.  The terminology used.

24        THE COURT:  Overruled if you can answer it.

25        THE WITNESS:  I'm sorry.  Can you repeat that, sir?

DIRECT EXAMINATION -   WILLIAM HOVANEC

```
 1   BY MR. SHOWALTER:
 2   Q   Based on your training at the academy, you knew that
 3   inmates who were classified as maximum security had already
 4   been determined to be more dangerous than inmates at lower
 5   security levels, correct?
 6   A   Classification deemed them a max.  I mean, that's
 7   obviously a higher classification than medium or minimum but
 8   it's not the highest.
 9   Q   You say that maximum is not the highest classification?
10   A   No.  Closed Custody is.
11   Q   Aren't -- forgive me if I'm misunderstanding something,
12   but isn't "Closed Custody" a housing category rather than a
13   classification category?
14   A   I apologize.  It's been a long time since I have been
15   there, so I think you're correct there.  But, yes, Closed
16   Custody would be a "house-alone" as well as a max, I believe.
17   You're correct.  I'm sorry about that.
18   Q   And so there can be in maximum security, not Closed
19   Custody, murderers, right?
20   A   What do you -- I'm sorry.  What do you mean?  Housed
21   where?
22        MR. STRUCK:  I object to foundation, Your Honor, to
23   this line of questioning.  He's not a Classification expert.
24        THE COURT:  Overruled.
25   BY MR. SHOWALTER:
```

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    Q    An ordinary maximum security house with other inmates, in

2    cells with other inmates, that were murderers, correct?

3    A    It's possible.  I don't really -- you know, I don't know

4    offhand if that really is the case, but I suppose it's

5    possible if the classification where they -- where they would,

6    yes.

7    Q    Okay.  Would you agree with me that when you lock two

8    people in a cell, you're creating a potential risk to both

9    people based on the characteristics of the other person?

10             MR. STRUCK:  Vague.  402.  403.

11             THE COURT:  Overruled.

12             THE WITNESS:  I don't know the characteristics of

13   every individual inmate.  We wouldn't become attached to

14   inmates in that nature, so I mean, I --

15             If there's ever something that we know that is an

16   issue, we would push it to a supervisor or a medical personnel

17   to have it looked at.  But other than that, I mean, I just

18   don't know the characteristics of every inmate, especially in,

19   you know, in 2 Bravo.  People come in and out all the time

20   for, you know, DARs and such, so.

21   Q    Well, if you had two inmates that you have to put in cells

22   and you know that one of them is in there for failing to

23   appear on a traffic fine and the other had committed a murder,

24   is that something you would want to know before you assigned

25   them to the same cell?

DIRECT EXAMINATION -   WILLIAM HOVANEC

```
1              MR. STRUCK:  It's speculation.  It's vague.  It's an
2    improper hypothetical.
3              THE COURT:  Sustained.
4    BY MR. SHOWALTER:
5    Q   You don't want people to be hurt when you put them in
6    cells, do you?
7    A   Not particularly, no.  I mean, I'm not in the business of
8    hurting people.
9    Q   You want to make the safest cell assignment you can
10   because you have an obligation to provide care, custody and
11   control, fair?
12   A   Within policy.
13   Q   Within policy?
14   A   Of course.
15   Q   And if Maricopa County were to change the policy --
16             Strike that.
17             Whatever policy you were taught, you followed when
18   you were at the Maricopa County Sheriff's Office, correct?
19   A   To the best of my knowledge, yes.
20   Q   And during the course of your time at the Maricopa County
21   Sheriff's Office, were there times when they taught you a new
22   policy?
23   A   There were new policies that came out.  They would be
24   distributed through our e-mails or online training of some
25   sort, I imagine, but new policies came out.
```

DIRECT EXAMINATION -   WILLIAM HOVANEC

1   Q   And when a new policy came out, you would follow it, fair?

2   A   Yes.

3   Q   It's not your job to second-guess the policy?

4   A   Correct.

5   Q   Do you believe that you were the person who had the most

6   information in the jail about Zach Daughtry and Ryan Bates

7   when you made that cell assignment?

8   A   That's a difficult question to answer.

9        I mean, Classification would have looked over a lot

10  more than I would have and did more in-depth investigation on

11  who these people are to classify them.

12       But I just classified to, you know, the main things

13  that we discussed before, you know, the classification,

14  medical and so on and so forth.

15  Q   And so you just followed the policy, fair?

16  A   Yeah, correct.

17  Q   I'm going to show you a document that's been accepted into

18  evidence as Exhibit 34.  And I would like to have you look at

19  page 449 of that document.

20       I can display it and publish it to you and the jury.

21       Do you recognize this document -- not this particular

22  one, but this type of document as a form you would use at

23  Maricopa County?

24  A   It looks like a Psychiatric Referral, what we would refer

25  to it as, if I remember correctly.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -   WILLIAM HOVANEC

1    Q    Now, it says the reason for referral is Inmate Daughtry's

2    behavior is of a concern for his safety, as when you try to

3    talk to him, he stares at the wall and the floor, giggles and

4    acts as if you were not there.  He sits on the floor in a

5    mediation-style pose for long periods of time.  His odd

6    behavior may endanger himself as other inmates will perceive

7    it as odd.

8            Do you see where it says that?

9    A    I do see that.  Yes.

10   Q    Did you have that information when you assigned Ryan Bates

11   to the cell with Zach Daughtry?

12   A    No.  I mean, this would have been referred to the

13   Psychiatric Department for him -- for Daughtry to be

14   evaluated.  So we don't receive those as general officers.

15           When he's reclassed, it's different, but.

16   Q    And so when you made that decision, you did not have

17   access to that information?

18   A    I did not see this paperwork, no.

19   Q    If you had had access to that information, would that have

20   changed your decision?

21   A    That's kind of speculation.  I'm not sure.  Depends on a

22   lot of factors.  I didn't -- I wasn't present for this.  I

23   didn't have anything to do with this.  I didn't see this

24   happen and I didn't see it before I assigned him a cell, so.

25   Q    But if you knew that an inmate's odd behavior put them at

DIRECT EXAMINATION -   WILLIAM HOVANEC

1   risk, would you simply put another inmate -- another maximum

2   security inmate in with him?

3         MR. STRUCK:  Objection, Your Honor.  Calls for

4   speculation.

5         THE COURT:  Sustained.

6   BY MR. SHOWALTER:

7   Q   I'm going to ask you to look at another document.  This

8   has been admitted into evidence as Exhibit 58, Plaintiff's

9   Exhibit 58, and this is an e-mail from Rosie Carrillo to

10  Walter McGowan.  Do you know either Walter McGowan or Rosie

11  Carrillo?

12  A   No, I do not.  I don't recall who those -- if I have met

13  them.  I don't think I know them.

14  Q   Now, you see that it says "Sergeant McGowan."  Does that

15  indicate to you that that would have been a uniformed

16  detention officer who received this e-mail?

17  A   He would have been a supervisor, yeah.

18  Q   And in the e-mail it says -- it's from Rosie Carrillo who

19  is identified as a Classification Supervisor.  And it says:

20         I spoke to my Supervisor John McMullan about Inmate

21  Zachary Daughtry.  John also agrees that this inmate is

22  probably not suitable for maximum security.  This inmate has

23  not had any violent DARs, does not have a current or past

24  violent arrest and does not have any felony arrests, only

25  misdemeanor arrests.  It appears this inmate has more

DIRECT EXAMINATION - WILLIAM HOVANEC

1    psychological issues as he has been placed into Psych housing

2    several times and is currently awaiting a Rule 11 his next

3    court.

4              Do you see that?

5    A    I do.

6    Q    Did you have access to this information indicating that

7    Zach Daughtry was not suitable for maximum security when you

8    assigned Ryan Bates to the cell with Zach Daughtry?

9    A    No.  I mean, we don't have direct -- that's an e-mail to a

10   Classification Supervisor.  I wouldn't have access to it --

11   the e-mail.

12   Q    It's an e-mail from a Classification Supervisor, right, to

13   a sergeant?

14   A    Okay.  I'm sorry.  Yes.  Okay.  But it's a personal

15   e-mail.  I wouldn't have access to their personal e-mail.

16   Q    But it's not a personal e-mail.  It looks like it's on

17   Sheriff e-mails, correct.  It's an official document, official

18   e-mail?

19             MR. STRUCK:  Objection, Your Honor.  Counsel is

20   testifying.  Foundation.

21             THE COURT:  Sustained.

22   BY MR. SHOWALTER:

23   Q    Do you see at the bottom there's a signature line?  And

24   then there's an e-mail address.  And that's a government

25   e-mail address, isn't it?

CROSS EXAMINATION - WILLIAM HOVANEC

1   A   Yes.  It's a Maricopa County e-mail address.

2   Q   And so when you say it's a personal e-mail, you simply

3   mean that it's between two individuals at Maricopa County?

4   A   Correct.  I apologize.  I just don't have access to this

5   individual person's e-mail, whether government or otherwise.

6   Q   And I'm going to have you look at another exhibit that's

7   been admitted into evidence as --

8           47 is in, correct?  Plaintiff's 47?

9           It's not?  All right.

10          If you had had information that three days before

11  July 9th, on July 6th, Zach Daughtry had been assaulted by his

12  cellmate because he had urinated on his cellmate's blanket --

13          Well, let me strike that question.

14          When you made the cell assignment, were you aware

15  that three days before Zach Daughtry was observed with bruises

16  on his face in a maximum security cell as a result of a mutual

17  fight with his cellmate?

18  A   I don't recall.  I mean, I don't know if I had moved him

19  at that point.  I'm sure -- I don't recall having anything to

20  do with the inmate assault with Daughtry before that, so I

21  have no idea.

22          MR. SHOWALTER:  Thank you.

23          THE COURT:  Cross-examination.

24          MR. STRUCK:  Yes, Your Honor.

25                   **CROSS EXAMINATION**

CROSS EXAMINATION - WILLIAM HOVANEC

1   BY MR. STRUCK:

2   Q   Good afternoon, Mr. Hovanec.

3   A   Hi.  How are you doing?

4   Q   Are you a little nervous?

5   A   A little bit, yeah.

6   Q   Have you ever testified in court like this before?

7   A   No.

8   Q   Well, it's almost over.

9          If you would please, I'd like to know a little bit

10  about your background.

11         Did you -- did you go to school -- did you go to

12  college?

13  A   Yes.

14  Q   Where did you go?

15  A   I went online.  I went to the University of Phoenix.  I

16  just recently graduated, so.

17  Q   Just recently graduated.  And what's your degree in?

18  A   Management.

19  Q   Now, before you came to the Maricopa County Sheriff's

20  Office, where were you employed?

21  A   Before MCSO, gosh.  I actually was working for -- I think

22  a limo company.  I was driving a limo and I had gone to school

23  for my CDL before that.

24  Q   When you got out of high school, did you -- where were you

25  employed?

CROSS EXAMINATION - WILLIAM HOVANEC

1    A    Well, I joined the military.

2    Q    Okay.  And what branch?

3    A    Army.

4    Q    And when were you enlisted?

5    A    I was active duty from 2002 to 2008.  I have been in the

6    Reserves since 2008, so 17 -- roughly 17 years.

7    Q    Okay.  And when you were in the Army, what was your duty?

8    A    I was a Military Police soldier.

9    Q    And were you a Military Police for the entire time that

10   you were in active duty?

11   A    Yes.

12   Q    And you say that was about six years?

13   A    Yeah.  March 2002 to -- I want to say June 2008 roughly.

14   Q    Okay.  So about six years?

15   A    Yes.

16   Q    And when you were in the Army and you were a military

17   policeman, did you get any training with respect to your

18   duties?

19   A    Yes.

20   Q    As a military policeman, what were your responsibilities?

21   A    To keep the base, persons and property safe from, you

22   know, crime, terrorism, many, many aspects of, you know, the

23   cantonment area.  So, be a police officer in the cantonment

24   area and our training areas.

25   Q    What was your rank?

CROSS EXAMINATION - WILLIAM HOVANEC

1    A    E5.  I was a Sergeant.

2    Q    And when -- did you get an honorable discharge?

3    A    Yes.

4    Q    Okay.  And so you -- as you left the active military and

5    an E5 Sergeant level?

6    A    Yes.

7    Q    In the Military Police?

8    A    Yes.

9    Q    Okay.  Any other law enforcement experience besides

10   working at the Sheriff's Office and being a Military Policeman

11   for six years?

12   A    Yes.  I worked as a Department of the Air Force --

13   Department of the Air Force police officer just for a short

14   amount of time, seven months roughly, at Luke Air Force Base.

15        Excuse me.  And I have been -- since Luke Air Force

16   Base I was hired at the Phoenix VA as a police officer and

17   that's where I have been -- that's where I'm currently

18   employed now.

19   Q    And what are duties there at the Phoenix VA as a police

20   officer?

21   A    Oh, everything.  Well, you know, we police, you know, all

22   the federal area.  Every area that the VA occupies.  You know,

23   obviously, we don't have, you know, concurrent jurisdiction

24   with outside agencies, but, you know, everything within our

25   area, any police matters, including investigations, car

CROSS EXAMINATION - WILLIAM HOVANEC

1  accidents, assault or things of those nature, so everything a
2  police officer does.
3  Q   Okay.  Now, counsel asked you earlier about your Maricopa
4  County training and asked you what you remembered about your
5  training.
6      How long ago was that that you went through the
7  in-service training -- I'm sorry -- the initial training at
8  the Sheriff's Office?
9  A   I think it was 2002.
10 Q   One of the things that you referred to earlier in your
11 testimony when -- I think it was when counsel was asking you
12 about who trained you or how were you trained with respect to
13 your duties as a tower officer.
14     You used the term "FTO."  What does that mean?
15 A   An FTO is a field training officer.
16     So when you go to a jail or maybe a special
17 assignment or -- you usually have a field training officer
18 assigned.  Usually, always one assigned to the shift in
19 general, but in the beginning of your assignment or as a new
20 officer, you would go and you would do a variation of time
21 frame training with the field training officer, the FTO and so
22 you can -- he or she can make sure you know what you're doing
23 before you go out there by yourself.
24 Q   All right.  I found what I was looking for.
25     Your Honor, may the clerk publish Exhibit -- it's not

CROSS EXAMINATION - WILLIAM HOVANEC

1    in evidence yet -- Exhibit 135 to the witness, please.

2           If you would take a look at that document, do you

3    recognize Exhibit 135?

4    A   Yes.

5    Q   And what is it?  Can you identify it, please.

6    A   This looks like the training schedule for my academy class

7    for Maricopa County Sheriff's Office.

8           MR. STRUCK:  Your Honor, I would like to admit

9    Exhibit 135.

10          THE COURT:  135?

11          MR. SHOWALTER:  No objection.

12          THE COURT:  135 is received.  Thank you.

13       (Exhibit No. 135 admitted in evidence.)

14          MR. STRUCK:  Your Honor, may we publish to the jury?

15          THE COURT:  You may.

16   BY MR. STRUCK:

17   Q   Okay.  So Exhibit 135, it looks like it consists of

18   several pages.  What are -- what is listed here, Mr. Hovanec?

19   What -- can tell us what all the -- you don't have to read it

20   but just, generally, what all is listed on this document?

21   A   The training necessary to become a detention officer and a

22   time line of events for the different weeks and days.

23   Q   And it looks like it's a daily -- it has the classes that

24   you took on a daily basis for that period of time?

25   A   Correct.  Yes.

CROSS EXAMINATION - WILLIAM HOVANEC

1    Q    Okay.  And it goes from Week One.  And if you look at MCSO

2    Bates stamp, page 4339, it goes all the way to Week Nine; is

3    that correct?

4    A    Yes.

5    Q    Okay.  And is this the -- this is kind of the initial

6    academy training that you underwent before you started as a

7    detention officer?

8    A    Yes.

9    Q    Okay.  And if -- once you became a detention officer, was

10   there any additional training that you went through besides

11   the academy?

12   A    I forget what it's called.  We did a lot of online

13   training.

14   Q    All right.  So -- was that something that was done on an

15   annual basis?  You had to do some sort of in-service training?

16   A    You know, it's been a long time, but, you know, we did --

17   I've gone back to the academy for training.  I just don't

18   remember what those things were.

19   Q    So even after you went through the academy and you started

20   to work as a detention officer, there were times when you went

21   back to the academy for additional training?

22   A    Yeah, for like, I believe it was a re-certification for

23   CPR.  I was back there -- I don't remember what all I went

24   back there for, honestly, but.

25   Q    But from time to time you went back for additional

CROSS EXAMINATION - WILLIAM HOVANEC

1    training?

2    A    Yes.

3    Q    And you also said there was online training as well?

4    A    There was.  There is, I'm sure.

5    Q    Do you remember how many hours a year that you had to do

6    of the in-service online training?

7    A    Oh, no.  There's a lot.

8    Q    When you started as a detention officer, was there any

9    on-the-job training?  OTJ.

10   A    Yeah.  We had -- I think it was a three-week FTO program,

11   if I remember correctly.  Just approximately, though, I don't

12   remember exactly what it was.

13        But, yeah, I spent time with a field training officer

14   working next to them and them training on how the Fourth

15   Avenue worked.

16   Q    So tell us, I mean, how would that work?  You would shadow

17   somebody or the FTO would follow you around and show you how

18   to do certain things?

19   A    Well, it went in phases.  First, the FTO -- and I don't

20   remember the curriculum exactly.  I was never an FTO.  But I

21   know I walked around with the FTO for a couple of days and he

22   showed me a lot of things.

23        Then he would monitor me doing those things that he

24   showed me.  And then to the point where I pretty much could go

25   out on my own and do it and he was just watching and making

UNITED STATES DISTRICT COURT

CROSS EXAMINATION - WILLIAM HOVANEC

1  sure that I did it well enough to be able to do it on my own

2  with no supervision.

3  Q   And was one of those duties that you were trained on by

4  the FTO the tower officer duties?

5  A   Yes.  He took us up in the towers.

6  Q   Okay.  And you talked a little bit in your testimony about

7  the duties of a tower officer.  And I know one of them was --

8  we all know one of them was cell assignments.

9      What other types of things as a tower officer would

10  you be responsible for during your shift?

11  A   You would, depending on what house you were in, like in

12  2 Bravo, when it's time for hour-outs when they come out of

13  their cell, you would have to make sure that everybody gets to

14  come out at a certain time and that it doesn't contradict with

15  any other issues as far as if there were "house-alones" or no

16  contact with other inmates.  So there was a lot to that.

17  Q   Okay.

18  A   So, let's see, what else would there have been?

19  Q   Was there -- what kind of responsibilities did the tower

20  officer have with respect to any, say, doors or those kinds of

21  things?  Was there anything like that?

22      MR. SHOWALTER:  Objection.  Asked and answered in

23  direct.

24      THE COURT:  Overruled.

25  BY MR. STRUCK:

CROSS EXAMINATION - WILLIAM HOVANEC

1    Q    As the tower officer, did you have any responsibility for

2    people coming and going?

3    A    Yes.  As the tower officer you control the doors, control

4    the doors into the housing unit itself, into the individual

5    pods that you control the door to where the -- they have legal

6    visits.  You control the doors to the cells which can be used

7    with a key in the cells as well in most houses.

8              But, you know, mainly it's a tower officer's

9    responsibility to open and close doors.

10   Q    Okay.  And when, say, staff were in, say, the 2B pod, what

11   responsibilities did you have with respect to when there are

12   floor officers on the floor.  What did you have to do?

13   A    The number one priority was always to watch the officers,

14   make sure, you know, nothing is happening, especially when

15   they're handling inmates.

16             You don't want to see other officers get hurt because

17   you're not paying attention, so that was the number one

18   priority for me.

19   Q    And how would you accomplish that when you were up there

20   in the tower?

21   A    Sometimes you can see, but it's a little difficult in some

22   places.  You would have to stand up to see anyway.  But we

23   have cameras.  There was cameras in the -- that show a good

24   portion of the pod.

25   Q    So you either -- there was -- you either visualized it

CROSS EXAMINATION - WILLIAM HOVANEC

1   without assistance or you were looking up at some sort of a

2   screen?

3   A   Correct.

4   Q   And then you spoke a little bit about the Operations

5   Journal or the OJ journal.  What was supposed to be put into

6   the OJ journal?

7   A   Everything.  A lot of things.  Anything that happens in

8   order to make sure it did happen and there was a record of it.

9          So if healthcare professionals were coming in, we

10   would mark that and their serial number.

11          If the sergeants were coming in to -- to pick up

12   grievances or, you know, the various things that happen, I

13   mean, pretty much it's a log of everything that happened from

14   beginning of shift to end of shift; movement of inmates, the

15   distribution of meals, you know, just everything that

16   happened.  It's just a log of everything that happened.

17   Q   When you were assigning cells, you talked about some of

18   the things you would look at.  And, again, we've heard a lot

19   about it in this case.  JMS.  That's the Jail Management

20   System, correct?

21   A   Yes.

22   Q   And what would you look at in JMS when you got the call to

23   say:

24          Inmate Bates is coming into your housing unit.

25          What would you do?

UNITED STATES DISTRICT COURT

CROSS EXAMINATION - WILLIAM HOVANEC

1     MR. SHOWALTER:  Objection.  Hypothetical.  Asked and

2   answered.

3     THE COURT:  Overruled.

4     THE WITNESS:  You would check the classification of

5   the inmate?  You would check if they were --

6   BY MR. STRUCK:

7   Q   Let me stop you right there.

8       You checked the classification of the inmate?

9   A   Yes.

10  Q   Were all of the inmates that were held in that pod,

11  particular pod, maximum security inmates?

12  A   At the time, I believe, we had medium inmates in there on

13  overflow from another jail.

14  Q   Okay.  And so would you house medium and maximum inmates

15  together?

16  A   You were able to, if I remember correctly, go one up or

17  one down.  So medium with a max or medium with a minimum.

18      But you can never -- you never put a minimum with a

19  max, if I remember correctly.

20  Q   Okay.

21  A   But, I mean, for me I didn't -- if I didn't have to put a

22  medium with a max, then, you know, you try not to.  That's not

23  always the case.  Sometimes, you know, there's other variables

24  involved in time and things of that nature.

25  Q   So, if I understand what you're saying, your practice was

CROSS EXAMINATION - WILLIAM HOVANEC

1    to try and match security levels.  If you had mediums and

2    maximums in the same housing unit, you tried to put the

3    maximums together and the mediums together?

4    A    Correct.

5    Q    But you were allowed under policy to house a max with a

6    medium?

7    A    Yes.

8    Q    Or a medium with a minimum?

9    A    Correct.  Yes.

10   Q    So the night when Mr. Bates came into the housing unit you

11   could have housed him with a medium security inmate per

12   policy?

13   A    Per policy, I could have.

14   Q    That just wasn't your practice?

15   A    Correct.

16   Q    All right.  So you checked classification.

17            And what else did you check in JMS?

18   A    You would check if they were "house-alone."

19   Q    All right.  And how would that -- since we don't have the

20   JMS system here to show the jury, can you describe what --

21   what would you see?

22            How would you know what is a "house-alone."  How

23   would that be indicated?

24   A    It would be indicated on the notes on the bottom of the

25   screen in the booking screen.

CROSS EXAMINATION - WILLIAM HOVANEC

1    Q    And it would specifically say "house-alone"?

2    A    It would.  It would say "house-alone."  And it wouldn't

3    allow you to assign that inmate to a cell that was -- that had

4    another inmate in it.

5    Q    So there was some sort of stop in the program itself that

6    would not allow you to place another inmate in with a

7    "house-alone"?

8    A    If I remember correctly, yes.  It wouldn't let you do it.

9    So -- and that's why I always would check JMS.

10   Q    Okay.

11   A    That was another reason.

12   Q    What else would you look for besides "house-alones"?

13   A    You know, medical, lower-tier, lower-bunk and then

14   "keep-aways."

15   Q    All right.  And explain "keep-aways"?

16   A    "Keep-aways."  So if somebody would -- somebody might be a

17   "keep-away" if they had been into a fight before.  You would

18   put them in as "keep-aways."  They're not allowed to be in the

19   same cell together, not allowed to come out at the same time

20   together for recreation or any of those things.  I would just

21   keep them away.

22         It could be gang-related too.  If the gang squad, you

23   know, decided that those two shouldn't be together, but

24   usually, we wouldn't put them in the same cell -- or same pod.

25   Usually, we move them to different jails.

CROSS EXAMINATION - WILLIAM HOVANEC

1    Q    And so in the notes it would tell you which people -- I

2    mean, how would you know who to -- by looking at the notes,

3    you would know who not to put in cells together?

4    A    Correct.  And I believe -- I don't want to say for sure

5    because I don't remember.  It's been a while.  But I don't

6    think it would let you house each other with a "keep-aways."

7    I'm not positive on that, but, yes, I would always check

8    anyway because that was my job.

9    Q    All right.  What is the DBK1?  Do you know what that is?

10   A    I believe it was booking detail, yes.

11   Q    And what was that something you might look at in JMS too?

12   A    Yeah.  It will give you a lot of information, you know, as

13   far as where the person has been, what the classification

14   indications are.

15          If they've gone up classifications or been below

16   classifications, it will tell you where and what jails they

17   have been -- I think it tells you what jails they have been

18   moved to or -- yeah, movement.  It's kind of just notes.

19   Q    And is that something that you would look at every time

20   you would look at the -- at the booking detail every time you

21   were making a cell assignment?

22   A    Yes, because you didn't want to be -- you know, you don't

23   want to put somebody with -- you know, any of the "keep-away"

24   stuff.

25   Q    Okay.

CROSS EXAMINATION - WILLIAM HOVANEC

```
 1    A    You know, so.

 2    Q    So you would check that booking detail?

 3    A    Sure.

 4    Q    Let me show you what's in evidence as Exhibit 34.  And it

 5    will pop up on your screen.

 6         And specifically, page -- hang on a second.  Let me

 7    give you the Bates number.  Bates No. 003488?

 8         Take a look at that.  What is that?

 9    A    That's the printout of the DBK1, the booking detail

10    inquiry.

11    Q    And this is something that you would have access to?

12    A    Yes.  Yes.  I would come up and that would just be in JMS

13    on the screen.

14    Q    Okay.  And it looks like there's some things blacked out,

15    but those look like some sort of I.D. numbers and dates of

16    birth.

17         Let's take a look at exhibit -- or excuse me -- page

18    No. 3489.  Is this also part of the booking detail that you

19    would have access to?

20    A    Yes. I just believe it's the -- it's sequential to the

21    page we just saw.

22    Q    Okay.  So, for example, if there was some -- if Psych had

23    said something about a "house-alone," it might show up here on

24    this particular booking detail?

25    A    Yes.  It might actually show up on both this one and the
```

CROSS EXAMINATION - WILLIAM HOVANEC

1    one we just looked at too.  I'm not -- I don't remember

2    correctly, but I would look through both.

3    Q   Okay.  And it also shows that the escape -- do you see

4    that on there?

5    A   I do.

6    Q   And this is the booking detail for Mr. Daughtry; is that

7    right?

8    A   Yes.

9    Q   Okay.

10   A   Uh-huh.

11   Q   And I think you said you didn't assign Mr. Daughtry's

12   cell, so you probably -- did you refer to Mr.--

13          Let me ask you.  When you put Mr. Bates in with

14   Mr. Daughtry, would you look at Mr. Daughtry's booking detail

15   as well as Mr. Bates?

16   A   No.  I mean, I would have looked to make sure he wasn't a

17   "house-alone."

18   Q   Okay.

19   A   And that's the only thing I would have looked at -- or a

20   "keep-away."  But that would also be on Bates.

21   Q   Counsel asked you about Exhibit 259.  Let me show you

22   Exhibit 259; specifically, page No. MCSO 150.

23          And if you'd look at the second and third entry -- or

24   were those entries made by you -- I'm sorry.  It should be up

25   on the screen.  You can look up at the screen, Mr. Hovanec.

CROSS EXAMINATION - WILLIAM HOVANEC

1    A    The first -- I'm sorry.  Which ones?

2    Q    The second and third entry.  Were those made by you?

3    A    Yes.  It's got my -- yes.

4    Q    Okay.  It doesn't -- do either one of those entries say

5    anything about anyone being injured?

6    A    No.

7    Q    Is there anything in there about -- I'm sorry.

8         Could you put that back up.

9         Anything in there about Medical being called to

10   assess anyone's injuries or anything like that?

11   A    It does not, no.  Both inmates were taken out of the pod,

12   so we probably placed -- I don't know what happened after

13   that.

14   Q    Why don't you take a look.  If you go down and you see

15   that entry right there, it says:

16        Both inmates were brought to Medical holding tanks

17   and given the opportunity but they refused medical treatment.

18        Do I see that?

19   A    That's correct and that's common practice.  You take the

20   inmates out after they fight or unless they need medical

21   attention right there.

22        But you would take them out of the pod, move them to

23   separate holding cells in the hallway and call Correctional

24   Health Services to come see them and clear them.

25   Q    If they are involved in any altercation at all, whether

CROSS EXAMINATION - WILLIAM HOVANEC

1   you see injuries or not, would Medical be called?

2   A   Yes.

3   Q   Okay.  Let me show you Exhibit 285, please.  And that's in

4   evidence.  And counsel asked you about this.

5        Now, this was the floor officer's headcount roster.

6   Was that your testimony?

7   A   Correct.

8   Q   Okay.  And that -- is this -- and this is something that

9   you -- you said you kept something similar up in the tower

10  with you?

11  A   Yes.

12  Q   Was that something that was done by policy or was that

13  just your practice?

14  A   I don't believe it was by policy.  It was almost like a --

15  for me it was a failsafe.  If, you know, computers -- anything

16  can happen to computers.  So I always marked down and wrote in

17  pen and would write in the inmates that were coming and the

18  inmates that were going.

19       This way, if anything happens to the computer system,

20  I still have something that says where the inmates are.  It's

21  an accountability is a big thing, so.

22  Q   So in other words, if you looked at the computer, you

23  would see all of this information, but just in case something

24  happened, you kept a back-up?

25  A   Correct.  And, you know, when you needed to get

CROSS EXAMINATION - WILLIAM HOVANEC

1   information very quickly, this document has a lot of

2   information on it, so.

3   Q   Okay.  And so that's -- there's the -- looks like the

4   floor officer wrote in "Bates in Mr. Daughtry's cell." Is that

5   correct?

6   A   Correct.

7   Q   And it also looks like -- if you look below, you see

8   Mr. Gause in C5?

9   A   Correct, in bunk one.

10  Q   And there is an indication that he was housed at one point

11  with a Dusko Krstic?

12  A   Correct.

13  Q   And what does that say next to Dusko Krstic?  Where was

14  Krstic moved to?

15  A   Well, he was moved.  It moved to 2 Bravo 1 -- 100 pod.

16  I'm not sure if that's a 17 or a 13 but it's one of those.

17  Q   Let's look at the next page and maybe that will tell us.

18          Which cell was he moved into?

19  A   He was in 13, bunk 2.

20  Q   So he was actually moved from -- he was moved from

21  Mr. Gause's cell and placed into a cell with an inmate named

22  Jason Villalobos.  Villalobos.  Is that correct?

23  A   Yes.  Correct.

24          MR. STRUCK:  Your Honor, defendants move to -- for

25  the admission of Exhibits 282, 283 and 284.

CROSS EXAMINATION - WILLIAM HOVANEC

1      MR. SHOWALTER:  No objection, Your Honor.

2      THE COURT:  282, 283 and 284 are received.

3      (Exhibit Nos. 282, 283 and 284 admitted in evidence.)

4   BY MR. STRUCK:

5   Q   Let me show you and we'll put it up on the screen, Exhibit

6   282, page 2725.  And this looks like another roster.  What's

7   the date on this?

8   A   July 6, 2014.

9   Q   Okay.  And you see that there's a handwritten note?

10  A   Yeah -- on that top left page next to --

11  Q   I'm sorry.

12      Well, who is in cell C -- cell 3?

13  A   Oh, okay.  That's in bunk one there would be Zachary

14  Daughtry.

15  Q   And it looks like he was housed with somebody.

16  A   Correct.  Jason Lopez.

17  Q   Okay.  Now the fact that it's handwritten, would that

18  be -- indicate that that -- Mr. Daughtry, he had either been

19  moved from another cell or he had just come into the housing

20  unit that day?

21  A   Yes.  More than likely, around 1500 hours or so, because

22  that's when his first -- that's when the first headcount was

23  done and he was present.

24  Q   So it looks like at least when Mr. Daughtry arrived in

25  that housing unit, he was housed with a cellmate; is that

CROSS EXAMINATION - WILLIAM HOVANEC

1    right?

2    A    Yes.

3    Q    And let's take a look at Exhibit 283, page MCSO 2720.

4            And if you'll look at cell 3, it looks like Mr. Lopez

5    is left at what point in time?

6    A    Correct.

7    Q    And what does it say?  There's a R-U next to his name.

8    What does that stand for?

9    A    That would be roll-up.

10   Q    And what does that mean?

11   A    It means they're going to be moved somewhere else,

12   possibly back to General Population.

13           A roll-up is really just when you -- slang for when

14   you're leaving the house.

15           So this inmate just rolled up.  They rolled up his

16   stuff and they moved to another cell -- another house,

17   possibly another cell.  But, you know, you would have to go

18   into JMS to actually check where that person went.

19   Q    Now, if, say, you were moving somebody from one cell in

20   this same housing unit to another, would you put R-U right

21   next to their name?

22   A    In the same house?

23   Q    Right.

24   A    Probably not.  You would put:

25           Moved to cell 5.  10.  Whatever he was moved to.

CROSS EXAMINATION - WILLIAM HOVANEC

1    Q    If someone's disciplinary time was up and they were

2    leaving, would you put R-U?

3    A    Yes.  I believe so.

4    Q    Counsel in his questioning asked you about whether you

5    knew of certain information with respect to Mr. Daughtry

6    whether that was something that you had access to when you

7    were making the cell assignment.

8          Do you remember those questions and answers?

9    A    Yes.

10   Q    Okay.  Based upon the questions that he asked you

11   regarding Mr. Daughtry -- and I think one of them -- let me

12   show you.  One of them was Exhibit 34.  Sorry.  I'm looking

13   for the correct page number.  MCSO 000499 of Exhibit 34.

14         And, if you would please -- and this is the -- if you

15   remember, this was the referral for psychiatric services that

16   he showed you.  Do you remember that?

17   A    Yes.

18   Q    What he didn't show you was the date at the bottom.

19         What was that date?

20   A    January 21st, 2014.

21   Q    Okay.  So that was about five months or so before the

22   incident, correct?

23   A    Correct.

24   Q    I believe more than five months.

25         But this was one of the things he showed you.  I

CROSS EXAMINATION - WILLIAM HOVANEC

1    think he showed you something else with respect to

2    Mr. Daughtry.

3           Would having had that information change your

4    decision with respect to placing Mr. Bates in his cell?

5           MR. SHOWALTER:  Objection.  Asked and answered.

6           THE COURT:  Overruled.

7           THE WITNESS:  No.  We housed classification.

8           If he didn't have any "keep-aways" and he wasn't a

9    "house-alone" and didn't have any medical reasons, that's what

10   we justify where we house inmates.

11          If he was -- if Psych would have wanted him to be

12   alone, our Psychiatric Evaluation Division or whatever you

13   want to call them, Psych, would want them to be able to be

14   alone, then they would have put him as a "house-alone."

15          I'm not sure if he was evaluated after that.  I

16   imagine so, a psych eval.

17   Q   Do you feel that the mental health professionals that work

18   at the Mental Health Unit are in a better position than you to

19   determine whether or not Mr. Daughtry is capable of being

20   housed in the General Population, max custody --

21          Excuse me -- in the max custody disciplinary unit?

22          MR. SHOWALTER:  Objection.  Lack of foundation.

23   Calls for expert medical opinion.

24   BY MR. STRUCK:

25   Q    -- than you?

REDIRECT EXAMINATION -  WILLIAM HOVANEC

```
1              THE COURT:  Overruled.
2    BY MR. STRUCK:
3    Q   Do you want me to ask that again?
4    A   No.  A medical professional is obviously way more equipped
5    than me to make any kind of medical decision, especially in
6    mental illness.
7              I don't have any, you know, medical training, medical
8    degrees or anything in mental illness.  That's why we refer
9    them to those people so they --
10   Q   You would defer to them to make decisions regarding
11   whether or not Mr. Daughtry was capable of living in a cell
12   with another inmate?
13   A   Correct.
14             MR. STRUCK:  All right.  No more questions.
15             THE COURT:  Let's take just a --
16             I'll call it a brief ten-minute break because I
17   didn't keep the last ten-minute break brief.  So let's just
18   try that and we'll get you in for redirect.
19        (Recess taken at 4:07 p.m.; resumed at 4:18 p.m.)
20             THE COURT:  Thank you.  Please be seated.  The record
21   will reflect the presence of the parties, counsel and the
22   ladies and gentlemen of the jury.
23             And you may go forward with redirect.
24             MR. SHOWALTER:  Thank you, Your Honor.
25                        REDIRECT EXAMINATION
```

REDIRECT EXAMINATION -   WILLIAM HOVANEC

```
1   BY MR. SHOWALTER:
2   Q   Mr. Struck had you look at Exhibits 282 and 283.  Do you
3   recall that, the headcount roster for 2B?
4        Do you have those in front of you?  If not I can --
5   A   No.  No.  I'm sure I have them right here.  282 and 283,
6   you said?
7   Q   Yeah.  And those were admitted into evidence.
8        And I want to show you, this is 282.
9   A   Okay.
10  Q   And this is for July 6th of 2014, correct?
11  A   Correct.
12  Q   And this indicates --
13       Can you tell from this when approximately within one
14  hour Zach Daughtry was brought in to cell 3, bed 1 of
15  2 Bravo 1?
16  A   I can tell you that it was in between 1400 hours, which is
17  2:00 p.m. and 1500 hours, which is 3:00 p.m. because he's
18  accounted for at three o'clock but not at four o'clock.
19  Q   And then counsel struggled a little bit on Mr. Lopez.
20       Do you see his cellmate at that point is Mr. Lopez?
21  And it says next to his name "DS" and then it has a date
22  range.  Do you see that?
23  A   Correct.
24  Q   What does that indicate?
25  A   That should be the time that the -- the time that they're
```

UNITED STATES DISTRICT COURT

REDIRECT EXAMINATION -  WILLIAM HOVANEC

1    in 2 Bravo for --

2    Q    For?

3    A    For Disciplinary Segregation, yes.

4    Q    And so that indicates that Mr. Lopez was leaving on that

5    date, correct?

6    A    It appears that way.

7    Q    And so then that was 282.

8         If we go to 283, it appears to show -- can you tell

9    from that when Inmate Lopez left?

10   A    No, but I can tell it was in between -- from this document

11   it was in between midnight and 0003, so three o'clock in the

12   morning.

13   Q    And wasn't it the custom and practice to have Disciplinary

14   Segregation begin and end at midnight?

15   A    Honestly, I don't remember when exactly it began, if it

16   was midnight or noon.  I don't remember.

17   Q    And so this indicates that at -- that as of midnight, it

18   appears Mr. Lopez was no longer sharing a cell with Zach

19   Daughtry, correct?

20   A    Well, it's hard to tell, honestly.  I know at three

21   o'clock in the morning he was not there for headcount, so it's

22   hard to tell before that when he left.

23   Q    And so at some point he rolled up, somebody scratched out

24   his name, somebody added another inmate's name, Brandon

25   Sprague, right?

REDIRECT EXAMINATION - WILLIAM HOVANEC

1    A    Yes.  It does look like that, yes.

2    Q    And at 6:00 a.m. and 7:00 a.m., does it appear that

3    Brandon Sprague is there in the cell?

4    A    Yes.  He was accounted for by the officer doing the

5    headcount roster at that time.

6    Q    And then at 10:00 a.m., it's hard to make out what is

7    going on, fair, with respect to the checks?

8    A    Sure.  It looks like -- I couldn't speculate on what that

9    person did there.  I have no idea, but.

10   Q    What the person wrote?  Why they wrote that there, you

11   mean?  Why --

12   A    Um --

13   Q    You can't speculate about why there's a bunch of

14   cross-marks in that box?

15   A    Yeah.  I didn't do it, so I have no idea.

16   Q    And so Brandon Sprague's name is written down.  He's

17   marked as being present.  And then he's crossed out, correct?

18   A    Yes.

19   Q    And then he's marked as not being present for the rest of

20   that day?

21   A    Yeah.  It looks like the cell was open for the rest of the

22   day.

23   Q    Do you know if Brandon Sprague left that cell because he

24   couldn't stand to house with Mr. Daughtry or if he got into a

25   fight with Mr. Daughtry on July 7th?

REDIRECT EXAMINATION - WILLIAM HOVANEC

1  A   I don't recall offhand.  If there is some notes in OJ

2  about it, maybe, but I don't remember.

3  Q   And from that point forward, are you aware of anybody else

4  housing with Mr. Daughtry before Ryan Bates was placed into

5  his cell?

6  A   No.  I mean, there is the -- I don't even know if I was

7  working in the house in 2 Bravo on these dates.  You know, I

8  mean, obviously I was there on the 9th, but I don't know if I

9  was even there on the 6th or 7th, so.

10 Q   Going back to the OJ log we looked at which was Exhibit

11 259, counsel asked you some questions about that entry about

12 the fight that occurred between Krstic -- Inmates Krstic and

13 Straughter.  Do you recall that?

14 A   When they asked me here?

15 Q   When Mr. Struck was asking you questions about that and he

16 noted that there was a different person listed as being

17 assigned to house with Krstic on the headcount roster.

18        Do you recall that?

19 A   Yes.

20 Q   And you said that the headcount roster is like these --

21 are these the official record?  Or is it the OJ log that's the

22 official record for what goes on there?

23 A   No.  I mean, the OJ -- you know, the Operations Journal is

24 kind of the set-forth guideline.  That has to be done on

25 transfer-ins and transfer-outs, no matter what.

REDIRECT EXAMINATION -   WILLIAM HOVANEC

1          Obviously, you have to do that on JMS but this is the

2    most important.  So if the numbers get messed up anywhere, you

3    know, the number of inmates or movement of inmates gets off

4    for any reason at any point, you can always go back to your

5    Operations Journal, find out who you moved, when you moved

6    them and figure out what the issue is at that time.

7          So, you know, they have a saying -- they had a saying

8    and, you know:  "OJ is God."

9          OJ has everything in it.  So you make sure you put it

10   in there.

11   Q   Have you ever heard an expression like:

12          If it's not documented, it didn't happen.

13   A   I've heard that but I just make it a practice to document

14   everything that happens.

15   Q   And the practice is to document everything that happens so

16   you know what happened, correct?

17   A   Correct.

18   Q   Because a written record is more accurate than memory,

19   correct?

20   A   Correct.

21   Q   And you would also agree with me that a written policy is

22   easier to follow than one that's passed on by custom or

23   practice?

24          MR. STRUCK:  Your Honor, this is outside the scope of

25   cross.

UNITED STATES DISTRICT COURT

REDIRECT EXAMINATION -   WILLIAM HOVANEC

1          THE COURT:  Sustained.

2    BY MR. SHOWALTER:

3    Q   Mr. Struck asked you some questions about minimum, medium

4    and maximum.  And it sounded like your testimony was that you

5    were permitted to house minimum security with medium and

6    medium with maximum.

7    A   Minimum with medium or medium with maximum.

8          If I remember correctly, that's the way it is.  Now,

9    you would have to refer back to policy on that, but I'm

10   positive you can go one up or one down classification-wise, if

11   necessary, approved by a supervisor-type thing.

12         But I would -- with the option given, I would house

13   classification first.

14   Q   And just to be clear, you also testified that -- under

15   questioning from counsel for Maricopa County that you would

16   not have looked at the booking detail for Zach Daughtry when

17   you put Ryan Bates in the cell?

18   A   It is on JMS.

19   Q   But you testified that you wouldn't -- that wasn't your

20   practice.  You would have simply looked at Bates' booking

21   detail and then you would have checked Daughtry's

22   classification and the comments.

23         MR. STRUCK:  That misstates his testimony.

24         THE COURT:  Overruled.

25         THE WITNESS:  So, no.  I think something is confused

UNITED STATES DISTRICT COURT

REDIRECT EXAMINATION -   WILLIAM HOVANEC

1   here, because I would have checked, you know -- everybody's

2   JMS is going to get checked.

3           JMS has a number of things in it.  As far as the

4   housing roster in itself is inside of JMS.

5           There's notes for individual inmates inside of JMS as

6   well.

7           So it's not just like one screen.  There's quite a

8   few things that are in that system that you look through.  And

9   one of them would be notes.

10          When you bring up the DBK1, I believe it was, that's

11  going to have their booking details.  And we saw that a little

12  while ago.

13          And then when you hit "Enter" to the next screen,

14  it's DZBK-something.  But it's going to bring up the notes

15  that, I believe, we also looked at.  So it's going -- it's one

16  follows the other.

17          And then you would also look at the roster.  When

18  you're going to move an inmate from wherever they're coming

19  from to your -- your pod or into that cell, you would look up

20  the housing roster as well.  It shows you everybody that's

21  already been transferred in on JMS.

22          So very similar to that headcount roster, it's just

23  on that system.  So there's a couple of differ places you go

24  inside of JMS.  When I refer to going into JMS, it's referring

25  to checking all those things because you have to check those

REDIRECT EXAMINATION -   WILLIAM HOVANEC

1    things where, you know, that's just what we do.  That's our

2    job, so.

3    Q    Do you have any independent recollection of doing that

4    with respect to either Ryan Bates or Zach Daughtry?

5    A    No, not a particular recollection of doing it before or

6    when it happened, but I did it on everybody.  So whenever an

7    inmate would come in and I was the tower officer, I would

8    check all those things and make sure everything was okay to

9    house those people or those inmates to where they're supposed

10   to go and nothing, no policies being violated, you know, the

11   security levels are good and they would be housed there.

12        You know, it's really not a lot.  They're

13   "house-alone," they're Medical, they're lower-tier, lower-bunk

14   and the things we have been talking about the whole time I

15   have been up here, so.

16   Q    And then Mr. Struck also asked you some questions about

17   Psych and you testified that it sounded like you rely on --

18   you don't know what Psych does, correct?

19   A    Well, I know a couple things they do.  I have never worked

20   in Psych, so I'm not an expert, but.

21   Q    Do you know what the medical providers at Psych do with

22   respect to what determination they're making as far as their

23   standard of care is for releasing somebody from General

24   Population -- I'm sorry -- for releasing somebody from Psych

25   into General Population?

REDIRECT EXAMINATION - WILLIAM HOVANEC

1          MR. STRUCK:  Foundation.

2          THE COURT:  Sustained.

3          MR. SHOWALTER:  I'm just asking him if he knows what

4     their standard is.

5     BY MR. SHOWALTER:

6     Q   When you look at a JMS note on release from Psych to

7     General Population, what details are included in that?

8     A   Reclassed.  So, I mean, I believe reclassed from P to G

9     would mean reclassed from Psych to General Population.

10    Q   And that's always what it says?

11    A   Yes.  Yeah.  When they're going -- when they go from G to

12    P is when they're going to Psych; when they go from Psych,

13    they go from P to G.  Yeah.

14    Q   Are there any other details about these people included in

15    those notes from Psych to Detention?

16    A   From Psych to Detention?  I mean, "house-alone,"

17    "keep-aways."  I'm sure they have the ability to put that

18    information in in that same place, so I don't -- but, I mean,

19    that's -- I don't know.  That's what I would look for and they

20    can put it in there.

21    Q   Let me ask you this.  When you had an inmate in

22    Administrative -- I'm sorry -- in Disciplinary Segregation, do

23    you consider Disciplinary Segregation to be General

24    Population?  Does Detention consider Disciplinary Segregation

25    to be General Population?

REDIRECT EXAMINATION -  WILLIAM HOVANEC

```
1          MR. STRUCK:  Outside the scope.  Foundation.

2          THE COURT:  Sustained.

3   BY MR. SHOWALTER:

4   Q   Other than that note from Psych saying "Reclass from P to

5   G," have you ever seen any other documentation in the JMS

6   notes about Psych issues for a particular inmate?

7   A   Not that I recall.  That's usually handled with, you

8   know -- by the Psych Unit, the other stuff.  And so I'm not a

9   doctor.  Even if they wrote stuff in there, I wouldn't know

10  what it is.

11  Q   You assume that Psych is doing their job so that you can

12  to yours?

13  A   Yes.

14  Q   And with respect to Classification, you assume that

15  Classification is doing its job of properly and correctly

16  classifying inmates so that you can do your job, fair?

17  A   Correct.

18          MR. SHOWALTER:  Mr. Hovanec, thank you.

19          THE WITNESS:  Mr. Hovanec.  Thank you.

20          THE COURT:  All right.  You may step down and you may

21  call your next witness.

22          MR. ROBBINS:  Your Honor, we call Detention Officer

23  Steven Hansen.

24     (Witness duly sworn)

25          THE CLERK:  Please state your name for the record,
```

DIRECT EXAMINATION -  STEVEN HANSEN

```
 1   spelling your first and last name.
 2           THE WITNESS:  Steven S-T-E-V-E-N.  H-A-N-S-E-N.
 3               STEVEN HANSEN, WITNESS, SWORN
 4                    DIRECT EXAMINATION
 5   BY MR. ROBBINS:
 6   Q   Good afternoon.
 7   A   Good afternoon.
 8   Q   Can you please introduce yourself to us by telling us your
 9   name -- go ahead?
10   A   Steven Hansen.
11   Q   And, obviously, you are employed with the Maricopa County
12   Sheriff's Office?
13   A   Correct.
14   Q   And how long have you been employed with Maricopa County
15   Sheriff's Office?
16   A   A tad over five years.
17   Q   And what would your start date have been?
18   A   Approximately, February 19th, give or take.
19   Q   February 19th of?
20   A   2013.
21   Q   Okay.  And was that the day you were sworn or you gave an
22   oath?
23   A   Roughly, I don't know.  Possibly.
24   Q   Okay.  But you would have gone to an academy that took
25   eight to nine weeks?
```

DIRECT EXAMINATION -   STEVEN HANSEN

1    A    Correct.

2    Q    You would have taken an oath to defend the Constitution of

3    the United States?

4    A    Correct.

5    Q    You would have then sworn to also take care of the care,

6    custody and control of the inmates in the Maricopa County

7    Jail?

8    A    Correct.

9    Q    Okay.  And go ahead and look at the screen.  I'm going to

10   use the demonstrative exhibit of the floor layout.

11            I'm going to put up a demonstrative.  That just means

12   that it shows us, basically, what something looks like.

13            And you were not working on 2E on the day that Ryan

14   Bates was put into a cell with Zachary Daughtry, correct?

15   A    Correct.

16   Q    And you weren't working in 2B that day either?

17   A    Correct.

18   Q    You were kind of a floating -- a floating floor officer.

19   Basically, you would be there for anyone on the second floor?

20   A    More other less, yeah, just to help out, yeah.

21   Q    Yeah.  And so this morning we spoke to an Officer Hewitt

22   and he was over -- let's see.  Is there a way?  Oh.

23            So we talked with an Officer Hewitt that was the

24   floor officer that was the person who Ryan Bates walked into

25   the sally port for.  And you know Officer Hewitt, correct?

DIRECT EXAMINATION -  STEVEN HANSEN

1   A   I do, yes.

2   Q   And we have talked with -- how do I erase?

3         So we talked with Officer Hewitt and we just talked

4   with Officer Hovanec who was the tower officer in 2E.  I don't

5   know if you knew that, but you might have seen him out in the

6   hallway.

7   A   Yeah.  I don't remember.  I just remember he's a tower

8   officer.

9   Q   So let me -- but they were the people that worked on --

10  Hewitt was 2E.  Hovanec was 2B.  And you were working on the

11  floor.  So you would work on 2A, 2B, 2C, 2D, 2E and 2F, just

12  depending on what needed to be done?

13  A   If they needed help, correct, but I was assigned to level

14  2 control.

15  Q   And I think we have the control -- is that the control

16  office right here?

17  A   Yes.

18  Q   Okay.  And you understand that when Officer Hewitt decided

19  that there was going to be a consequence or a discipline that

20  was going to be applied to Mr. Bates, that he took Ryan Bates

21  to a holding cell, correct?

22  A   I don't remember Bates being taken to a holding cell.  I

23  came to find that out later.

24  Q   Okay.  What was your job in terms of putting Mr. Bates

25  into a cell?

DIRECT EXAMINATION -  STEVEN HANSEN

1   A    I just came over to meet my partner Officer Huber and I

2   just helped him escort Mr. Bates.

3   Q    And do you know whether you escorted him from a holding

4   tank over to 2B?

5   A    From what I recall, I met him in front of, I believe,

6   2 Edward, 2E, and just escorted him over to 2B.

7   Q    Did you ever see him come out of the holding tank?

8   A    No.  Not that I recall.

9   Q    Did you see him come out of the door on 2E?

10  A    No.

11  Q    So, as I understand it, you would have taken him from

12  basically here in front of 2E in through this sally port and

13  then over to the cell, correct?

14  A    Correct, but not the floor office.

15  Q    I know.  I gave you a detour.

16  A    Yeah.  But, yes, correct, into the 100 pod.

17  Q    Right.  That's if -- that's basically what you were

18  responsible for?

19  A    Correct.

20  Q    You did not make the cell assignment, correct?  That was

21  told to you by other people?

22  A    Yes.

23  Q    And you did not decide that there would be discipline,

24  correct?

25  A    No.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - STEVEN HANSEN

1  Q   That wasn't part of what you were doing?

2  A   Nope.  I was just simply escorting point A to point B.

3  Q   And you are assuming that the correct decision's been made

4  in terms of discipline, correct?

5  A   It is a Disciplinary Segregation pod, so I assumed some

6  type of rule violation was committed.

7  Q   And you assume that the person has been classified

8  correctly so they are in the right area of the jail, correct?

9  A   Yes.

10  Q   And when you put them into a cell, you assume that the

11  person in that cell belongs in maximum security Disciplinary

12  Segregation, correct?

13  A   For the most part, I would assume that, yes.

14  Q   It wasn't your decision, but you rely on the other people

15  to do their jobs the right way so you can do your job the

16  right way, fair?

17  A   Fair enough, correct.

18  Q   And when you -- but you do have an insight that we can

19  share in terms of why there was a bit of a hurry to get him

20  into a cell; is that fair?

21  A   From my point of view, I didn't think anything was rushed.

22  I simply met up with him and escorted him.  Nothing seemed

23  rushed at all.

24  Q   Okay.  Because we had the opportunity to speak before,

25  correct?

DIRECT EXAMINATION -   STEVEN HANSEN

1    A    Yes.

2    Q    You and I at a deposition?

3    A    Yes, correct.

4    Q    And basically, you had an understanding that Mr. Bates was

5    being moved because there was a shift change and they wanted

6    to have him in a unit where he could be counted, correct?

7    A    Correct.  But it doesn't mean that things were rushed.

8    Q    Okay.  But rush, it wasn't a decision that was made after

9    consulting -- it was a decision that was made, basically, to

10   put him somewhere before the next shift began, correct?

11              MS. HESMAN:  Objection, Your Honor.  Foundation.

12              THE WITNESS:  Basically, not to --

13              THE COURT:  Sustained.

14              THE WITNESS:  Do I answer that question?

15              MR. ROBBINS:  No.  I'll lay a predicate so you can

16   answer it.

17   BY MR. ROBBINS:

18   Q    You heard that night -- or that day -- I guess it was

19   night.  That night you heard why they were moving him at the

20   time they were moving him, correct?

21   A    You mean concerning from his rule violation?

22   Q    Yeah, why they were moving --

23   A    I found out later that, yeah, he was in an unauthorized

24   area.

25   Q    But the reason they were moving him at the time they were

DIRECT EXAMINATION - STEVEN HANSEN

1    moving him was to get him into a cell so when they did count,

2    he would be in the cell?

3              MS. HESMAN:  Objection, Your Honor.  Foundation.

4              THE WITNESS:  No, I don't --

5              THE COURT:  Sustained.

6              Whenever there's an objection, you need to wait to

7    answer until I rule on the objection.

8              THE WITNESS:  Okay.

9    BY MR. ROBBINS:

10   Q    Now, you had been taught how to recognize behavior and

11   signs of mental illness, correct?

12   A    Correct.

13   Q    And you had -- they had talked to you among other things

14   about paranoid schizophrenics, correct?

15   A    Yes.

16   Q    And your understanding was that sometimes people who are

17   paranoid schizophrenics may be delusional and people might

18   hear voices?

19   A    Yeah.

20   Q    Right?

21   A    That's a possibility, yeah.

22   Q    And did anyone tell you whether Mr. Bates was having

23   delusions?

24   A    No.

25   Q    In fact, he did not -- you don't recall him speaking to

DIRECT EXAMINATION -  STEVEN HANSEN

1   you, correct?

2   A   No.  Yeah, he didn't speak to me at all.

3   Q   So if he was having a delusion, he didn't share it with

4   you, correct?

5   A   I suppose.  I mean, I don't know.

6   Q   And no one told you that he was walking around looking for

7   a fellow named Junior that was nowhere to be found, correct?

8   A   I don't know who Junior is.

9   Q   And you didn't hear it that day?

10  A   Nope.  I didn't hear it.

11  Q   And you do recognize who Ryan Bates is, correct, or at

12  least you did?

13  A   Do I --

14  Q   Let me show you a picture.

15         Do you recognize who is pictured on Exhibit No. 76,

16  page 1?

17  A   Yeah.  I recognize him.

18  Q   And that is Ryan Bates, correct?

19  A   Correct.

20  Q   And you were taught when you were in the academy that

21  mentally ill inmates could pose a danger because of the way

22  they acted in terms of irrationality, correct?

23  A   It's always a possibility, but any inmate can pose a

24  danger at any time, mental illness or not.

25  Q   Are you telling me that they didn't teach you that

DIRECT EXAMINATION - STEVEN HANSEN

1  mentally ill people are more unstable than normal people?

2          MS. HESMAN:  Objection, Your Honor.  Foundation.

3          THE COURT:  Sustained.

4  BY MR. ROBBINS:

5  Q   Were you taught anything about whether or not mentally ill

6  people who are unmedicated are unstable?

7          MS. HESMAN:  Same objection, Your Honor, and counsel

8  is testifying.

9          THE COURT:  Overruled.

10         MR. ROBBINS:  That means you can answer.

11         THE WITNESS:  Repeat the question.

12 BY MR. ROBBINS:

13 Q   No problem.  Were you taught at the academy that people

14 who are mentally ill and who are unmedicated are more unstable

15 than people who are either medicated or not mentally ill?

16 A   I was always taught just to be alert that -- I mean, I

17 can't -- I can't diagnose whether people have a mental illness

18 or not.  I was just taught to keep your head on a swivel and

19 be aware of any inmate at any time.

20         MR. ROBBINS:  Okay.  Ms. Williams, would you hand the

21 witness his deposition.

22 BY MR. ROBBINS:

23 Q   It's just a book that was typed up after the deposition.

24 A   Okay.

25 Q   Go ahead and look at page No. 26.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -   STEVEN HANSEN

1   A   Okay.  26.

2   Q   And at line No. 14, I'm going to read the question and the

3   answer:

4          Question:  Okay.  Did they teach you that mentally

5   ill inmates could pose a danger to you because of the way that

6   they act irrationally?

7          And your answer was?

8   A   Yes.

9   Q   And it still is "yes."

10  A   But that doesn't mean that they can pose a danger any more

11  than any other inmate that's not mentally ill.

12  Q   Well, when they were teaching you that mentally ill people

13  can be dangerous because of their irrationality, and when you

14  answered "yes" to that, has that changed?

15         Has anyone taught you --

16  A   No.

17  Q   Has anyone said anything to you that somehow mentally ill

18  people aren't more dangerous because of their potentially

19  irrational behavior?

20  A   No.

21  Q   Okay.  And let me ask you this.

22         Mentally ill people can also be targets for violence

23  in the jails and you were taught that, correct?

24         MS. HESMAN:  Objection, Your Honor.  Foundation.

25         THE COURT:  Overruled.

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -   STEVEN HANSEN

1              THE WITNESS:  They can be a target for any reason,

2    not just mental illness.

3    BY MR. ROBBINS:

4    Q   But mentally ill inmates who act strangely can be targets

5    for violence and you were taught that, correct?

6    A   It's a possibility.  I wouldn't say I was taught that,

7    but.

8    Q   So you weren't taught that?

9    A   In my experience it's possible, yes.

10   Q   Well, for instance, if someone just pees, just like if

11   they're sitting in a chair in a doctor's office and they just

12   start peeing or they're sitting in -- they pee on their

13   roommates bunk, in your experience as a detention officer,

14   that can lead to being assaulted within the jail, correct?

15   A   I haven't experienced an inmate peeing on someone's bunk.

16   I don't know.

17   Q   If someone had that background that they did that to

18   another inmate for no particular reason, that would be a

19   person who was potentially going to be the victim of assault?

20   A   I can't speak --

21             MS. HESMAN:  Objection, Your Honor.  Calls for

22   speculation.

23             THE COURT:  Sustained.

24   BY MR. ROBBINS:

25   Q   What about masturbating in the middle of a pod?  In your

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -   STEVEN HANSEN

1   experience is that something that might lead to violence

2   against that person?

3          MS. HESMAN:   Objection, Your Honor.   Calls for

4   speculation.

5          THE COURT:   Sustained.

6   BY MR. ROBBINS:

7   Q   Let me ask you this.

8          Were you aware -- did you know anything about Zach

9   Daughtry?

10  A   No.

11  Q   Did you know whether he had, in fact, peed on his

12  roommate's bed three days before and was beaten because of it?

13  A   No.

14  Q   Do you know whether or not he had masturbated in public in

15  the jails?

16  A   No.

17  Q   Did you know that he -- that he acted strangely and at one

18  point had been sent to Psych because of the fear that he would

19  be injured because of his odd behavior?

20  A   No.

21  Q   Concerning Ryan Bates, did anyone tell you that he had

22  written in 2007 that he had been on several medications in

23  many hospitals and had a history of many attempts of suicide

24  and violence due to being a Value Options patient and that he

25  had anxiety, was restless and sometimes at night he couldn't

DIRECT EXAMINATION - STEVEN HANSEN

1   sleep because things went on in his head that shouldn't be and

2   people were scared.

3           Did anyone tell you that?

4           MS. HESMAN:  Objection, Your Honor.  Counsel is

5   testifying.

6           THE COURT:  I just didn't hear what you were

7   objecting.

8           MS. HESMAN:  Counsel is testifying.

9           THE COURT:  Overruled.

10          THE WITNESS:  Can you repeat that?

11  BY MR. ROBBINS:

12  Q   Yes.  Did anyone ever tell you that Bates had written in

13  2007 that he had been on several medications, had been in many

14  mental hospitals, had a history of many attempts of suicide

15  and violence due to being a Value Options patient, that he had

16  anxiety and was restless and sometimes at night he couldn't

17  sleep because things go on inside of his head that shouldn't

18  and that people were scared of him?

19          MS. HESMAN:  Objection.  Assumes facts and hearsay.

20          THE COURT:  Overruled.

21          THE WITNESS:  No.  I never knew that.

22  BY MR. ROBBINS:

23  Q   And that is something that possibly would have helped you

24  in doing your job as a detention officer providing the care,

25  custody and control for Mr. Bates, fair?

DIRECT EXAMINATION -   STEVEN HANSEN

 1   A    No, because I would have gone off of -- if there was any

 2   red flags that were posed to me in that moment in time.   If he

 3   acted normal, which he was pretty much normal when we were

 4   escorting him, there was no red flags that popped up.

 5   Q    Go ahead and look at page 29 of your deposition.   And, in

 6   fact, I kind of have to start you on page 28 at line 19.

 7   A    28?

 8   Q    Yeah.   28, line 19.   I'm not going to reread it, but

 9   remember the question I asked you about whether anyone had

10   told you about what Ryan Bates had written?

11   A    Do you -- did anyone ever tell you -- okay.

12   Q    And then you looked at -- and so that was the thing about

13   people not having told you about all of those things.

14           And on the next page, the next question, I asked the

15   question:

16           Would that have helped you to do your job to know

17   that this person was a dangerous, paranoid schizophrenic?

18           And your answer was?

19           MS. HESMAN:   Your Honor, this misstates the evidence

20   and it's improper impeachment.

21           THE WITNESS:   No.

22           MS. HESMAN:   He was answering a different question in

23   the deposition.

24           MR. ROBBINS:   I'll read the whole thing.   I don't

25   want to --

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION -   STEVEN HANSEN

 1              THE COURT:  Very well.

 2      BY MR. ROBBINS:

 3      Q   Question:  Did anyone ever tell you that he had written in

 4      2007 that he had been on several medications in many mental

 5      hospitals, had a history of many attempts of suicide and

 6      violence due to being a Value Options patient and he had

 7      anxiety, was restless sometimes at night and couldn't sleep

 8      because things go on inside his head that shouldn't and that

 9      people were scared of him?

10              Did anyone tell you that?

11              Your answer was:  No.

12              The next question I asked:

13              Would that have helped you to do your job to know

14      that this person was a dangerous, paranoid schizophrenic?

15              And your answer was:  Possibly.

16              Did I read that correctly?

17      A   Correct.

18              MS. HESMAN:  Objection.  Asked and answered and it's

19      an improper impeachment.

20              THE COURT:  Overruled.

21              THE WITNESS:  Possibly.  But would it have changed

22      what I did that day?  No.

23      BY MR. ROBBINS:

24      Q   I'm sorry.  You just said that wouldn't change anything.

25              If they had trained you to react to information like

DIRECT EXAMINATION - STEVEN HANSEN

1    that, you would follow your training, correct?

2    A    Correct.

3    Q    So -- and there is no training of that sort because you

4    don't get that kind of information, correct?

5    A    Well, I was going off of how I feel.

6    Q    Well, you're not a trained --

7    A    If there was any red flags posed to me, so.

8    Q    Okay.  Let's talk about red flags.

9             If someone walks into the sally port, that's a red

10   flag, right?

11   A    Not necessarily.  Inmates go into unauthorized areas quite

12   frequently.  They do it to kind of push the envelope and test

13   us.

14   Q    According to Detention Officer Hewitt, it's the first time

15   that anyone just walked right into that sally port.

16            Are you saying that inmates walk all the time right

17   into the sally port?

18   A    For instance, when inmates are out in the day room,

19   they're supposed to remain off the top tier.  A lot of them

20   like to go up there.

21   Q    Okay.  But let's talk about the difference between a top

22   tier and the sally port.

23            The sally port is one door away from getting at the

24   officers, right?

25   A    Correct.

DIRECT EXAMINATION -   STEVEN HANSEN

1   Q   And you don't want anyone -- the top floor, someone might

2   do something up there on the top floor but that's not a danger

3   to the officers, correct?

4   A   No, but it could be a danger to themselves.  We don't know

5   if they're going to jump off.

6   Q   Yeah.  But you gave an example of people sometimes go up

7   there and they're not supposed to go up there.

8           Being in the sally port is a danger to the entire

9   facility, correct?

10  A   It's a security risk.

11  Q   And you have never had any -- you have never heard of

12  anyone doing that other than this case if Officer Hewitt

13  talked to you?

14  A   In my experience, no, but it doesn't mean that it hasn't

15  occurred before.

16  Q   Okay.  But that would be really unusual, fair?

17  A   It's a violation, yeah.  It's kind of unusual.

18  Q   If people start asking us -- I'm going to time this a

19  little bit just because for 40 seconds someone was saying:

20          "Where's Junior?  Where's Junior?  Junior.  Where's

21  Junior?  Junior.  Junior is here.  Junior.  Where's Junior?"

22          I'm at ten seconds, but if I go four times as long as

23  that, it will be 40 seconds.

24          MS. HESMAN:  Your Honor, this assumes facts.  There

25  has been no testimony that it was that long.

DIRECT EXAMINATION -   STEVEN HANSEN

1          THE COURT:  We'll let the jury recall the testimony.

2          Overruled.

3    BY MR. ROBBINS:

4    Q    If someone is asking those kind of questions about a

5    person that is not around, a person that's not missing, that's

6    something unusual and that would be a red flag for you, is

7    that fair?

8    A    I don't know what's going on inside his head.  Junior

9    could have been another inmate.  We don't know that.

10   Q    Well --

11   A    We don't know if someone doesn't exist and I never heard

12   him say that.

13   Q    Okay.  Because if you heard it, you would start saying:

14          Wait a second.  Is there a Junior around here?  Is

15   there someone that's missing?  Did someone escape.

16          You would start asking those questions and look at

17   it, right?

18          MS. HESMAN:  Objection, Your Honor.  Speculation and

19   it's also compound.

20          THE COURT:  Sustained.

21   BY MR. ROBBINS:

22   Q    If someone told you that they were looking for someone for

23   40 seconds without reacting to your input, that would cause

24   you concern that it was a red flag for mental illness that

25   this person needed to go to Mental Health, correct?

DIRECT EXAMINATION - STEVEN HANSEN

1    MS. HESMAN:  Objection, Your Honor.  Calls for

2  speculation.

3    THE COURT:  Sustained.

4  BY MR. ROBBINS:

5  Q   You talked about red flags.

6    A red flag is something that you're taught as a

7  detention officer to look at in order to determine whether or

8  not someone ought to be referred to Mental Health.

9    Is that a fair assessment?

10  A   What's your question?

11  Q   I said you were talking -- you used the term "red flag"?

12  A   Yeah.

13  Q   And I have heard that a couple times in this trial, so I

14  want to know --

15  A   Yeah.

16  Q   -- what is a -- tell us what a "red flag" is?

17    MS. HESMAN:  Objection, Your Honor.  Vague.

18    THE COURT:  Overruled.

19    THE WITNESS:  Regarding what?

20  BY MR. ROBBINS:

21  Q   Mental illness.  Signs of mental illness that clue you in

22  as a detention officer that you need to get this person to

23  Mental Health to evaluate whether or not they're having a

24  florid psychotic episode that they might need medication to

25  make the person calm enough and not crazy enough to be in the

DIRECT EXAMINATION - STEVEN HANSEN

```
 1   jail under your care, custody and control.
 2          MS. HESMAN:  Objection, Your Honor.  Foundation.
 3   Calls for speculation.
 4          THE COURT:  Sustained.
 5   BY MR. ROBBINS:
 6   Q   What is a "red flag" in the context that you used it for
 7   indicators of problems with mental health?
 8   A   For instance, if I heard an inmate possibly talking to
 9   themself or telling me that he is hearing voices.
10   Q   But if they're looking for someone who's not there, would
11   that be a red flag?
12          MS. HESMAN:  Objection, Your Honor.  Foundation.
13   Calls for speculation.
14          THE COURT:  Overruled.
15          THE WITNESS:  It would probably prompt me to put in a
16   Mental Health Referral.
17   BY MR. ROBBINS:
18   Q   Sure.  And if that person who is talking in a way that
19   you -- that raises that red flag but they won't go back to
20   their cell, that's another red flag, fair?
21   A   I suppose.
22          THE COURT:  Let's quit for the day and resume
23   tomorrow morning at 8:30.  8:30 tomorrow.  And we will recess
24   tomorrow at three o'clock.
25          And remember the admonition, please.
```

DIRECT EXAMINATION -   STEVEN HANSEN

1          (Proceedings adjourned at 5:02 p.m.)

2                              *  *  *

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT

DIRECT EXAMINATION - STEVEN HANSEN

```
 1

 2                    C E R T I F I C A T E

 3

 4          I, ELIZABETH A. LEMKE, do hereby certify that I am

 5   duly appointed and qualified to act as Official Court Reporter

 6   for the United States District Court for the District of

 7   Arizona.

 8          I FURTHER CERTIFY that the foregoing pages constitute

 9   a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13          DATED at Phoenix, Arizona, this 17th day of May,

14   2018.

15

16

17

18

19                         s/Elizabeth A. Lemke
                           ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25
```